UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 06-10427 |
| | ) | |
| JEFFREY SHIELDS | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 06-10439 |
| | ) | |
| JOEL WETMORE | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 06-10449 |
| | ) | |
| CHARLES PEAVY | ) | |
| | ) | |

## **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Page Kelley
      B.B.O. #548237
William Fick
      B.B.O. #650562
Judith Mizner
      B.B.O. #350160
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061


John Swomley
      B.B.O. #551450
Swomley & Associates
227 Lewis Wharf
Boston, MA 02110
Tel: 617-227-9443

<u>TABLE OF CONTENTS</u>

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.   Statutory Procedures. . . . . . . . . . . . . . . 2

    2.   Sexually Dangerous Person. . . . . . . . . . . . .3

    3.   Facial Challenges. . . . . . . . . . . . . . . . .4

I.    THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
    EXCEEDS CONGRESS' POWER UNDER ARTICLE I, SECTION 8
    AND IS INCONSISTENT WITH THE TENTH AMENDMENT. . . . . . . .4

    1.   The Act Exceeds Congress' Commerce Clause
       Power Because It Does Not Regulate The
       Use Of Interstate Commerce Channels,
       Instrumentalities Of Or Persons And
       Things In Interstate Commerce, Or Activities
       Substantially Affecting Interstate Commerce. . . . . .6

    2.   The Act Exceeds Congress' Commerce Power
       Because Even If It Regulates An Activity
       The Activity Does Not Substantially
       Affect Interstate Commerce. . . . . . . . . . . . .9

    3.   The Act Exceeds Congress' Power Under
       The Necessary and Proper Clause Because
       It Does Not Facilitate The Exercise of
       Any Enumerated Power. . . . . . . . . . . . . . .13

    4.   The Act Exceeds Congress' Power Under The
       Necessary and Proper Clause Because It
       Conflicts With The Federalist Structure
       Of The Constitution. . . . . . . . . . . . . . . 18

    5.   Conclusion. . . . . . . . . . . . . . . . . . .21

II.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
    DENIES DEFENDANTS' RIGHT TO EQUAL PROTECTION
    OF THE LAWS. . . . . . . . . . . . . . . . . . . . . . .21

    1.   The Act is Subject to Strict Scrutiny. . . . . . . 22

    2.   The Act Denies Defendants Equal Protection

Of The Laws Because The Class of All
Federal Prisoners Is Not Rationally Related
To the Governmental Purpose of Incapacitating
Sexually Dangerous Persons. . . . . . . . . . . . .23

3.   The Act Denies Defendants Equal Protection
Of The Laws By Arbitrarily Imposing Greater
Burdens On Federal Prisoners With A Particular
Type Of Mental Disorder. . . . . . . . . . . . . . 25

4.   Conclusion. . . . . . . . . . . . . . . . . . . . .29

III.  THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
SUBJECTS DEFENDANTS TO CRIMINAL PROCEEDINGS
WITHOUT AFFORDING THEM REQUIRED CONSTITUTIONAL
PROTECTIONS. . . . . . . . . . . . . . . . . . . . . . . .30

1.   Congress Intended to Act to Establish
Criminal Proceedings. . . . . . . . . . . . . . . .31

2.   The Act Is So Punitive In Purpose And
Effect That It Must Be Considered A
Criminal Statute. . . . . . . . . . . . . . . . . .33

3.   The Act Fails to Provide The
Constitutional Protections Required
In Criminal Proceedings. . . . . . . . . . . . . . 38

     a)   Ex Post Facto Clause. . . . . . . . . . . . . 38

     b)   Fourth Amendment. . . . . . . . . . . . . . . 39

     c)   Fifth Amendment. . . . . . . . . . . . . . . .40

     d)   Sixth Amendment. . . . . . . . . . . . . . . .40

     e)   Eighth Amendment. . . . . . . . . . . . . . . 41

4.   Conclusion. . . . . . . . . . . . . . . . . . . . .41

IV.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
DENIES DEFENDANTS DUE PROCESS OF LAW. . . . . . . . . . . 42

1.   The Act Violates Due Process Because it
Authorizes Indefinite Commitment of
Persons Who Have Never Been Convicted
of or Charged With a Sex Offense . . . . . . . . . 42

2.   The Act Deprives Defendants of Due
     Process of Law Because it Deprives them
     of Liberty Without a Preliminary Hearing
     or "Probable Cause" Determination. . . . . . . . . . 46

3.   The Act Denies Defendants Due Process
     Of Law Because It Fails To Provide For
     Adequate Notice, Proof Beyond A
     Reasonable Doubt, And Trial By Jury. . . . . . . . 49

4.   Conclusion. . . . . . . . . . . . . . . . . . . .57

V.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT
     VIOLATES DUE PROCESS AND CONTRAVENES ARTICLE I,
     SECTION 1 BY FAILING TO ADEQUATELY DEFINE KEY
     TERMS. . . . . . . . . . . . . . . . . . . . . . . .57

VI.  THE ACT IS A FACIALLY UNCONSTITUTIONAL DENIAL
     OF DUE PROCESS OF LAW BECAUSE THE EXPERT TESTIMONY
     IT REQUIRES IS INSUFFICIENTLY RELIABLE TO PROVIDE
     THE CLEAR AND CONVINCING EVIDENCE NEEDED FOR
     COMMITMENT AS A SEXUALLY DANGEROUS PERSON. . . . . . 61-62

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . .73

RESERVATION OF RIGHTS. . . . . . . . . . . . . . . . . 73

REQUEST FOR ORAL ARGUMENT. . . . . . . . . . . . . . . 74

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
            v.                  )    DOCKET NO.: 06-10427
                                )
JEFFREY SHIELDS                 )
                                )

UNITED STATES OF AMERICA        )
                                )
            v.                  )    DOCKET NO.: 06-10439
                                )
JOEL WETMORE                    )
                                )

UNITED STATES OF AMERICA        )
                                )
            v.                  )    DOCKET NO.: 06-10449
                                )
CHARLES PEAVY                   )
                                )

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants respectfully submit this memorandum of law in
support of their motion to dismiss commitment proceedings.  For
reasons described below, the statutory provisions that make up
the Jimmy Ryce Civil Commitment Program are facially
unconstitutional.

### INTRODUCTION

The Jimmy Ryce Civil Commitment Program (hereinafter "the
Act"), enacted as part of the Adam Walsh Child Protection and
Safety Act of 2006[1] and codified at Title 18, Sections 4247 and
4248, authorizes and provides procedures for the potentially

---

[1]      42 U.S.C. § 16901, et. seq.

lifetime commitment of a "sexually dangerous person" in the custody of the Bureau of Prisons (BOP) or the Attorney General (AG).

    1.   <u>Statutory Procedures</u>

Upon certification by the AG or the Director of the BOP that a prisoner is a "sexually dangerous person," and the filing of that certification with the clerk of the district court, the prisoner is held pending a court hearing.  <u>See</u> 18 U.S.C. § 4248(a).  There is no requirement that a prisoner have ever been convicted of or charged with a sexual offense to be certified as a sexually dangerous person.  <u>See</u> 18 U.S.C. § 4247(a)(5), (6).  The Act does not require that the initial certification take any particular form or contain any particular information, nor does it require that the certification be filed at a specific time before the prisoner's regularly scheduled release date.  <u>Id</u>. The Act does not provide for a preliminary hearing or any finding of probable cause for the certification decision by a neutral magistrate.  <u>Id</u>.

Between the initial certification and the hearing on the merits, the certificate is served on the prisoner, his counsel, and the government.  <u>Id</u>.  Additionally, the district court, "may order that a psychiatric or psychological examination" be conducted, "and that a psychiatric or psychological report be filed with the court" pursuant to Section 4247(b) and (c).  <u>See</u>

§ 4248(b).  Up to 75 days are allotted for completion of the evaluation once it is ordered by the court.  <u>See</u> § 4247(b).

At the hearing on the merits, the prisoner shall be represented by counsel and has the right to testify and present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine any testifying witnesses.  <u>See</u> § 4247(d).  If the court finds that the prisoner is a sexually dangerous person by clear and convincing evidence, he is committed to the custody of the AG.  <u>See</u> § 4248(d).  The prisoner has no statutory right to have a jury determine whether he is a sexually dangerous person.  <u>See</u> § 4248(c); § 4247(d).

The Act provides procedures for review of the prisoner's condition.  <u>See</u> § 4247(e)(1)(b).  Those procedures provide for an annual paper report, but do not require regularly scheduled court hearings.  <u>Id</u>.  The prisoner is barred from petitioning for his discharge within six months of a court finding that he remains, by a preponderance of the evidence, a sexually dangerous person.  <u>See</u> § 4248(e); § 4247(h).

2.    <u>"Sexually Dangerous Person"</u>

A "sexually dangerous person" is one, "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  § 4247(a)(5).  "Sexually dangerous to others" means, "that the

-3-

person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  § 4247(a)(6).

### 3.   Facial Challenges

Defendants raise a number of facial challenges to the Act:

I.    The Act exceeds Congress' authority under Article I, Section 8 and is inconsistent with the Tenth Amendment;

II.   The Act denies defendants equal protection of the laws;

III.  The Act subjects defendants to criminal proceedings without providing required constitutional protections;

IV.   The Act denies defendants due process of law by failing to provide necessary procedural protections;

V.    The Act denies defendants due process of law and illegitimately delegates legislative authority by failing to adequately define key terms; and

VI.   The Act denies defendants due process of law because the expert testimony it requires is insufficiently reliable to provide the clear and convincing evidence needed for commitment as a sexually dangerous person.

## I.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT EXCEEDS CONGRESS' POWER UNDER ARTICLE I, SECTION 8 AND IS INCONSISTENT WITH THE TENTH AMENDMENT.

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."  United States v. Morrison, 529 U.S. 598,607 (2000); See also Marbury v. Madison, 1 Cranch 137, 176 (1803) ("The powers of the legislature are

defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written."). Congress' powers are enumerated in the eighteen clauses of Article I, Section 8 of the Constitution. See U.S. Const. Art. I § 8. Of the eighteen clauses, only two are relevant to this case – the Commerce Clause and the Necessary and Proper Clause. See U.S. Const. Art. I § 8, cl. 3 & cl. 18.[2]

The Commerce Clause grants Congress the authority, "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I § 8, cl. 3. The Necessary and Proper Clause empowers Congress, "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its powers, "and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I § 8, cl. 18.

The Tenth Amendment makes explicit that powers not enumerated to Congress, the Executive, or the Judiciary, "are reserved to the States respectively, or to the people." U.S. Const., Amend. X. The Supreme Court has articulated two tests to determine whether a statute is consistent with the Tenth Amendment. "In some cases the Court has inquired whether an Act

---

[2]     The defendants assume that the government will not rely on obviously irrelevant powers of Congress, e.g., the Spending Clause and the Copyright Clause. See U.S. Const. Art. I § 8, cl. 1 & cl. 8.

of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution." New York v. United States, 505 U.S. 144, 155 (1992) (citations omitted). "In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment." New York, 505 U.S. at 155 (citations omitted).

Thus, if the Act is a constitutional exercise of congressional authority, that authority must derive from the Commerce Clause or the Necessary and Proper Clause.  If the statute cannot be justified under either clause, or if it upsets the federalist balance of government established by the Constitution, then it is also inconsistent with the Tenth Amendment.

For the reasons that follow, the defendants maintain that the Act is not authorized by the Commerce Clause or the Necessary and Proper Clause and that it therefore constitutes an ultra vires usurpation by the federal government of the police power that the Constitution commits to the states.

1.   The Act Exceeds Congress' Commerce Clause Power Because It Does Not Regulate The Use Of Interstate Commerce Channels, Instrumentalities Of Or Persons And Things In Interstate Commerce, Or Activities Substantially Affecting Interstate Commerce.

The Commerce Clause empowers Congress to regulate "three broad categories of activity."[3]  <u>United States v. Lopez</u>, 514 U.S. 549, 558 (1995)(citations omitted).  "First, Congress may regulate the use of the channels of interstate commerce." <u>Lopez</u>, 514 U.S. at 558 (citations omitted).  Second, Congress may regulate and safeguard the instrumentalities of interstate commerce, and persons and things in interstate commerce, even if they are threatened only by intrastate activities.  <u>See</u> <u>Lopez</u>, 514 U.S. at 558 (citations omitted).  Third, Congress possesses, "the power to regulate those activities...that substantially affect interstate commerce."  <u>Lopez</u>, 514 U.S. at 559 (citation omitted).

Thus, to determine whether Congress acted within its Commerce Clause authority in enacting the Act this Court must determine whether the statute fits within one of the three <u>Lopez</u> categories, <u>supra</u>.

The Act provides for the commitment as "sexually dangerous person(s)" of defendants in the custody of the Bureau of Prisons or the Attorney General, incompetent defendants, or defendants against whom all charges have been dismissed because of their mental condition.  <u>See</u> 18 U.S.C. § 4248(a).  The statute thus pertains only to persons in federal custody and does not

---

[3]      Hereinafter the three "<u>Lopez</u> categories."

regulate the use of the "channels" of interstate commerce as
required by the first Lopez category.  Cf. United States v.
Darby, 312 U.S. 100 (1941) (upholding Fair Labor Standards Act
as regulation of use of channels of interstate commerce
preventing shipment of goods produced under substandard working
conditions); Heart of Atlanta Motel, Inc. v. United States, 379
U.S. 241 (1964) (upholding public accommodations section of
Civil Rights Act of 1964 as regulation of use of interstate
commerce channels by travelers).

Because it affects only federal prisoners, the Act does not
regulate or protect instrumentalities, persons, or things "in"
interstate commerce and it does not fall under the second Lopez
category.  Cf. Shreveport Rate Cases, 234 U.S. 342 (1914)
(regulation of rates charged by interstate carriers permissible
as regulation of instrumentalities of interstate commerce);
Southern R. Co. v. United States, 222 U.S. 20 (1911) (upholding
Safety Appliance Act mandating safety features for vehicles to
be used in interstate commerce).

The Act also does not fit within the third Lopez category,
under which Congress is permitted to regulate "activities"
substantially affecting interstate commerce.  In fact, the Act
does not regulate "activities" at all.  The statute merely
governs the disposition of federal prisoners based on their past
conduct, present mental state, and predictions about their

-8-

future conduct.  No present, recent, imminent, or ongoing
activity by a prisoner is required to render the statute
applicable to him.  See 18 U.S.C. §§ 4248 & 4247; Cf., N.L.R.B.
v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937)(approving
National Labor Relation Act's regulation of intrastate unfair
labor practices by fourth largest steel producer in nation);
Maryland v. Wirtz, 392 U.S. 183 (1968) (upholding application of
Fair Labor Standards act to individuals employed by any
"enterprise" involved in interstate commerce).  Hence, the Act
does not regulate "activities" within the reach of the Commerce
Clause at all.

     2.    <u>The Act Exceeds Congress' Commerce Power Because Even
If It Regulates An Activity The Activity Does Not
Substantially Affect Interstate Commerce</u>.

Although the Respondents maintain that the Act does not
regulate "activities" at all, a very liberal reading of the
statute might yield a contrary conclusion.  Specifically, the
Act defines a "sexually dangerous person," in part, as, "a
person who has engaged or attempted to engage in sexually
violent conduct or child molestation..."  See 18 U.S.C. §
4247(5).  A permissive interpretation of the statute thus might
construe it as regulating the "activities" of sexually violent
conduct and child molestation.

Assuming *arguendo* that the Act does regulate these activities, the question remains whether sexually violent conduct and child molestation "substantially affect" interstate commerce as required to make the law a legitimate assertion of Congress' Commerce Clause authority under the third <u>Lopez</u> category.  <u>Lopez</u> and another recent Supreme Court case, <u>United States v.Morrison</u>, answer this question in the negative.

In <u>Lopez</u>, the Supreme Court struck down, as beyond Congress' Commerce Clause authority, the Gun-Free School Zones Act of 1990 (GFSZA), which criminalized possession of a firearm within a school zone.  <u>See</u> <u>Lopez</u>, 514 U.S. at 551.  The Court's invalidation of the statute rested on five grounds.

First, GFSZA was a criminal statute having nothing to do with commerce or any economic endeavor.  <u>See</u> <u>id</u>. at 561. Second, GFSZA was not an essential part of a larger scheme of economic regulation, such that the invalidation of the prohibition on intrastate gun possession would undermine the overall regulatory plan.  <u>See</u> <u>id</u>.  Third, GFSZA did not contain a federal jurisdictional element that could ensure, in any given case, that the intrastate gun possession at issue actually did "substantially affect" interstate commerce.  <u>See</u> <u>id</u>. at 561-62. Fourth, Congress had not compensated for the lack of a federal jurisdictional element by making findings substantiating the posited nexus between intrastate gun possession and interstate

-10-

commerce.  See id. at 562-63.  Fifth, the arguments purporting to demonstrate the substantial effects of intrastate gun possession on interstate commerce relied on a conjectural string of inferences that, if indulged, would upset the federal structure erected by the Constitution.  See id. at 567 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.").

Five years after Lopez, the Supreme Court reaffirmed the reasoning of that case in United States v. Morrison, 529 U.S. 598.  The Morrison court ruled that a civil damages provision of the Violence Against Women Act (VAWA) that permitted victims of intrastate gender-motivated violence to sue their attackers in federal court exceeded Congress' authority under the Commerce Clause.  See Morrison, 529 U.S. at 601-02.  The Court emphasized that it was rejecting, "...the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce" and noted that it was so holding despite the "numerous" Congressional findings supporting VAWA.  Id. at 614-17. Moreover, the Court again disavowed the piling of inference upon inference to demonstrate a substantial affect on interstate

commerce, finding that approach, "...unworkable if we are to maintain the Constitution's enumeration of powers":

> The Constitution requires a distinction between what is truly national and what is truly local...The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States...Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

Id. at 615-18 (citations omitted).

The reasoning of Lopez and Morrison fully applies to the Act.  Like the statutes in those cases, the Act regulates non-economic intrastate activities – sexually violent conduct and child molestation – and it is not an integral part of a larger scheme of economic regulation.  Moreover, Congress did not include a federal jurisdictional element in the Act, and it did not make findings supporting a nexus between sexually violent conduct, child molestation, and interstate commerce.  Finally, as with the statutes in Lopez and Morrison, any connection between the sexually violent conduct and child molestation regulated by the Act and interstate commerce must rest on a long chain of speculative inferences – e.g., that the specter of child molestation discourages parents from taking their children to unknown places, or from moving to new areas, thereby depressing the interstate tourism and housing markets.  Thus,

-12-

because it regulates conduct that does not substantially affect interstate commerce, the Act cannot be upheld as an exercise of Congress' Commerce Clause power under the third <u>Lopez</u> category.

> 3.  <u>The Act Exceeds Congress' Power Under The Necessary And Proper Clause Because It Does Not Facilitate The Exercise Of Any Enumerated Power</u>.

The seminal case interpreting the Necessary and Proper Clause is <u>M'Culloch v. Maryland</u>, 17 U.S. 316 (1819).  The question before the Court in <u>M'Culloch</u> was whether Maryland had the right to tax a branch of the Bank of the United States located within that state.  <u>See</u> <u>M'Culloch</u>, 17 U.S. at 318-19. To answer that question, the Court first needed to decide whether a statute incorporating a Bank of the United States was a, "...constitutional law(s) enacted by congress to carry into effect the powers vested in the national government." <u>Id</u>. at 323.  If so, then Maryland would, "...have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control" this legitimate exercise of power by the national sovereign.  <u>Id</u>.

The Court began by noting that the Constitution does not deny to the national government "incidental or implied powers." <u>Id</u>. at 406.  Instead, "...whether the particular power which may become the subject of contest, has been delegated to the one government, or prohibited to the other...depend(s) on a fair construction" of the Constitution as a whole.  <u>Id</u>. at 406-07.

-13-

Looking at the relevant constitutional provisions, the Court noted that Congress' enumerated powers include the authority, "...to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies." Id. at 407. Given these incontestable fiscal powers of Congress, the Court concluded that Congress must impliedly have the authority to create a national bank because the existence of a national bank would assist Congress in the exercise of those powers and, "[t]he power being given, it is the interest of the nation to facilitate its execution." Id. at 408 & 424.

Thus, the existence of enumerated congressional powers implies the allied power to take measures necessary and proper – or "plainly adapted to" – their execution, provided that the measures chosen do not contravene another constitutional prohibition. Id. at 421.

The legitimacy of a claim of authority under the Necessary and Proper Clause depends on whether the action asserted to be "necessary and proper" in fact facilitates the execution of an enumerated power. Any authority Congress possesses under the Necessary and Proper Clause is entirely derivative of, and adjunctive to, authority bestowed by another specific, enumerated power of the national government.

There is no decision addressing the Act's constitutionality under the Necessary and Proper Clause.  There are, however, several cases analyzing the similar federal competency statutes as an exercise of Necessary and Proper Clause authority.

In Greenwood v. United States, the Supreme Court was called upon to decide the constitutionality, under Title 18, Section 4244 (now Section 4241), of the indefinite involuntary commitment of an incompetent, dangerous federal criminal defendant who was unlikely ever to regain competency or to be safe to release.  See Greenwood, 350 U.S. 366 (1956).  At the time Section 4244 provided that the involuntary commitment of such a defendant must last, "...until sanity is restored, or until the prisoner's condition is so improved that he will not endanger the officers, property, or other interests of the United States..."  Greenwood, 350 U.S. at 368-69.

Eschewing a broad holding, the Court held that, "...in the context of this case" the defendant's indefinite commitment was, "...plainly within congressional power under the Necessary and Proper Clause."  Id. at 375.  The defendant was in the custody of the federal government legitimately, and the power authorizing his initial and continued detention remained:

> The petitioner came legally into the custody of the
> United States.  The power that put him into such custody
> – the power to prosecute for federal offenses – is not
> exhausted.  Its assertion in the form of the pending
> indictment persists...The fact that at present there may

be little likelihood of recovery does not defeat federal
power to make this initial commitment of the petitioner.
We cannot say that federal authority to prosecute has
now been irretrievably frustrated.

Id. Thus, because of the continued pendency of the indictment
against him, the defendant's ongoing commitment was necessary
and proper to assist the Executive in fulfilling its enumerated
power to "...take Care that the Laws be faithfully executed."
U.S. Const. Art. II § 3.

Other cases analyzing the federal competency scheme both
before and after Greenwood have articulated similar limits on
federal power under it, relying on a nexus between the
defendant's mental illness and his violation of the federal
criminal law to justify federal commitment, or ruling as
Greenwood did that it is the extant possibility of federal
prosecution that legitimizes the commitment. See e.g., United
States v. Sahhar, 917 F.2d 1197, 1203 (9th Cir. 1990)
(indefinite detention of incompetent and dangerous federal
criminal defendant justified because mental illness resulted in
violation of federal criminal law prohibiting threats to
President); Higgins v. United States, 205 F.2d 650, 652-53 (9th
Cir. 1953) (federal government has authority to temporarily
commit incompetent federal defendants awaiting trial but must
release them when, after a "reasonable time," they have not
regained competency); Kitchens v. Steele, 112 F.Supp. 383, 387

-16-

(W.D. Mo. 1953) (power of federal government to indefinitely commit incompetent federal defendant hinges on now obsolete language of Section 4247 requiring showing that if released, "he will probably endanger the safety of the officers, the property, or other interests of the *United States...*") (emphasis added).

Unlike commitment under Section 4246 or its predecessors, commitment under the Act is not connected in any meaningful way to the federal criminal process.  To be subject to the Act, it is not necessary for a potential committee to be incompetent to stand trial, enter a plea of not guilty by reason of insanity, or even stand accused or convicted of a federal sex offense.  Indeed, the Act does not require the existence of a pending federal indictment of any kind for its operation.

Thus, in contrast to Section 4246, Congress' assertion of authority under the Act cannot be sustained as a necessary and proper means to facilitate the Executive's law enforcement function.  In fact, the Act is an expansive assertion of national power untethered to any constitutional grant of authority and depending for its invocation only on the chance and arbitrary circumstance that a potential committee find himself in the custody of the Attorney General or the Bureau of Prisons. See 18 U.S.C. § 4248(a).  This happenstance occurrence is simply inadequate to imbue the government with the authority it seeks in the Act.

4. <u>The Act Exceeds Congress' Power Under The Necessary
And Proper Clause Because It Conflicts With The
Federalist Structure Of The Constitution</u>.

The Necessary and Proper Clause is, "...the last, best hope
of those who defend ultra vires congressional action." <u>Printz
v. United States</u>, 521 U.S. 898, 923 (1997).  But the Necessary
and Proper Clause is merely an instrumentality for effectuating
enumerated Congressional powers, and a law claimed to be
necessary and proper is neither if it conflicts with another
constitutional provision.  See <u>Printz</u>, 521 U.S. at 923-24 ("When
a 'La[w]...for carrying into Execution' the Commerce Clause
violates the principle of state sovereignty reflected in the
various constitutional provisions...it is not a 'La[w]...*proper*
for carrying into Execution the Commerce Clause,' and is
thus...'merely [an] ac[t] of usurpation' which deserve[s] to be
treated as such.'" (citations omitted)); <u>M'Culloch</u>, 17 U.S. at
421 (even if end of legislation is constitutional, means
employed to achieve end must be consistent, "with the letter and
spirit of the constitution" and must not be prohibited by it).

As argued <u>supra</u>, the Act is not a necessary and proper
means of facilitating any enumerated power, and it is
unconstitutional for that reason.  Beyond that, however, the Act
is also unconstitutional because it upsets the federal structure
of government established by the Constitution.

"'The several states in their character as parens patriae have general power and are under the general duty of caring for insane persons.  The prerogative is a segment of the police power.'" <u>Higgins v. United States</u>, 205 F.2d 650, 653 (9th Cir. 1953) (citation omitted); <u>See</u> <u>also</u> <u>Gonzalez v. Oregon</u>, 126 S.Ct. 904, 923 (2006) (federalism permits the states, "'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort and quiet of all persons.'"); <u>Morrison</u>, 529 U.S. at 618 (founders denied federal government police power); <u>Lopez</u>, 514 U.S. at 566-67 (plenary police power retained by states and denied to Congress by the Constitution).

Courts have repeatedly recognized that Congress, in enacting the federal competency statutes, observed the federalist limitations imposed by the Constitution by limiting their applicability to the few circumstances in which a genuine federal interest was present.  <u>See</u> <u>United States v. Charters</u>, 829 F.2d 479, 487 (4th Cir. 1987) ("As the legislative history unequivocally states, Congress considered the care and custody of the mentally ill to be a state function and not a task for the federal government."); <u>United States v. Baker</u>, 807 F.2d 1315, 1324 (6th Cir. 1986) (Congress placed limitations on use of Section 4246 commitment procedures because it believed, "...that it 'is essentially the function of the States' to provide care and treatment to mentally ill individuals whose

sentences are about to expire or who no longer face federal charges because of their illness."); United States v. Clark, 617 F.2d 180, 184 n. 5 (9th Cir. 1980) ("The determination of legal competency by a federal court is limited to the purposes of a criminal trial in that court...The passage of 18 U.S.C. ss 4244 and 4246 was not intended to be an invasion of the general field of lunacy, which is reserved to the states.").

In contrast to the federal competency statutes, which apply in limited circumstances and even mandate continuing efforts by the Attorney General to find state placements for committed individuals,[4] the Act is a limitless encroachment into an area that is traditionally and properly the domain of the states. Applying to anyone in the custody of the Attorney General or the Bureau of Prisons, it does not contain the inherent limitations on application of Section 4246, nor does it require repeated efforts by the Attorney General to find state placement for committees.  Compare 18 U.S.C. § 4246(a), (d) with 18 U.S.C. § 4248(a), (d).  And, the Act effects this major change in the distribution of power between the federal and state governments even though Congress has not provided any evidence – "an express statement of pre-emption or...pervasive regulation" of the area of mental health, for example – that this shift was its "clear

---

[4]     See 18 U.S.C. § 4246(d).

and manifest" goal in passing the Act.  Commonwealth of
Massachusetts v. Federal Deposit Insurance Corporation, 102 F.3d
615, 622 (1st Cir. 1996); See also, Puerto Rico Department of
Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 500
(1988). In the absence of such evidence, this Court should not
deem constitutional the radical revision of the federal
structure that is the result of the Act.

     5.   Conclusion

     The Act is not a valid exercise of Congress' Commerce
Clause power, nor is it a law Necessary and Proper to the
exercise of another enumerated power of the national government.
Furthermore, it represents a limitless expansion of the federal
government into an area of sovereignty reserved to the states.
The Act thus exceeds Congress' power under Article I, Section 8
of the Constitution and is inconsistent with the Tenth
Amendment.  It is therefore facially unconstitutional.

## II.  THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT DENIES DEFENDANTS' RIGHT TO EQUAL PROTECTION OF THE LAWS.

     The Equal Protection Clause of the Fourteenth Amendment
commands that "no state shall deny to any person within its
jurisdiction the equal protection of the laws," which is
"essentially a direction that all persons similarly situated
should be treated alike."  City of Cleburne v. Cleburne Living
Center, 473 U.S. 432, 439 (1985) (internal citation and

quotation marks omitted).  A federal law that violates equal
protection is likewise unconstitutional because "if a
classification would be invalid under the Equal Protection
Clause of the Fourteenth Amendment, it is also inconsistent with
the due process requirement of the Fifth Amendment." Johnson v.
Robison, 415 U.S. 361, 366 n.4 (1974).

Here, the Act violates equal protection in two separate
ways.  First, the Act arbitrarily singles out a class of persons
– all federal prisoners, whether or not ever convicted of a sex
crime – as eligible for possible lifetime civil commitment as
"sexually dangerous."   Second, the Act arbitrarily subjects one
class of mentally ill federal prisoners – those with a disorder
that results in a "serious difficulty in refraining from
sexually violent conduct or child molestation" – to greater
procedural and substantive burdens than those imposed on
mentally ill federal prisoners whose disorder poses a generic
"substantial risk of serious bodily injury to another person."

1.   The Act Is Subject to Strict Scrutiny.

Neither of these classifications can pass constitutional
muster, regardless of the level of scrutiny the Court applies.
Nevertheless, the Court should apply strict scrutiny in
evaluating the Act.

The "Supreme Court has not squarely addressed the
appropriate level of scrutiny to apply to civil commitment

statutes." <u>Hubbart v. Knapp</u>, 379 F.3d 773, 781 (9th Cir. 2004).
Ordinarily "legislation is presumed to be valid and will be
sustained if the classification drawn by the statute is
rationally related to a legitimate state interest" or government
purpose. <u>Cleburne</u>, 473 U.S. at 440. However, classifications
of a suspect class, e.g., race, national origin, and laws that
impinge on fundamental rights are subject to strict scrutiny and
can be sustained only if narrowly tailored to serve a compelling
state interest. <u>See</u> <u>Id</u>.

Because civil commitment may result in a lifetime
deprivation of liberty, strict scrutiny should apply. <u>See</u>
<u>Foucha v. Louisiana</u>, 504 U.S. 71, 85-86 (1992) ("Freedom from
physical restraint being a fundamental right, the State must
have a particularly convincing reason, which it has not put
forward, for such discrimination against insanity acquittees who
are no longer mentally ill."). Here, in any event, the Act
fails even under the more relaxed "rational basis" standard.

2.   <u>The Act Denies Defendants Equal Protection Of The Laws</u>
     <u>Because The Class Of All Federal Prisoners Is Not</u>
     <u>Rationally Related To The Governmental Purpose Of</u>
     <u>Incapacitating Sexually Dangerous Persons</u>.

The Act authorizes the Attorney General or the Director of
the Bureau of Prisons to certify as "sexually dangerous"persons
who are in the custody of the Bureau of Prisons, persons who
have been committed to the custody of the Attorney General after

being found incompetent to stand trial, or persons against whom criminal charges have been dismissed solely for reasons related to mental condition.   See 18 U.S.C. § 4248(a).  Put another way, the Act potentially subjects every federal prisoner, simply by virtue of being a federal prisoner, to an evaluation process that can result in lifetime civil commitment.

The class of persons in federal custody bears no correlation, let alone a rational relation, to the governmental purpose of incapacitating "sexually dangerous" individuals. "Based upon the most recent data . . . it is estimated that rape and sexual assault offenders account for about 1% of those serving time in Federal Prisons."  Sex Offenders and Offense, Bureau of Justice Statistics (revised 2/6/1997) at 16-17.  This is hardly surprising; since the federal government lacks a general police power to prosecute violent crime, the federal prison population contains relatively few sexually violent offenders and child molesters.  See e.g, United States v. Morrison, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

There is simply no logical nexus between the class of all federal prisoners and the purpose animating the Act; the fact that a person may have robbed a bank or distributed narcotics

has no bearing on the question of whether that person should be subject to evaluation for possible civil commitment as a sexually dangerous person.  Notably, in contrast, the pre-existing federal civil commitment scheme is more narrowly targeted and may be invoked only against persons in custody who are already hospitalized for treatment of mental illness.  See 18 U.S.C. § 4246.

All persons in federal prison are subject to commitment proceedings under the Act at the pleasure of the director of the Bureau of Prisons.  Persons outside of federal prison can never be subjected to such proceedings.  As the Supreme Court has noted, the government "discriminates . . . in violation of the Equal Protection Clause of the Fourteenth Amendment" when it can invoke a particular civil commitment proceeding simply because the target "at one time committed a criminal act." Foucha, 504 U.S. at 84-85 .  Likewise here, the Act denies defendants equal protection of the laws because it arbitrarily exposes only those who happen to be in federal custody – for the most part, persons who have committed a federal crime – to commitment as "sexually dangerous" under the Act.

3.   The Act Denies Defendants Equal Protection Of The Laws By Arbitrarily Imposing Greater Burdens On Federal Prisoners With A Particular Type Of Mental Disorder.

Under the Act, federal prisoners with a particular type of mental disorder – one resulting in "serious difficulty in

-25-

refraining from sexually violent conduct or child molestation,"
18 U.S.C. 4247(a)(6) – are subjected to a civil commitment
scheme that confers fewer procedural rights and imposes more
substantive burdens than the pre-existing civil commitment
scheme applicable to federal prisoners who pose some other kind
of "substantial risk of serious bodily injury to another
person," 18 U.S.C. 4246(a).  This type of discrimination among
purportedly "dangerous" mentally ill federal prisoners violates
the Equal Protection Clause.  See e.g., Baxstrom v. Herold, 383
U.S. 107 (1966); Humphrey v. Cady, 405 U.S. 504 (1972); Jackson
v. Indiana, 406 U.S. 715 (1972).

     The civil commitment scheme created by the Act differs from
the pre-existing federal civil commitment scheme codified at
Title 18, Section 4246  in at least two important ways:

     First, the pre-existing civil commitment scheme applies only
to persons in custody who are already hospitalized.  The Act, in
contrast, contains no such requirement and may be invoked against
any person in custody.  Compare 18 U.S.C. § 4246 (pre-existing
commitment scheme) with 18 U.S.C. § 4248 (the Act as codified).

     The hospitalization requirement is important because there
are multiple substantive and procedural hurdles that the
government must clear before a prisoner can be hospitalized in
the first place.  See 18 U.S.C. § 4245 (provision governing
hospitalization of prisoners alleged to have mental disorder

requiring treatment).  Among other things, a prisoner may object
to hospitalization, which automatically stays any transfer.  <u>See</u>
<u>id</u>.  At that point, the government may move for a hearing, which
the court shall grant only upon determination that there is
"reasonable cause to believe that the person is suffering from a
mental disease or defect for the treatment of which he is in need
of custody for care or treatment in a suitable facility."  <u>Id</u>.
The court may order hospitalization only after a full hearing, at
which the government bears the burden of proof by a preponderance
of the evidence.  <u>See id</u>.  Persons subject to commitment under
section 4246 thus have had the benefit of access to extensive
legal proceedings that persons subject to commitment under the
Act do not enjoy.

     Second, the pre-existing commitment scheme requires ongoing
efforts by the Attorney General to transfer committed persons to
state custody.  <u>See</u> 18 U.S.C. § 4246(d) ("The Attorney General
shall continue periodically to exert all reasonable efforts to
cause such a State to assume such responsibility for the person's
custody, care and treatment."  The Act contains no parallel
provision.  <u>See</u> 18 U.S.C. 4248(d).

     There is no rational basis for these distinctions, as
Supreme Court precedent demonstrates.  In <u>Baxstrom</u>, for example,
the Supreme Court struck down a New York law that subjected
prisoners nearing release who are suspected of mental illness to

a different civil commitment procedure than non-prisoners
suspected of mental illness.  Specifically, in contrast to other
mentally ill persons, prisoners were not afforded the right to a
jury trial on the question of their sanity and were not afforded
a judicial proceeding to determine whether commitment should be
to a civil or correctional mental hospital.  See 383 U.S. at 111-
12.  The Court explained:

> Equal protection does not require that all persons be
> dealt with identically, but it does require that a
> distinction made have some relevance to the purpose for
> which the classification is made.  Classification of
> mentally ill persons as either insane or dangerously
> insane of course may be a reasonable distinction for
> purposes of determining the type of custodial or medical
> care to be given, but it has no relevance whatever in the
> context of the opportunity to show whether a person is
> mentally ill at all.  For purposes of granting judicial
> review before a jury of the question whether a person is
> mentally ill and in need of institutionalization, there
> is no conceivable basis for distinguishing the commitment
> of a person who is nearing the end of a prison term from
> all other civil commitments.

Id.  Here, the distinction between Sections 4246 and 4248 among
purportedly "dangerous" mentally ill prisoners has even less of a
rational basis than the state's efforts in Baxstrom to
distinguish the "civilly insane" from the "criminally insane."

    Similarly, in Jackson, the Court struck down an Indiana
statute that subjected pretrial detainees to a lower commitment
standard and more stringent release standard than those
applicable to persons not charged with offenses.  The Court
explained:

-28-

> Baxstrom held that the State cannot withhold from a few
> the procedural protections or the substantive
> requirements for commitment that are available to all
> others . . . . [W]e hold that by subjecting [petitioner]
> to a more lenient commitment standard and to a more
> stringent standard of release than those generally
> applicable to all others not charged with offenses, and
> by thus condemning him in effect to permanent
> institutionalization without the showing required for
> commitment or the opportunity for release afforded [to
> all others], Indiana deprived petitioner of the equal
> protection of the laws . . . .

406 U.S. at 729-30.

Finally, in Cady, the Supreme Court applied the Baxstrom

line of cases to a state sex offender commitment statute by

remanding for an evidentiary hearing a constitutional challenge

to a Wisconsin law that failed to provide the right to a jury

trial in proceedings to extend a commitment.  The Court noted:

> The equal protection claim would seem to be especially
> persuasive if it develops on remand that petitioner was
> deprived of a jury determination, or of other procedural
> protections, merely by the arbitrary decision of the
> State to seek his commitment under one statute rather
> than the other.

405 U.S. at 512.  The very same potential for arbitrary and

discriminatory "statute shopping" is present here because the

government can circumvent the rights embedded in Sections 4245

and 4246 by seeking commitment under the Act.

4.   Conclusion

The Act denies defendants equal protection of the laws

because it classifies them, as federal prisoners, in a fashion

that bears no rational relationship to a legitimate governmental

-29-

interest.  Additionally, it denies defendants equal protection of the laws by arbitrarily subjecting them to greater burdens and providing them with fewer protections than other allegedly dangerous, mentally ill persons in federal custody.  For those reasons, the Act is facially unconstitutional.


**III. THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT SUBJECTS DEFENDANTS TO CRIMINAL PROCEEDINGS WITHOUT AFFORDING THEM REQUIRED CONSTITUTIONAL PROTECTIONS.**

"The categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction.'" Kansas v. Hendricks, 521 U.S. 346, 361 (1997) (citation omitted). The first step in the process of statutory construction is to determine if Congress intended the law to establish civil or criminal proceedings.  See Hendricks, 521 U.S. at 361.  To make this determination, a court must examine the text and structure of the statute to ascertain whether Congress, "'...indicated either expressly or impliedly a preference for one label or the other.'" Smith v. Doe, 538 U.S. 84, 93 (2002) (citation omitted).

Even if the legislature has labeled a statute "civil" that designation will not control where, "'the statutory scheme [is] so punitive in either purpose or effect as to negate [the State's] intention' to deem it 'civil.'" Hendricks, 521 U.S. at 361 (citation omitted).  To determine whether a statute is so

-30-

punitive in purpose or effect that it qualifies as a criminal law notwithstanding its civil label, the Supreme Court has listed a number of factors for lower courts to consider:

> Whether the sanction involves an affirmative disability or restraint, whether it has been historically regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment - retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned...

Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963).

1. Congress Intended The Act To Establish Criminal Proceedings.

On the face of the Act the lone factor weighing in favor of a determination that Congress intended it to establish civil proceedings is that it entitled the Act, "Civil commitment of a sexually dangerous person." 18 U.S.C. § 4248. On the other hand, there are two powerful indications that Congress intended the Act to establish criminal proceedings.

First, Congress' definitions of key terms make it abundantly clear that the Act, like any criminal statute, is primarily intended to protect the public. Congress provided that a "sexually dangerous person" is someone, "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." § 4247(a)(5) (emphasis added). "Sexually dangerous to others"

means, "that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  § 4247(a)(6).  The Act is thus focused on the preventive incarceration of persons alleged to be predisposed to commit criminal acts against others to the exclusion of concern for the welfare and protection of the committee himself.  This distinguishes the Act from a traditional civil commitment scheme, in which concern for the welfare of the committed person is equal to, or paramount over, concern for the safety of third parties.  Cf. Addington v. Texas, 441 U.S. 418, 420 (1979) (Texas commitment statute provided for hospitalization for committee's "own welfare and protection or the protection of others")(emphasis added).

Second, Congress placed the Act in Title 18 of the United States Code, governing crimes and criminal procedure.  See 18 U.S.C. § 4248.  The Act was passed as one part of the Adam Walsh Child Protection and Safety Act of 2006 (Walsh Act).  See 42 U.S.C. § 16901, et. seq.  The Walsh Act consists of forty-eight separate statutes that are all related, in various ways, to the control of sex offenders and the protection of children.  See, e.g., 42 U.S.C. § 16914 (listing sex offender biographical information to be included in national registry); 42 U.S.C. § 16987 (making available grants for online child safety programs

-32-

to states, localities, and non-profit organizations).  Of those forty-eight statutes *only six*, including Section 4248, were placed in the federal criminal code.  See 18 U.S.C. § 2250 (criminal penalties for failure to register as a sex offender); § 3299 (eliminating statute of limitations for child abduction and sexual offenses involving children); § 2257A (criminalizing failure to keep records of simulated sexual conduct); § 2260A (providing additional penalty for registered sex offenders who commit sex crimes); § 2252C (criminalizing the use of deception to lure viewers to online pornography).

Thus, the Act keeps company in Title 18 with five other Walsh Act statutes, all of which either criminalize sex-related conduct, enlarge the time for prosecution of sex crimes, or provide for augmented punishment for sex offenders.  Had Congress intended the Act to establish civil proceedings, it could easily have placed the statute in Title 42, governing the public health and welfare, with the other forty-two statutes comprising the Walsh Act.  That Congress chose not to do so is decisive evidence that it intended the Act to establish criminal proceedings.

   2.   The Act Is So Punitive In Purpose And Effect That It Must Be Considered A Criminal Statute.

The conclusion that Congress intended the Act to establish criminal proceedings is only supported by an application of the Mendoza-Martinez factors, which demonstrates that the Act does,

in fact, establish criminal proceedings that punish "sexually dangerous person(s)."

First, the Act obviously imposes an affirmative disability or restraint – if committed, a "sexually dangerous person" is subject to an indefinite term of detention.  See 18 U.S.C. § 4248(d), (e).  Release from incarceration may be "conditional" upon the offender's ongoing compliance with a treatment regime and the offender may be re-institutionalized for straying from the ordered treatment.  § 4248(f).  Thus, like a probationer or a defendant on supervised release, even when he is at liberty a sexually dangerous person is subject to affirmative restraints.

Second, the indefinite detention by the federal government of sexually dangerous persons is decidedly the kind of sanction that has historically been regarded as punishment.  As the Supreme Court has noted, "[I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual.  Whether we label this phenomena 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual."  Addington v. Texas, 441 U.S. 418, 425-26 (1979).  In the case of the Act, this stigma is augmented by branding as a "sexually dangerous person" and indefinite banishment from society, a measure that has long been

-34-

regarded as punishment.  See Lawrence M. Friedman, Crime and Punishment In American History 40 (1993) (banishment, or total exclusion from the community, was colonial punishment for the permanently dangerous and repeat offenders).

Third, commitment under the Act comes into play only on a finding of scienter.  The statute requires that the court find, by clear and convincing evidence, that the potential committee is a "sexually dangerous person."  18 U.S.C. § 4248(d).  To make that finding, the court must determine by clear and convincing evidence that the committee has, "engaged or attempted to engage in sexually violent conduct or child molestation..."  18 U.S.C. § 4247(a)(5).

Although the statute does not define "sexually violent conduct," presumably Congress did not intend, absurdly, to incarcerate persons who engaged in objectionable sexual conduct by mistake or accident.  Thus, the finding that a committee has engaged in sexually violent conduct or child molestation necessarily represents a finding that the conduct was engaged in with a culpable mental state akin to the mens rea of a criminal statute.  See e.g., 18 U.S.C. § 2241(a) (aggravated sexual abuse requires perpetrator to "knowingly" use force or threats to cause another to engage in sexual acts); 18 U.S.C. § 2251A (prohibited transfers of custody of children requires transfer be made with knowledge that child will be used in sexually explicit visual

depiction or with intent that child engage in sexual act for purpose of producing such visual depiction).

Fourth, indefinite commitment of sexually dangerous persons serves the purposes of retribution and deterrence.  The statute predicates incarceration and stigmatizing denomination as a "sexually dangerous person" on a finding that the committee has committed, or attempted to commit, conduct amounting to a crime. It therefore serves a retributive purpose.  See Note, Toward A Constitutional Definition of Punishment, 80 Colum. L. Rev. 1667, 1678-81 (1980) ("Punishment is the deprivation of legal rights in response to a prior offense for the purpose of deterrence and social condemnation.").

And, the Act serves the purpose of both general and specific deterrence - general deterrence by dissuading other sexually dangerous persons from engaging in prohibited conduct, and specific deterrence both by the physical incapacitation of the committee for the duration of his incarceration, and by influencing him not to re-offend and risk re-commitment.  See United States v. Brown, 381 U.S. 437, 458 (1965) ("One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment."); 4 W. Blackstone, Commentaries 11-12 (incapacitation as a purpose of criminal punishment).

Fifth, although the Act does not define "sexually violent conduct," the term is presumably meant to indicate behavior amounting to a crime, as the term "child molestation" certainly does.  Thus, the Act applies to behaviors that are already criminal.

Sixth, it is impossible to conclude that an alternative purpose to punishment may rationally be assigned to the Act.  The government refuses to provide the defendants with any information concerning what treatment, if any, will be offered to committees under the Act.  This refusal leaves a record devoid of any suggestion of an alternative purpose for the statute.  See Hendricks, 521 U.S. at 382 (Breyer, J., dissenting) (focus on treatment, "...as a kind of touchstone helping to distinguish civil from punitive purposes, is not surprising, for one would expect a nonpunitive statutory scheme to confine, not simply in order to protect, but also in order to cure.").

Seventh, assuming that the claimed alternative purpose for the Act will be treatment, the statutory scheme is excessive in relation to that purpose.  The statute mandates commitment on a finding of sexual dangerousness without considering whether gradations of dangerousness might warrant less restrictive approaches in some cases.  See § 4248(d).  Additionally, the statute fails to provide reasonable review procedures, mandating only an annual paper report on the committee's condition, rather

-37-

than providing for more frequent reports or hearings.  <u>See</u> §
4247(e)(B).  This infrequency of review is compounded by the
provision denying committees the right to petition for their
release within six months of a court finding that they remain
sexually dangerous.  § 4247(h).

3.   <u>The Act Fails To Provide The Constitutional Protections</u>
     <u>Required In Criminal Proceedings</u>.

Because it establishes criminal proceedings, the Act should
provide for the full panoply of protections offered criminal
defendants by the Constitution, as follows.

a.   <u>Ex Post Facto Clause</u>

Article I Section 9 prohibits Congress from passing any ex
post facto law.  <u>See</u> U.S. Const. Art. I § 9.  An ex post facto
law is a law, "'which imposes a punishment for an act which was
not punishable at the time it was committed; or imposes
additional punishment to that then prescribed.'" <u>Weaver v.
Graham</u>, 450 U.S. 24, 28 (1981) (citation omitted).

The Act creates the additional punishment of indefinite
federal incarceration for sexually violent conduct or child
molestation that took place before its passage. Additionally, if
the undefined terms "sexually violent conduct" and "child
molestation" are construed to apply to conduct that was not
criminalized at the time it was committed, the Act will punish
acts for which punishment was not prescribed at the time of

-38-

commission.  Under either scenario, the Act is an
unconstitutional violation of the ex post facto clause.

      b.   <u>Fourth Amendment</u>

The Act authorizes the detention, pending a court hearing,
of a potential committee on the certification of the Attorney
General, his designee, or the Director of the Bureau of Prisons.
<u>See</u> § 4248(a).  The statute does not specify the evidentiary
burden a certification must satisfy, nor does it call for the
evidence prompting the potential committee's incarceration to be
evaluated by a neutral magistrate.  <u>Id.</u>; <u>Gerstein v. Pugh</u>, 420
U.S. 103, 114 (1975) ("[T]he Fourth Amendment requires a judicial
determination of probable cause as a prerequisite to extended
restraint of liberty following arrest.").  The Act thus effects a
de facto arrest without a showing of probable cause.  <u>See</u> <u>Dunaway
v. New York</u>, 442 U.S. 200, 212-13 (1979); <u>United States v.
Trueber</u>, 238 F.3d 79, 93 (1st Cir. 2001).

Any and all evidence or statements tainted by this
unconstitutional seizure must therefore be excluded from trial on
the issue of sexual dangerousness.  <u>See</u> <u>Brown v. Illinois, 422
U.S. 590</u>, 603-04 (1975); <u>Wong Sun v. United States</u>, 371 U.S. 471,
484-85 (1963).  It is the government's burden to demonstrate that
the evidence on which it seeks to rely is not tainted by the

illegal seizure.  See Brown, 422 U.S. at 604 (citing Nardone v. United States, 308 U.S. 338, 342 (1939)).

        c.   Fifth Amendment

The Act authorizes incarceration in excess of one year in a penitentiary-like setting.  It is therefore arguably an "infamous crime" for which grand jury indictment is required.  See United States v. Colt, 126 F.3d 981, 984-86 (7th Cir. 1997); See also Fed. R. Crim. P. (a)(1)(B).

Moreover, the potential committee enjoys the Fifth Amendment's protections against self-incrimination.  Thus, if the government wishes to interrogate a potential committee, it must first provide Miranda rights.  See  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Any statements obtained without benefit of Miranda warnings, or in disregard of a committee's invocation of his right to remain silent or to speak with an attorney, must be excluded from evidence against him.  See United States v. Browne, 891 F.2d 389, 394 (1st Cir. 1989); United States v. Downing, 665 F.2d 404, 406 (1st Cir. 1981).  Moreover, these protections apply even to interrogations occurring during incarcerations unrelated to the Act.  See Mathis v. United States, 391 U.S. 1 (1968); Palmigiano v. Baxter, 510 F.2d 534 (1st Cir. 1975).

        d.   Sixth Amendment

The committee is entitled to a speedy and public trial and to a determination of the facts of his case by an impartial jury

of his peers.  See Barker v. Wingo, 407 U.S. 514 (1972); Waller
v. Georgia, 467 U.S. 39 (1984); Duncan v. Louisiana, 391 U.S. 145
(1968).  The indictment in his case must include all of the
essential elements of the offense of being a sexually dangerous
person as well as sufficient information and detail so that he
may be protected against double jeopardy.  See United States v.
Resendiz-Ponce, 127 S.Ct. 782 (2007).  The committee enjoys the
right to confront the witnesses against him, and the right to
compulsory process to secure the testimony of his own witnesses.
See Crawford v. Washington, 541 U.S. 36 (2004); United States v.
Scheffer, 523 U.S. 303 (1998).  Finally, the committee is
entitled to the assistance of counsel upon the filing of the
certification document, which constitutes the beginning of formal
adversarial proceedings.  See Moran v. Burbine, 475 U.S. 412
(1986).

       e.   Eighth Amendment

The committee enjoys a right to bail that is not excessive
and, assuming he is ultimately found to be a sexually dangerous
person, the penalty imposed on him must not be grossly
disproportionate to the gravity of his offense as measured by
evolving standards of decency.  See United States v. Montalvo-
Murillo, 495 U.S. 711 (1990); Roper v. Simmons, 543 U.S. 551
(2005).

    4.   Conclusion

Congress intended the Act to establish criminal proceedings and, in fact, proceedings under the Act are so punitive in purpose and effect that it must be considered a criminal law. The Act is therefore facially unconstitutional because it subjects Defendants to criminal proceedings without providing them with the protections afforded criminal defendants under the Constitution.

## IV.   THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT DENIES DEFENDANTS DUE PROCESS OF LAW.

The Fifth Amendment to the United States Constitution provides that "no person shall be . . . deprived of . . . liberty . . . without due process of law."  Key elements of due process, recognized over centuries, include the requirements that deprivations of liberty must be based only on reliable evidence, that an individual must be afforded a prompt hearing before a judge to test the basis for a deprivation of liberty, and that the procedures employed in a proceeding are calculated to minimize the risk of an erroneous deprivation of liberty and other interests.

1.   <u>The Act Violates Due Process Because it Authorizes Indefinite Commitment of Persons Who Have Never Been Convicted of or Charged with a Sex Offense</u>.

In order to commit a person as "sexually dangerous" under the Act, the Court must find that the respondent, "has engaged or attempted to engage in sexually violent conduct or child

molestation."  18 U.S.C. § 4247(a)(5).  Notably, the Act neither
defines these terms nor requires that the prior conduct finding
be predicated on an actual criminal conviction or charge, in
stark contrast to similar statutes that have survived
constitutional challenges.  The lack of such critical components
– clearly defined statutory terms and indicia of reliability
conferred by criminal proceedings – violates Defendants' right to
due process.

Because the Act authorizes indefinite detention, heightened
procedural safeguards must apply.  As the Supreme Court has
observed:

> [G]overnment detention violates th[e Due Process] Clause
> unless the detention is ordered in a <u>criminal</u> proceeding
> with adequate procedural protections, or, in certain
> special and narrow nonpunitive circumstances, where a
> special justification, such as harm-threatening mental
> illness, outweighs the individual's constitutionally
> protected interest in avoiding physical restraint.

<u>Zadvydas v. Davis</u>, 533 U.S. 678, 690 (2001) (internal citations
and quotation marks omitted).  The Court consistently has:

> upheld preventive detention based on dangerousness <u>only</u>
> when limited to specially dangerous individuals and
> subject to strong procedural protections. . . . . In
> cases in which preventive detention is of potentially
> indefinite duration, we have also demanded that the
> dangerousness rationale be accompanied by some other
> special circumstance, such as mental illness, that helps
> to create the danger.

<u>Id</u>. at 691.

-43-

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Court
evaluated whether a sex offender commitment statute satisfied
these rigorous procedural requirements.  Specifically, the Court
held that any civil commitment of a "sexually dangerous
individual" must: (1) take place pursuant to proper procedures
and evidentiary standards; (2) involve a finding of dangerousness
to one's self or others; and (3) couple that proof of
dangerousness with proof of some additional factor such as mental
illness or mental abnormality.  See Kansas v. Crane, 534 U.S.
407, 409 (2002) (discussing Hendricks).

The Court emphasized that the statute at issue in Hendricks
"unambiguously requires a finding of dangerousness" and provides
that "[c]ommitment proceedings can be initiated only when a
person has been convicted of or charged with a sexually violent
offense."  Hendricks, 521 U.S. at 357 (emphasis added).  This
requirement of a prior criminal process plays a crucial
gatekeeping role.  As the Court has noted in substance on
multiple occasions in a variety of circumstances, "there is a
vast difference between accepting the validity of a prior
judgment of conviction entered in a prior proceeding in which the
defendant had a right to a jury trial and the right to require
the prosecutor to prove guilt beyond a reasonable doubt, and
allowing the judge to find the required facts under a lesser
standard of proof."  Apprendi v. New Jersey, 530 U.S. 466, 496

-44-

(2000).  Indeed, the "fact that person has been found, beyond a
reasonable doubt, to have committed a criminal act" was a key
reason why the Court upheld a civil commitment scheme for
defendants who have been acquitted by reason of insanity.  See
United States v. Jones, 463 U.S. 354, 364 (1983).

Consistent with this understanding of due process
requirements, most if not all states to implement civil
commitment provisions for sex offenders require a prior criminal
charge and/or conviction for a sexually violent crime.   See
e.g., Ariz Rev. Stat § 36-3701(7)(a); Calif. Welf. & Inst. Code §
6600(a)(1); Fla. Stat. Ann. § 394.910(10)(a); 725 Ill. Comp.
Stat. 207/5(f); Iowa Code § 229.A2(11); Kan Stat. Ann § 59-
29a02(a); Mass. Gen. Laws ch. 123A, § 1; Mo. Rev. Stat §
632.480(5)(a); N.J. Stat. Ann. § 30:4-27.26; S.C. Code Ann. § 44-
48-10(1); Tex Health & Safety Code Ann. § 841.003; Va. Code Ann.
§ 37.2-900; Wash Rev. Code § 71.09.20(16); Wis Stat. § 980.01(7).
The fact "that a practice is followed by a large number of states
is . . . plainly worth considering in determining whether the
practice offends some principle of justice so rooted in the
traditions and conscience of our people as to be ranked as
fundamental."  Schall v. Martin, 467 U.S. 253, 268 (1984)
(internal quotation marks omitted).

The requirement of a conviction is also eminently sensible
as a prudential matter.  Without such a predicate, the

decisonmaker in a civil commitment proceeding could be required to make factual findings based on allegations of conduct decades in the past.

By neglecting such a basic procedural and substantive safeguard, the Act is "only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond a reasonable doubt to have violated a criminal law." <u>Foucha</u>, 504 U.S. at 83.2.

> 2.   <u>The Act Deprives Defendants of Due Process of Law
> because it Deprives them of Liberty Without a
> Preliminary Hearing or "Probable Cause" Determination</u>.

Defendants are currently detained beyond the dates when they were to have been released from custody imposed by criminal conviction and judgment.  This detention, pursuant to the civil commitment provisions of the Act, must comport with the requirements of due process.  <u>See</u> <u>Vitek v. Jones</u>, 445 U.S. 480, 491-92 (holding that civil commitment entails "a massive curtailment of liberty" and that "it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause.") (internal citations and quotation marks omitted).

Even if defendants were still in custody under their criminal sentences they would be entitled to due process

protection upon their certification as "sexually dangerous persons."  In addition to actual physical restraint, courts have noted that civil commitment implicates due process because of the accompanying social stigma, See Addington v. Texas, 441 U.S. 418, 425-26 (1979) and the various impositions required by treatment. See Vitek, 480 U.S. at 492.  Moreover, designation as "sexually dangerous" is, itself, "precisely the type of 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' that the Supreme Court held created a protected liberty interest."  Neal v. Shimoda, 131 F.3d 818, 830 (9th Cir. 1997) (citation omitted).

In short, both the initial certification of defendants as "sexually dangerous" and their continued detention past their scheduled dates of release from criminal custody represent deprivations of liberty that trigger due process protections.

Furthermore, given the time allowed for a court-ordered psychiatric evaluation, the complexity of factual and scientific proof at issue, and the schedules of counsel and the court, Defendants are likely, as a practical matter, to spend many months in detention before the court is able to hold a full hearing on the merits and make a final commitment determination.

A key component of due process is the right of a person whose liberty is curtailed to a prompt hearing before a neutral decisonmaker in order to test the basis and validity of the

-47-

restriction. For example, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Gerstein v. Pugh, 420 U.S. 103, 114 (1975).  It is also "well-settled that the Fourth Amendment's protections against unreasonable searches and seizures apply to the involuntary hospitalization of persons for psychiatric reasons." Ahern v. O'Donnell, 109 F.3d 809, 815 (1st Cir. 1997).  Absent extraordinary circumstances, the probable cause hearing ordinarily should be held within 48 hours of detention.  See County of Riverside v. McLaughlin, 500 U.S. 44, 56-58 (1991).

Notably, most if not all state civil commitment schemes for sex offenders expressly include a requirement for a judicial probable cause determination at the outset of proceedings.  For example, the Kansas statute approved by the Supreme Court in Kansas v. Hedricks, 521 U.S. 346 (1997), requires an adversarial probable cause hearing within 72 hours of filing a petition.  See Id. at 352 n.7; see also K.S.A. § 59-29a05(b).  Other state laws incorporate similar requirements.  See e.g., Ariz. Rev. Stat. § 36-3705 (Arizona); Cal. Wel. & Inst. Code § 6602(a) (California); Fl. Stat. ch. 394.915 (Florida); 725 Ill. Comp. Stat. 207/30 (Illinois); Iowa Code § 229A.5 (Iowa); Mass. Gen. Laws ch. 123A, § 12(c) (Massachusetts); Minn. Stat. § 253B.07, Subd. 7 (Minnesota); Mo. Rev. Stat. § 632.489 (Missouri); N.H. Rev. Stat.

§ 135-E:7 (New Hampshire); N. J. Stat § 30:4-27.28 (New Jersey);
N.D. Cent. Code § 25-03.3-11 (North Dakota); S.C. Code Ann. § 44-
48-80 (South Carolina); Va. Code. Ann. § 37.2-906 (Virginia);
Wash. Rev. Code. § 71.09.040 (Washington); Wis. Stat. § 980.04
(Wisconsin); See also Schall, 467 U.S. at 268 (holding that
state practice can be an important indicator of what due process
requires).

    3.    The Act Denies Defendants Due Process Of Law Because It
          Fails To Provide For Adequate Notice, Proof Beyond A
          Reasonable Doubt, And Trial By Jury.

        The failure of the Act to mandate adequately detailed notice
of the proposed basis for commitment, proof beyond a reasonable
doubt, and a jury trial creates an unjustifiable risk that
potential committees will be erroneously deemed sexually
dangerous persons and deprived of their liberty.  Three Supreme
Court decisions illustrate the necessity of these missing
procedural protections to proceedings under the Act.

        In Application of Gault, the Court held that due process
required, inter alia, the provision of constitutionally adequate
notice of charges in a juvenile case.  See 387 U.S. 1, 33-34
(1967).  Although recognizing the value of informality and a
rehabilitative emphasis in juvenile proceedings, the Court rested
its decision on the "reality" of the juvenile process, in which,
"[a] boy is charged with misconduct.  The boy is committed to an

institution where he may be restrained of liberty for years."
Id. at 27.  In light of the substantial liberty interest at
stake, the Court held that notice, "...must 'set forth the
alleged misconduct with particularity.'" Id. at 33 (citation
omitted).

Three years after Gault, the Court in In re Winship held
that due process required proof beyond a reasonable doubt of
delinquency in juvenile proceedings.  See 397 U.S. 358, 368
(1970).  The Court rejected the, "'...civil label-of-convenience
which has been attached to juvenile proceedings'" and again based
its holding on the reality of juvenile adjudications, in which a
child may be stigmatized by a finding that he violated the
criminal law and may be committed to an institution.  Winship,
397 U.S. at 365-67.  The Court could not tolerate the imposition
of these consequences, "...on proof insufficient to convict him
were he an adult."  Id. at 367.

Lastly, in Duncan v. Louisiana the Court held that the right
to trial by jury is "fundamental to the American scheme of
justice," and thus applicable to the States.  391 U.S. 145, 149-
50.  Duncan was, of course, a criminal case decided under the
Sixth and Fourteenth Amendments.  See id. at 146-50.
Nevertheless, the Court's rationale for its holding is
applicable to the due process clause and proceedings under the
Act:

> Providing an accused with the right to be tried by a jury
> of his peers gave him an inestimable safeguard against
> the corrupt or overzealous prosecutor and against the
> compliant, biased, or eccentric judge... Beyond this, the
> jury trial provisions in the Federal and State
> Constitutions reflect a fundamental decision about the
> exercise of official power - a reluctance to entrust
> plenary powers over the life and liberty of the citizen
> to one judge or to a group of judges.

Id. at 156.

In salient respects, a proceeding under the Act starkly resembles the juvenile delinquency proceedings in Gault and Winship and the criminal trial in Duncan.

As with a criminal law, the overarching concern of the Act is the protection of the public.  By definition, a "sexually dangerous person...is sexually dangerous to others."  § 4247(5).  Thus, unlike a traditional civil commitment scheme, there is no mention in the Act of the potential committee constituting a danger to himself, and no suggestion that commitment is for his welfare.  Cf. Addington v. Texas, 441 U.S. 418, 420 (1979) (Texas commitment statute provided for hospitalization for committee's "own welfare and protection or the protection of others")(emphasis added).

Moreover, the Act mirrors criminal and juvenile delinquency laws by requiring that the government prove that the potential committee perpetrated a criminal act.  See § 4248(d) (court must find prisoner to be a sexually dangerous person to commit him) and § 4247(5) ("'sexually dangerous person'" means, *inter alia*, a

person *who has engaged or attempted to engage* in sexually violent
conduct or child molestation...") (emphasis added).[5]  This
requirement of a factual finding of criminal behavior
distinguishes the Act from traditional civil commitment laws,
under which evidence of criminal or quasi-criminal behavior might
be introduced as symptomatic of a mental illness, but not because
a criminal act was a statutory element to be proved.  Cf.
Addington, 441 U.S. at 420 (proof of threatening and assaultive
behavior not required to be proved by commitment statute but
introduced at trial).

     Finally, the finding of criminal conduct required by the Act
and the consequent labeling of the committee as a "sexually
dangerous person" entail serious consequences, beyond
incarceration, that are similar to those that follow upon a
juvenile adjudication or a criminal conviction.  Like a
"delinquent" or a "felon," the committee will be stigmatized by
his denomination as a "sex offender."  That stigmatizing
designation may, depending on the particular circumstances, be
accompanied by significant burdens, such as the obligation to
register with law enforcement, to refrain from living in certain

---

     [5]     The Act does not define the terms "sexually violent
conduct" or "child molestation."  The defendants assume that the
words of the statute are to be given their usual meaning and
concludes that the terms are intended to refer to behavior that
is generally considered criminal.

areas, and to tolerate harassment.  <u>See</u> <u>e.g.</u>, 42 U.S.C. § 16901
(declaring purpose of federal government to protect the public
from sex offenders and offenders against children by establishing
national registration scheme); Iowa Code § 692A.2A (barring sex
offenders from residing within 2000 feet of any school); <u>Doe v.</u>
<u>Pataki</u>, 919 F.Supp. 691, 697 (S.D.N.Y. 1996) (recounting
incidents of harassment of sex offenders).

The similarity of proceedings under the Act to the
proceedings in <u>Gault</u>, <u>Winship</u>, and <u>Duncan</u> counsels that similar
procedural protections should apply in all four settings.  To
determine whether due process requires the implementation of a
particular procedural safeguard, this court must weigh:

> ...the private interest that will be affected by the
> official action...the risk of an erroneous deprivation of
> such interest through the procedures used, and the
> probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal
> and administrative burdens that the additional or
> substitute procedural requirement would entail.

<u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976).

The private interest of the potential committee under the
Act is to avoid an erroneous and indefinite deprivation of his
liberty, the unwarranted stigma of being found to be a sexually
dangerous person who has committed criminal sexual conduct, and
the serious social consequences of such an erroneous labeling.

Absent adequate notice, proof beyond a reasonable doubt, and trial by jury, the risk that an erroneous deprivation of the potential committee's private interests will occur is high.

Inadequate notice not describing with particularity the specific allegation the committee is expected to meet hampers his defense.  For example, the timely and thorough investigation of witnesses will be compromised because counsel will not be adequately informed of the facts requiring investigation, and counsel will not be able to properly prepare to confront the government's witnesses if they are vaguely identified or the relevance of their testimony is unclear.

A clear and convincing evidence burden of proof, while perhaps adequate in a traditional commitment proceeding focused on the welfare of the committee and not involving a finding of criminal conduct, does not, "adequately instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions" in a proceeding under the Act, where a finding of criminal conduct is a predicate to indefinite incarceration.  Winship, 397 U.S. at 370.

Nor is the clear and convincing evidence standard adequate to guard against erroneous deprivations of liberty under a statute that predicates indefinite incarceration on controversial predictions of future dangerousness.  Compare, Heller v. Doe by Doe, 509 U.S. 312, 321-24 (1993) (recognizing that difficulties

inherent in diagnosing mental illness and predicting future dangerousness require a higher burden of proof for commitment than is required for commitment of the mentally retarded, who are more readily diagnosed) with <u>Addington</u>, 411 U.S. at 428-29 (declining to require reasonable doubt standard in traditional civil commitment scheme providing, "...layers of professional review and observation of the patient's condition," that would, "provide continuous opportunities for an erroneous commitment to be corrected.") and 18 U.S.C. § 4247(e)(1)(B), (e)(2), (h) (providing only annual paper review of committee's condition, barring committee-initiated discharge petitions within six months of a court determination that committee shall not be discharged, and requiring only that facility director "shall inform" committees of "any" rehabilitation programs that may be available).

Recognizing the inadequacy of any lower standard, approximately half of the states that have enacted laws authorizing the commitment of sex offenders require proof beyond a reasonable doubt in their commitment proceedings.  <u>See</u> Ariz.Rev. Stat. §  36-3707; Cal. Welfare & Inst. Code § 6604; 725 Ill. Comp. Stat. 207/35(f); Iowa Code § 2297A.7(4); Kan. Stat. Ann.§ 59-29a10; Mass. G.L. ch. 123A § 14(d); S.C. Code Ann. § 44-48-100; Tex Health & Safety Code § 841.062; Wis.

Stat. § 980.05(3)(a).[6]

And, given the politically and emotionally charged nature of any proceeding relating to "sexually dangerous person(s)," due process requires that the potential committee be given the opportunity to have the facts of his case, and the application of the law to those facts, determined by a jury of his peers who can be screened for their impartiality and objectivity, who are not subject to the same political and institutional pressures as prosecutors and judges, and who can benefit from one another's input and reflections on the case.

Finally, the governmental interest in dispensing with the proposed additional procedures is slight.  Very little cost,

---

[6]     For similar and related reasons, the discharge provision at Section 4248(e) violates due process.  The provision provides that if, after hearing, the court finds by a preponderance of the evidence that, "...the person's condition is such that he will not be sexually dangerous to others" he shall be released unconditionally or with conditions, as the case may require.  § 4248(e)(1), (2).  A substantially identical provision at § 4246(e)(1), (2) has been held by at least one court to place the burden of showing "recovery" on the committee.  See United States v. McCallister, 963 F.Supp. 829 (D.Minn. 1997).
    If Section 4248(e) is interpreted to place the burden of proving that he is no longer sexually dangerous on the committee, it violates due process because this burden-shifting unjustifiably risks the possibility that his commitment will be wrongly protracted.  If, on the other hand, Section 4248(e) is interpreted to place the burden on the government to show that the committee remains sexually dangerous, the provision violates due process by permitting continued incarceration on a preponderance of the evidence standard, rather than by a proof beyond a reasonable doubt standard.  On either interpretation, the Act denies the committee due process and is facially unconstitutional.

either monetary or in terms of effort, should be involved in
making the certification document a clear and sufficiently
detailed statement of the allegation the government intends to
prove. The application of the burden of proof beyond a reasonable
doubt standard imposes no fiscal burden on the government and
cannot be said to otherwise hamper governmental objectives, since
the United States clearly has no interest in committing someone
who is not, in fact, a "sexually dangerous person."  Finally,
although the provision of a jury trial obviously entails a
monetary commitment, that expenditure must pale in significance
before the enhanced reliability offered by the collective wisdom
of a group of impartial citizens.

    4.   <u>Conclusion</u>

Because the Act fails to require a sex offense charge or
conviction as a predicate for indefinite commitment, dispenses
with a preliminary hearing or probable cause finding prior to
imposing detention, and does not mandate adequate notice, proof
beyond a reasonable doubt of sexual dangerousness, and trial by
jury, it denies Defendants due process of law.  For these
reasons, it is facially unconstitutional.

**V.**    **THE ACT IS FACIALLY UNCONSTITUTIONAL BECAUSE IT  VIOLATES DUE PROCESS AND CONTRAVENES ARTICLE I, SECTION 1 BY FAILING TO ADEQUATELY DEFINE KEY TERMS.**

Defendants maintain that the statutory language in Title 18,
Section 4247(a)(5) and (a)(6) (defining the terms "sexually

dangerous person" and "sexually dangerous to others") fails to adequately define those critical terms.  This failure renders Title 18, Section 4248 unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution, and delegates legislative responsibility to the finder of fact in derogation of Article 1 §1 of the United States Constitution.

As the Supreme Court warned in <u>Panama Refining Co. v. Ryan</u>, 293 U.S. 388, 421 (1935) in terms as relevant today as they were then:

> Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly.  The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards , while leaving to selected instrumentalities the making of subordinate rules within prescribed limitations and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorization of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.  But the constant recognition of the necessity and validity of such provisions and the wide range of administrative authority which has been developed by means of them cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained.

Accordingly, a statute must provide an "intelligible principle to which the person or body authorized [to act] is directed to conform".  <u>Id</u>. at 430.

Here, the statute fails to provide that "intelligible principle."  While it requires a causal nexus between the "serious mental illness, abnormality, or disorder" and the "serious difficulty in refraining from sexually violent conduct" by requiring that "serious difficulty" must result from "serious mental illness," it neither defines nor cross references a definition of those terms.

Nor does the Act provide any criteria or standards for the executive or judicial branches to use in devising regulations or uniform standards to determine whether a person should be committed for what could be, literally, the rest of his life. There are potentially as many definitions of the terms as there are district court judges.  Defendants submit that these unguided, open ended bases for an indefinite civil commitment provide no bounds to delegated authority and constitute a congressional abrogation of the legislative function, devolving it upon the executive and judicial branches of government.

A statute is void for vagueness not only when it fails to provide fair notice of its scope to the individual, but also where it, "permits and encourages an arbitrary and discriminatory enforcement of the law."  Papachristou v. City of Jacksonville, 405 U.S. 156, 170 (1972);  See also Grayned v.City of Rockford, 408 U.S. 104, 108-109 (1972) ("....if arbitrary and discriminatory enforcement is to be prevented, laws must provide

explicit standards for those who apply them.  A vague law
impermissibly delegates basic policy matters to policemen,
judges, and juries for resolution on an *ad hoc* and subjective
basis, with the attendant dangers of arbitrary and discriminatory
applications."); Fantasy Book Shop, Inc. v. City of Boston, 652
F.2d 1115, 1119 (1st Cir. 1981) (licensing ordinance providing
that license may be denied if it would, "otherwise significantly
harm the legitimate protectable interests of the affected
citizens of the city" and that, "no application shall be denied
if the anticipated harm is not significant or if the likelihood
of its occurrence is remote" is facially invalid as vague); Goldy
v. Beal, 429 F.Supp. 640, 648 (M.D.Pa. 1976) (Pennsylvania
involuntary commitment statute, requiring that person be in need
of care to warrant commitment, promulgated impermissibly vague
standard: "Such lack of specificity in a statute that authorizes
an interference with the constitutionally protected right of
physical liberty places insufficient limits on the discretion of
officials who are responsible for its implementation, with the
result that there is nothing in the statute to prevent it from
being enforced arbitrarily.  Such a result amounts to vagueness
that violates due process.").

     "Serious difficulty" and "serious mental illness" are not
self defining.  Other statutes employing the modifier "serious"
define their terms.  For example, Title 18 Sections 43, 1365,

2119, 2332(b), and Title 21, Section 841, <u>inter</u> <u>alia</u>, all employ the term "serious bodily injury". They do not leave the definition of that term to every member of the executive or judiciary acting on an ad hoc basis. "Serious bodily injury" is specifically statutorily defined. <u>See</u> 18 U.S.C. §43(d)(4); §1365(h)(3); 21 U.S.C §802(25). In another instance, the term "serious drug offense" is specifically defined in Title 18 Section 924(e)(2).

Nor does the Act define "sexually violent conduct" or "child molestation." <u>See</u> § 4247(a)(5), (6). In this respect, it is as unlike state sex offender commitment statutes as it is unlike the federal statutes cited, *supra*. To take just a few examples, Kansas, Illinois, Washington, and Massachusetts all define the terms "sexually violent offense" or "sexual offense." <u>See</u> KSA §29a02 (e); 725 ILCS 207/5(e); RCWA 71.09.020; M.G.L. c.123A §1.

Because the Act neither defines key terms itself nor directs those who are charged with applying it to another source of definitional authority, it is unconstitutionally vague in violation of due process and it illegitimately delegates legislative authority in contravention of Article I, Section 1. The statute is facially unconstitutional.

**VI. THE ACT IS A FACIALLY UNCONSTITUTIONAL DENIAL OF DUE PROCESS OF LAW BECAUSE THE EXPERT TESTIMONY IT REQUIRES IS INSUFFICIENTLY RELIABLE TO PROVIDE THE CLEAR AND CONVINCING**

**EVIDENCE NEEDED FOR COMMITMENT AS A SEXUALLY DANGEROUS PERSON.**

Under the Kansas sexually violent predator act addressed in Hendricks v. Kansas, 521 U.S. 346 (1997), civil commitment required proof that a person was convicted of or charged with a sexually violent offense and suffered from a mental abnormality or personality disorder, "which makes a person likely to engage in the predatory acts of sexual violence." 521 U.S. at 357.[7]   As construed by the Supreme Court, the statute required a finding of future dangerousness and linked it to a mental abnormality or personality disorder, "that makes it difficult, if not impossible, for the person to control his dangerous behavior." 521 U.S. at 358.  The Court held such a finding sufficient to meet due process standards.  In Kansas v. Crane, 534 U.S. 407 (2002) the Court again addressed the Kansas statute, holding that the state need not establish a complete lack of volitional control to comport with due process standards; proof of serious difficulty was sufficient.

As the Supreme Court has recognized in addressing state civil commitment statutes, factual issues are, "only the beginning of the inquiry.  Whether the individual is mentally ill

---

[7]  It also provided for a jury trial, employed a proof beyond a reasonable doubt standard, required care and treatment for a person confined, provided for a yearly review and allowed the individual to petition for release at any time.

and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists". Allen v. Illinois, 478 U.S. 364, 371 (1986) (citation omitted); See also KSA §59-29a05 and 29a06; 725 ILCS 207/10, 207/25, 207/30, and 207/35; RCWA 71.09.040 and 0.50; MGLA c.123A §§ 1,13 and 14; NH Rev. Stat. §§135-E:3 and E:9 for illustrative state statutes requiring evaluations by qualified examiners and authorizing the retention of such examiners by the defendant in sexually dangerous or sexually violent person commitment proceedings.

The Supreme Court has also recognized the many inadequacies of such expert psychiatric/psychological predictive testimony. In Addington the Court rejected a requirement of proof beyond a reasonable doubt for civil commitment because: "Given the lack of certainty and the fallibility of psychiatric diagnoses, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous." 441 U.S. at 429. Yet, in Heller v. Doe by Doe, 509 U.S. 312, 321-322 (1993), the Court upheld Kentucky's use of a lower standard of proof in commitments for mental retardation (clear and convincing evidence) than for commitment based on mental illness (beyond a reasonable doubt) because mental retardation is easier to diagnose than mental illness and, therefore, imposing a higher burden of proof for mental illness

commitments would lessen the risk of an erroneous commitment. The Court also noted difficulties in predicting future violent behavior by the mentally ill, recognizing that "...many psychiatric predictions of future violent behavior by the mentally ill are inaccurate." Id. at 324.

Notwithstanding the recognized inaccuracy of psychiatric predictions of future dangerousness, in Barefoot v. Estelle, 463 U.S. 880, 896 (1983) the Supreme Court rejected defendant's contention that future dangerousness could not be established by psychiatric testimony.[8]  However, the question and statute addressed in Barefoot differed significantly from the question and statute at issue here. There, the question addressed by psychiatric testimony was the probability of the defendant's commission of future criminal acts of violence that would constitute a continuing threat to society, see 463 U.S. at 894 – a question that the Court had held in Jurek v. Texas, 428 U.S. 262 (1996) was one a jury could consider in determining whether the death penalty should be imposed because it permitted consideration of mitigating circumstances and, therefore, did not violate the Eighth and Fourteenth Amendments to the United States

---

[8]  As noted in Barefoot v. Estelle, 463 U.S. 880, 920 (1983) the American Pscyhological Association (APA) took the position in 1983 that psychiatric testimony concerning the  prediction of future dangerousness was inadequate because its best estimate was that psychiatric predictions of long-term future dangerousness were wrong in two out of every three cases.

Constitution.  It was not a question requiring the presentation of psychiatric testimony.  Indeed, in Jurek, no psychiatric testimony was presented at sentencing.  Jurek, 428 U.S. at 267; Barefoot, 463 U.S. at 897. Unlike the issue to be decided here, the issue in Jurek and Barefoot did not require proof of mental illness or proof that mental illness would result in serious difficulty in refraining from certain conduct.

Here, the definitions of "sexually dangerous person" and "sexually dangerous to others" in Section 4247(a)(5) and (a)(6) used for civil commitment, require proof that the person has engaged in or attempted to engage in described conduct and that he "suffers from a serious mental illness, abnormality or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation". Section 4247(b) provides that psychiatric or psychological examinations shall be conducted by a licensed or certified psychiatrist or psychologist.  While the first component of the definition of "sexually dangerous person" is thus a question of historical fact (has a person engaged in or attempted to engage in particular conduct), the second component -- whether a person suffers from, "a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released" -- is a combination of mental state and prediction.

Indeed, it requires a prediction about future conduct for an individual who, in many cases, has been incarcerated for a number of years and whose predicate conduct occurred many years earlier. Accordingly, unlike the statute addressed in Barefoot, expert psychiatric or psychological testimony is an integral component of the federal civil commitment statute for sexually dangerous persons.

Defendants maintain that while psychiatric or psychological evidence is necessary for commitment under the statute – to establish the requisite "serious mental illness" etc. and causally link that illness to the requisite, "serious difficulty in refraining from sexually violent conduct or child molestation if released," Sections 4247(a)(5) and (a)(6)– the available science in the field is not sufficiently reliable to meet the current evidentiary standards established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).  In sum, because mental health professionals cannot reliably evaluate whether an individual's  mental illness will result in serious difficulty in refraining from certain conduct if the person is released, and because the statute requires clear and convincing evidence of that "serious difficulty", denies defendants due process of law by subjecting them the unjustifiable risk of an erroneous deprivation of liberty based on unreliable evidence.

In Daubert, the Court addressed the standard for the
admission of expert testimony in the context of scientific expert
testimony, concluding that the Federal Rules of Evidence
superseded the "general acceptance in the field" Frye[9] test and
placed limitations on the admissibility of expert testimony. 509
U.S. at 587, 589.  The Court construed Fed. R. Evid. 702 as
imposing a gatekeeping obligation on the trial judge.  The trial
judge:

> must determine at the outset, pursuant to Rule 104(a),
> whether the expert is proposing to testify to (1)
> scientific knowledge that (2) will assist the trier of
> fact to understand or determine a fact in issue.  This
> entails a preliminary assessment of whether the reasoning
> or methodology underlying the testimony is scientifically
> valid and of whether that reasoning or methodology
> properly can be applied to the facts on issue.

509 U.S. at 592-593.  The Court set out some "general
observations" to assist the lower courts.  A "key question" is
whether the theory or technique has been tested.  Id. at 593.
Another "pertinent consideration" is whether it has been
subjected to peer review and publication.  Id. at 593-594.  The
court also, "ordinarily should consider the known or potential
rate of error...and the existence and maintenance of standards
controlling the technique's operation..."  Id. at 594.  General
acceptance within the relevant scientific community may still be

---

[9]  Frye v. United States, 54 App.D.C. 46, 293 F. 1013
(1923).

relevant. <u>Id.</u>  The focus of the "flexible" inquiry is, "solely on principles and methodology..." <u>Id.</u> at 595.

In <u>Kumho Tire</u>, the Court addressed <u>Daubert's</u> application to experts testifying based on "technical" and "other specialized" knowledge", concluding that the gatekeeping obligation also applied in these areas and that the specific <u>Daubert</u> factors were relevant but not determinative.  <u>Id.</u> at 141-142.  The gatekeeping focus is on reliability: "The objective of that [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony." <u>Id.</u> at 152.  The centrality of reliability in evaluating the admissibility of expert testimony is illustrated by the following cases.

In <u>United States v. Velarde</u>, 214 F.3d 1204 (10th Cir. 2000) the district court's failure to determine the  reliability of expert testimony concerning allegations of child sexual abuse – a pediatrician's testimony that the alleged victim's behavior and statements were consistent with child abuse notwithstanding the absence of physical evidence, and a psychologist's testimony that the alleged victim's behavior was consistent with child abuse and that she found no evidence that the alleged victim was subject to lying or overexaggerated fantasizing  – required reversal and a new trial.

In <u>United States v. White Horse</u>, 316 F.3d 769 (10th Cir. 2003) defendant was charged with sexually molesting his six year

old son.  The court affirmed the district court's exclusion of a
psychologist's testimony that the defendant did not have a sexual
interest in underage boys. His testimony was based, in part, on
an "Abel Assessment", a test which combines scores resulting from
a person's viewing slides of clothed and partially clothed people
and the results of a questionnaire designed to detect sexual
behavior and willingness to admit to experiencing common social
problems, and then subjects the combined score to three
predictive equations, "in order to predict the likelihood that
the subject is sexually interested in children under fourteen and
that he would lie about his interest."  316 F.3d at 774-775.
Noting that there was no evidence that the slides had been tested
with a statistically significant sample of Native Americans, that
none of the slides contained pictures of Native Americans, and
that a study stated that incest only cases had been excluded from
the testing of two of the three predictive equations, the court
agreed with the district court that the assessment was neither
scientifically valid nor a good fit for the specific case. Id..

In United States v. Powers, 59 F.3d 1460 (4th Cir. 1995) the
court concluded that the penile plethysmograph test lacked
sufficient reliability for admission in defendant's trial on
incest abuse charges. See also Doe ex rel. Rudy-Glanzer v.
Glanzer, 232 F.3d 1258, 1266 (9th Cir. 2000) (no indicia of
reliability to support admission of plethysmograph test as

evidence at trial).  The Powers court also found proposed
evidence that defendant did not meet the profile of a fixated
pedophile was properly excluded in his trial for incest abuse
because it failed to meet Daubert's relevancy test.  The
psychologist would have testified that 40% of the time incest
abusers exhibit characteristics of fixated pedophiles while
defendant did not.  As the court concluded: "At most, this
evidence would have shown only that [defendant] did not belong to
a group that comprised forty percent of incest abusers....To be
relevant, this testimony must show, in a very real way, that
because [defendant] did not share a characteristic common to a
large minority of incest perpetrators, he was less likely to be
an incest perpetrator himself."  In the absence of a proffer of
evidence to link a non-proclivity for pedophilia with a non-
proclivity for incest the testimony was properly excluded.  59
F.3d at 1471-1472.

     As set forth below, the available expert
psychological/psychiatric evidence concerning the type of risk
assessment and prediction required by Sections 4247 and 4248 –
whether as a result of "serious" mental illness, abnormality ,
etc. a person will have "serious difficulty" refraining from
certain conduct – is not sufficiently reliable to allow the court
to find, even by clear and convincing evidence, that a person

should be indefinitely civilly committed as a sexually dangerous person.

Defendants have submitted an affidavit from Dr. Daniel Kriegman, a licensed psychologist with significant experience in the area of sex offender evaluation and treatment, who has published extensively in the field.  He addresses, <u>inter</u> <u>alia</u>, the tools available to the psychological profession for predicting future sexual dangerousness and concludes that those tools fall short; that is, that psychological testimony cannot establish, by clear and convincing evidence, that an individual is a sexually dangerous person within the meaning of the statute. Dr. Kriegman's background and experience, including his work at the Massachusetts Treatment Center for the Sexually Dangerous between 1977 and 1986, his designation as a Qualified Examiner after leaving the Treatment Center, his work at Human Services Cooperative, Inc. (a company providing sexual dangerous determinations to the Commonwealth of Massachusetts) and his extensive publications are set forth in his affidavit and Exhibit 1.

Dr. Kriegman outlines the inadequacies in predictions of dangerousness or sexual dangerousness based on clinical judgment. Pars. 9-12 and Ex.2.[10]

---

[10]  Those inadequacies in the context of dangerousness were recognized by the Supreme Court in <u>Barefoot</u>, <u>supra</u>, discussing

The nature of actuarials – tests taking a number of predictive factors known to be independently and truly related to the end question, assessing, scoring and weighting the factors, and then combining them according to a formula to produce a prediction – and their development and use in risk prediction is set out at pars. 13-30 and Exs.3-7.  While more accurate than clinical opinion, they remain far from reliable predictors.

As explained, the relevance of the tests depends on a base rate (pars.17-20 and Exs.3 and 10).  The base rate is a reference to the class of similar facts about similar individuals and events.  A lower base rate decreases the accuracy of a prediction as to a particular individual.  Dr Kriegman has concluded that using a base rate of sex offense recidivism at the high end of the reasonable range of such estimates[11] and the best actuarial

_____

the amicus curiae brief of the APA and the studies it referenced.

As reported in Richard Wollert, Low Base Rates Limit Expert Certainty When Current Actuarials Are Used to Identify Sexually Violent Predators, 12 Psychol. Pub. Pol'y & L. 56 (2006), subjective clinical judgment "is wrong from 72% to 93% of the time, for the purpose of making sexual recidivism predictions..." (at 58).

[11]  This analysis uses a base rate of 30%.  Studies, including one from the Department of Justice, have shown that the recidivism rate of sex offenders for the commission of sex offenses is not high.  The DOJ study showed that recidivism rate to be 5.3%. See <http://www.ojp.usdoj.gov/bjs/crimoff.htmrecidivism>. A meta-analysis of 61 studies found a sex offense recidivism rate of 13.4%.  R.K. Hanson & M. Bussiere, Predicting Relapse: A Meta-analysis of Sex Offender Recidivism Studies, 66 J. Consulting &

predictive methods, the actuarially based prediction that someone is sexually dangerousness will be wrong 66% of the time. Defendants submit that if the best actuarial tools result in an erroneous conclusion well over 50% of the time, such evidence can not, *ipso facto*, establish sexual dangerousness by clear and convincing evidence.

Freedom from physical restraint "has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992).  The Act, which restrains a person potentially for the remainder of his lifetime based on a prediction of sexual dangerousness that cannot be rendered reliable even by using the best available tools and information violates due process and is facially unconstitutional.

## CONCLUSION

For the foregoing reasons, the Act is facially unconstitutional and must be struck down.

## RESERVATION OF RIGHTS

The government refuses to provide any of the discovery requested by defendants relative to these matters.  For that reason, and to protect their right to adequately respond to any government pleadings and arguments, defendants reserve the right

---

Clinical Psychol. 348, 351 (1998).

to supplement, amend, or alter these arguments, or to advance new arguments.  Defendants further reserve the right to introduce further evidence in support of these and any other arguments they may advance.

## REQUEST FOR ORAL ARGUMENT

Defendants hereby request oral argument in support of this Motion.

                          JEFFREY SHIELDS
                          JOEL WETMORE
                          CHARLES PEAVY
                          By their attorneys,


_____   /s/ Page Kelley
                          Page Kelley
                              B.B.O. #548237
                          William Fick
                              B.B.O. #650562
                          Judith Mizner
                              B.B.O. #350160
                          Federal Defender Office
                          408 Atlantic Avenue, 3rd Floor
                          Boston, MA  02110
                          Tel: 617-223-8061



                          /s/ John Swomley
                          John Swomley
                              B.B.O. #551450
                          Swomley & Associates
                          227 Lewis Wharf
                          Boston, MA 02110
                          Tel: 617-227-9443

May 16, 2007

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants
as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non registered
participants on May 16, 2007.

                                        /s/ Page Kelley

                                        Page Kelley