# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | Misc. No. 06-10427 PBS |
| Petitioner,    ) | |
| ) | |
| v.    ) | |
| ) | |
| JEFFREY SHIELDS,    ) | |
| (Reg. No. 10760-036),    ) | |
| ) | |
| Respondent.    ) | |

———————————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | Misc. No. 06-10439 PBS |
| Petitioner,    ) | |
| ) | |
| v.    ) | |
| ) | |
| JOEL WETMORE,    ) | |
| (Reg. No. 10379-036),    ) | |
| ) | |
| Respondent.    ) | |

———————————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | Misc. No. 06-10449 PBS |
| Petitioner,    ) | |
| ) | |
| v.    ) | |
| ) | |
| CHARLES PEAVY,    ) | |
| (Reg. No. 24545-050),    ) | |
| ) | |
| Respondent.    ) | |

———————————————————————

## OPPOSITION OF THE UNITED STATES TO
## RESPONDENTS' CONSOLIDATED MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.   RESPONDENTS' FEDERALISM CHALLENGES TO THE ACT
     LACK MERIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   Respondents' Facial Attack to the Act Fails Under Prevailing
          Supreme Court Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.   Congress Maintains the Necessary and Proper Authority to Prevent
          the Commission of Federal Sex Crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     C.   The Act Does Not Transgress the Tenth Amendment. . . . . . . . . . . . . . . . . 16

II.  THE ACT DOES NOT VIOLATE EQUAL PROTECTION. . . . . . . . . . . . . . . . . . 18

     A.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B.   The Act Does Not Violate Equal Protection By Being Underinclusive. . . . . . . . 21

     C.   The Act Does Not Violate Equal Protection By Being Overinclusive. . . . . . . . 24

III. THE ACT IS A NON-PUNITIVE CIVIL COMMITMENT STATUTE, NOT
     SUBJECT TO CRIMINAL PROTECTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     A.   Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     B.   Congress Intended to Create a Civil Commitment Proceeding. . . . . . . . . . . . . 29

     C.   The Act is Not Punitive in Purpose or Effect. . . . . . . . . . . . . . . . . . . . . . . . 31

     D.   The Act Does Not Require the Constitutional Protections Required
          in Criminal Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

IV.    THE ACT DOES NOT VIOLATE DUE PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    A.    Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    B.    The Act Does Not Violate Due Process By Authorizing the
        Commitment of Persons Who Have Not Been Convicted or Charged
        With a Sex Crime.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    C.    Respondents Cannot Show on a Facial Challenge that the Deprivation
        of Liberty Without a Preliminary Hearing or Probable Cause
        Determination Violates Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    D.    Due Process Does Not Require Proof Beyond a Reasonable Doubt or
        Trial by Jury in These Civil Commitment Proceedings.. . . . . . . . . . . . . . . . . 40

V.     THE ACT IS NOT VOID FOR VAGUENESS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    A.    Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    B.    The Act is Not Unconstitutionally Vague. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VI.    RESPONDENTS' CHALLENGE TO THE GOVERNMENT'S ANTICIPATED
      EXPERT TESTIMONY DOES NOT RAISE A CONSTITUTIONAL QUESTION,
      IS PREMATURE, AND LACKS MERIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    A.    Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    B.    Daubert Did Not Announce a Constitutional Rule. . . . . . . . . . . . . . . . . . . . . 49

    C.    Respondents' Daubert Challenge is Premature. . . . . . . . . . . . . . . . . . . . . . . 51

    D.    Respondents' Daubert Challenge In Any Event Lacks Merit. . . . . . . . . . . . . 52

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## PRELIMINARY STATEMENT

Petitioner, the United States of America, by and through its undersigned counsel of record, hereby responds to the consolidated motion to dismiss filed by respondents Jeffrey Shields, Joel Wetmore, and Charles Peavy, which presents a myriad of facial constitutional challenges to section 302(4) of the Adam Walsh Child Protection and Safety Act, Pub. L. No. 109-248, Title III, § 302(4), 120 Stat. 620 (July 27, 2006), codified at 18 U.S.C. §4248.  As we show below, none of those facial constitutional challenges has merit.

## STATUTORY FRAMEWORK

The Adam Walsh Child Protection and Safety Act of 2006 (the "Act") enacted provisions for court-ordered civil commitment of sexually dangerous persons in the custody of the Bureau of Prisons.  The Act provides, in relevant part:

> In relation to a person who is in the custody of the Bureau of Prisons, * * * the Attorney General or any individual authorized by the Attorney General or the Director of the Bureau of Prisons may certify that the person is a sexually dangerous person, and transmit the certificate to the clerk of the court for the district in which the person is confined.  The clerk shall send a copy of the certificate to the person, and to the attorney for the Government * * * The court shall order a hearing to determine whether the person is a sexually dangerous person.  A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.

18 U.S.C. §4248(a) (emphasis added).  Thus, the Act authorizes the Attorney General or any individual authorized by the Attorney General or the Director of the Bureau of Prisons to initiate civil commitment proceedings by certifying that a person in federal custody is a "sexually dangerous person" and transmitting the certificate to the district court in which the inmate is confined.  Upon the filing of the certificate, the court must order a hearing to determine whether the person is a

"sexually dangerous person," and the person's release must be stayed pending completion of the section 4248 proceedings.

The procedures governing civil commitment under section 4248 are further set forth by reference to section 4247. Thus, following certification and prior to the hearing, the court "may" order the person to undergo a psychiatric or psychological examination pursuant to the provisions of subsections 4247(b) and (c). See 18 U.S.C. §4248(b). Subsection 4247(b) directs the court to designate a licensed or certified psychiatrist or psychologist as the examiner, but allows the person to select an additional examiner. See 18 U.S.C. §4247(b). For the purposes of the examination, the court may commit the person to be examined for a reasonable period, not to exceed forty-five days, to the Attorney General's custody for placement in a suitable facility.[1] Id. The director of the facility may apply for a reasonable extension, not to exceed thirty days, upon a showing of good cause that the additional time is necessary to observe and evaluate the defendant. Id. The examiner's report, which is to be filed with the court and provided to both counsel, must include the person's history and present symptoms, a description of the psychiatric, psychological, and medical tests that were employed and their results, the examiner's findings, and the examiner's opinions as to diagnosis, prognosis, and, whether the person is a sexually dangerous person. See 18 U.S.C. §4247(c).

With respect to the hearing itself, procedures are set forth in subsection 4247(d). See 18 U.S.C. §4248(c). Accordingly, the person is entitled to representation by counsel (including appointed counsel under section 3006(A), and the opportunity to testify, to present evidence, to

---

[1] Unless impracticable, the psychiatric or psychological examination must be conducted in the suitable facility closest to the court. See 18 U.S.C. §4247(b). A "suitable facility" is "a facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." 18 U.S.C. §4247(a)(2).

- 2 -

subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing. See 18 U..S.C. §4247(d). The government bears the burden of showing, by clear and convincing evidence, that the person is a "sexually dangerous person." Id.

If, after the hearing, the court finds that the government has carried its burden, the court must commit the person to the Attorney General's custody for placement in a suitable facility for treatment. See 18 U.S.C. § 4248(d). A committed person must remain in a suitable facility until the state of his domicile, or the state where he was tried, will assume responsibility for his custody, care, and treatment, or until he is no longer sexually dangerous to others or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment, whichever is earlier. 18 U.S.C. §§4248(d)(1), 4248(d)(2).

Following a person's commitment to a suitable facility under section 4248, when the Director of that facility determines that the person is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment, the Director of the facility must promptly file a certificate with the court. See 18 U.S.C. §4248(e). The court must then order the person's discharge or, on the government's motion or on its own motion, hold a hearing to determine whether the person should be released. Id. If, after such a hearing, the court finds by a preponderance of the evidence that the person will not be sexually dangerous to others if released unconditionally, the court must order that the person be immediately discharged. See 18 U.S.C. §4248(e)(1). If, after the hearing, the court finds by a preponderance of the evidence that the person will not be sexually dangerous to others if released under an appropriate prescribed regimen of care or treatment, the court must order that the person be conditionally discharged under that regimen, with the person's compliance as an explicit

condition of release.  See 18 U.S.C. §4248(e)(2).  The person's failure to comply with the regimen can result in proceedings to revoke the person's conditional discharge under section 4248(f). Moreover, at any time, the court may, after a hearing, modify or eliminate the regimen of care or treatment.  See 18 U.S.C. §4248(e)(2).

## ARGUMENT

## I.   RESPONDENTS' FEDERALISM CHALLENGES TO THE ACT LACK MERIT

Respondents' first contend (Brief at 4-21) that the Act is facially unconstitutional because it exceeds Congress's authority under both the Commerce Clause and the Necessary and Proper Clause, and therefore constitutes an "ultra vires usurpation by the federal government of the police power that the Constitution commits to the States" in violation of the Tenth Amendment.  As we now show, those contentions lack merit..

### A.   Respondents' Facial Attack to the Act Fails Under Prevailing Supreme Court Authority

Facial challenges to a federal statute "impose a 'heavy burden' upon the parties maintaining the suit."  Gonzales v. Carhart, 127 S. Ct. 1610, 1639 (2007) (citing Rust v. Sullivan, 500 U.S. 173, 183 (1991)); see also United States v. Sabri, 541 U.S. 600, 609 (2004) ("Facial challenges are best when infrequent" and "are especially to be discouraged.").  That burden requires the litigant to show that "no set of circumstances exists under which the Act would be valid.  The fact that [the tax] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside of the limited context of the First Amendment" United States v. Salerno, 481 U.S. 739, 745 (1987).  Thus, to succeed on their facial challenge to the Act, respondents must show that every conceivable

application of the Act exceeds Congressional authority under the Commerce Clause and the Necessary and Proper Clause. That is a showing that respondents cannot make.

The Act subjects three categories of individuals to civil commitment proceedings: (1) those in the custody of the Bureau of Prisons; (2) those who have been committed to the custody of the Attorney General because of mental incapacity to stand trial for federal charges pursuant to 18 U.S.C. §4241(d); and (3) those against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person. See 18 U.S.C. §4248(a). By advancing a facial attack on the entire civil commitment scheme, respondents therefore must show that Congress exceeded its Article I authority with respect to all three categories of individuals subject to civil commitment proceedings. See Salerno, 481 U.S. at 745. Thus narrowed, the constitutional question is squarely answered by the Supreme Court's decision in Greenwood v. United States, 350 U.S. 366 (1956).

In Greenwood, the Supreme Court considered a challenge to a statute providing for "the care and custody of insane persons charged with or convicted of offenses against the United States." Id. at 367 (considering former 18 U.S.C. §§4244-48 (1949)). The petitioner had been charged with two counts of robbery from a United States Post Office and felonious assault on a postal employee. Id. at 369. After reviewing a series of psychological examinations, the trial court deemed petitioner to be legally insane and unable to participate in a criminal trial, and concluded that the petitioner "would probably endanger the safety of the officers, property, or other interests of the United States" if released into the community. Id. at 372. Under then-current sections 4247 and 4248, the trial court was authorized to commit a person found to be insane and "a probable danger to the officers, property, or other interests of the United States," until his sanity was restored or he was deemed no

- 5 -

longer a danger to others.  Id.  Finding sections 4247 and 4248 applicable, the trial court committed the petitioner to the custody of the United States.  Id.  Subsequently, the petitioner in Greenwood, as do the respondents here, challenged federal authority to permit the commitment of mentally ill persons unable to stand trial for pending criminal charges who were found to be a danger to others if released into the public.  Id. at 373.

The Supreme Court unanimously held that the civil commitment provisions were "plainly within congressional power under the Necessary and Proper Clause," holding that:

> The petitioner came legally into the custody of the United States.  The power that put him into such custody – the power to prosecute for federal offenses – is not exhausted.  Its assertion in the form of the pending indictment persists.  The District Court has found that the accused is mentally incompetent to stand trial at the present time and, that, if released, he would probably endanger the officers, property, or other interests of the United States[.]

Id. at 375.  Finding that the "commitment and therefore the legislation authorizing commitment in the context of this case, involve an assertion of authority, duly guarded, auxiliary to incontestable national power," the Court rejected the petitioner's challenge, concluding that the unlikelihood of petitioner's mental recovery "does not defeat federal power to make this initial commitment of the petitioner" and noting that Congress's power to hold the petitioner derived in part because "federal authority to prosecute" had not "been irretrievably frustrated."  Id.

In the half-century since the Supreme Court's decision in Greenwood, its teaching remains undisturbed.  "The federal government may resort to civil commitment when such commitment is necessary and proper to the exercise of some specific federal authority."  United States v. Perry, 788 F.2d 100, 110 (3d Cir. 1986).  More specifically, in Greenwood, the Court made clear that the "auxiliary" authority to commit mentally ill persons facing untried federal criminal charges is

tethered to Congress's Commerce Clause power to proscribe the conduct criminalized in those federal charges.  See 350 U.S. at 375; see also Higgins v. McGrath, 98 F. Supp. 670, 674 (W.D. Mo. 1951) ("If a person be so insane at the time he is brought to trial for the commission of a crime, he may be confined by the sovereign having jurisdiction of the crime, after his arrest therefor * * *  the right of the sovereign to proceed against an insane person charged with the commission of a felony is incidental to the power to define crimes and prescribe procedure under a criminal code.").

The circumstances under which an individual could be civilly committed under the Act under the second category set forth above -- those who have been committed to the custody of the Attorney General because of mental incapacity to stand trial for federal charges pursuant to 18 U.S.C. §4241(d) -- are strikingly similar to the circumstances examined in Greenwood.  In such cases, an individual would "legally [come] into the custody" of the United States when charged with criminal conduct in violation of federal laws.  And the power that brought the individual into the custody of the United States -- the power to prosecute -- would remain unexhausted.  A court would have adjudged the individual to be mentally incompetent to stand trial for those charges and placed him or her into the custody of the United States under section 4241, just as Greenwood was adjudged incompetent and committed to the custody of the United States under section 4241.  After the court had so ruled, the United States would have filed its certification to civilly commit the individual under section 4248 as directed by statute.  See 18 U.S.C. §4241(d) ("If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit proceedings to go forward, the defendant is subject to the provisions of sections 4246 and 4248.").  As with Greenwood -- who was found to suffer from a mental illness that would probably cause harm to others if released into the community -- the certification would reflect a determination that

the individual suffers from a serious mental illness, abnormality or disorder that would cause him or her serious difficulty in refraining from sexually violent conduct or child molestation if released into the community.

Each of the factors considered significant in Greenwood would be present in the case of an individual civilly committed under the Act.  That individual would have been charged with violating federal law -- but would not be able to stand trial because of mental incapacity -- and because he or she would have been certified as a danger to the community due to a condition rendering it likely that he or she will commit future sexually violent acts or child molestation, Congress possesses the power to craft a legislative scheme to preserve the government's prosecutorial authority by committing that individual in a way that is safe for the public.  Thus, at an irreducible minimum, Greenwood teaches that section 4248 as applied to an individual in the second category of persons who may be civilly committed is constitutionally valid.  And that is sufficient on a facial challenge to sustain the constitutionality of the Act.  See, e.g., Salinas v. United States, 552 U.S. 52, 61 (1997) (holding that when application of a statutory provision in a specific case "did not extend federal power beyond its proper bounds," the Court would not inquire into whether the provision exceeded Congress's power with respect to its "application in other cases"); United States v. Raines, 362 U.S. 17, 24-25 (1960) (prohibiting state official from attacking congressional legislation proscribing private citizens from race-based interference with voting rights); Rancho Viejo, LLC v. Norton, 323 F.3d 1062, 1078 (D.C. Cir. 2003) ("Because Rancho Viejo's own case represents a 'set of circumstances' under which the [Endangered Species Act] may constitutionally be applied [under the Commerce Clause] – even to the lowly arroyo toad – plaintiff cannot shoulder the 'heavy burden' required to prevail in a facial challenge."); S.D. Myers, Inc. v. City & County of San Francisco, 253 F.3d 461, 469 (9th Cir. 2001)

- 8 -

("By choosing to attack the Ordinance on its face, Myers has the burden of showing that the Ordinance will have the practical effect of directly regulating interstate commerce under all circumstances.").

### B.    Congress Maintains the Necessary and Proper Authority to Prevent the Commission of Federal Sex Crimes

Even if the constitutional analysis were to viewed more broadly, the Necessary and Proper Clause authorizes the entire civil commitment scheme of section 4248.  Where a person in the custody of the BOP or the Attorney General is certified as unable to refrain from committing sexually violent acts or molesting children because of a mental illness, abnormality, or disorder, Congress possesses the necessary and proper authority to prevent the likely future commission of a federal sex crime by preventing the release of the person into the public.  In this instance, Congress elected to preserve its powers to proscribe sexual misconduct by subjecting those incapacitated persons in BOP's or the Attorney General's custody to civil commitment.  Where the Constitution invests Congress with the power to criminalize, it invests Congress with the power to prevent the commission of those crimes by persons in BOP or Attorney General custody where "necessary and proper" to its authority to regulate persons in its custody and to criminalize the conduct.

Indeed, courts have blessed civil commitment schemes when necessary and proper to prevent the future commission of federal crimes.  In United States v. Perry, for example, the Third Circuit considered Congressional authority to "provide for civil commitment for 'the safety of the community'" by detaining persons under the Bail Reform Act, 18 U.S.C. §3142(e).  The appellant in that case had challenged a provision of the Bail Reform Act creating a presumption for persons charged with one of four drug trafficking offenses or firearm felonies that "no condition or

combination of conditions will reasonably assure * * * the safety of the community" and therefore requiring detention of the person before trial.  See Perry, 788 F.2d. at 109.

The Third Circuit unanimously rejected that claim.  In a decision authored by Judge Gibbons for himself and Judges Higginbotham and Becker, the Third Circuit rejected the appellant's contention that the Bail Reform Act's safety-of-community provision was prohibited "general welfare" legislation divorced from any of Congress's enumerated powers.  Id. at 110-11.  In reaching that conclusion, the Third Circuit first clarified that it was not presented with the same type of unexhausted federal prosecution issue extant in Greenwood.

> Because the government does not rely on the likelihood that [appellant] will not appear for trial, it does not defend the constitutionality of a detention order as necessary to assure [appellant's] presence at trial.  Instead, we are faced solely with the constitutionality of the second provision of the second presumption -- the safety of the community.

Id. at 109.  The Third Circuit nonetheless reasoned that "[w]hat Greenwood teaches * * * is that the federal government may resort to civil commitment when such commitment is necessary and proper to the exercise of some specific federal authority."  Id. at 110.  Because the presumption of detention was triggered only for those charged with serious violations of four federal drug and firearms offenses, the Third Circuit interpreted the Bail Reform Act as "aimed at preventing the specific harm to the community proscribed" by the four drug and firearms laws based on the "likelihood that the defendant will, if released, commit one of the proscribed federal offenses."  Id.  As such, the Third Circuit found the legislation to be a valid exercise of Congressional authority under the Necessary and Proper Clause, explaining that, "because Congress has the power to proscribe the activities in

- 10 -

question, it has the auxiliary-authority, under the necessary and proper clause, to resort to civil commitment to prevent their occurrence." Id. (emphasis added).

Perry is consistent with Necessary and Proper Clause jurisprudence. The Framers of the Constitution inserted the Necessary and Proper Clause "to remove all doubts respecting the right to legislate on the vast mass of incidental powers which must be involved in the constitution." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 420-21 (1819). Conferred with capacity to make all laws necessary and proper to the execution of its enumerated powers, Congress may enact laws that "bear a rational connection to any of its enumerated powers." United States v. Plotts, 347 F.3d 873, 878 (10th Cir. 2003) (citing United States v. Edgar, 304 F.3d 1320, 1326 (11th Cir. 2002)). To bear a rational connection to or be necessary and proper for its enumerated powers, an Act of Congress need not be "absolutely necessary" to the exercise of its constitutionally authorized powers. Jinks v. Richland Cty., 538 U.S. 456, 462 (2003). Indeed, for close to two centuries, the Supreme Court has counseled that "all means which are appropriate" and "plainly adapted" to effectuate Congress's powers "are constitutional." M'Culloch, 17 U.S. (4 Wheat) at 421.

Following M'Culloch, courts have routinely upheld legislation aimed at preventing federal crimes by persons in federal custody and as preemptive means to aid in Congress's authority to criminalize conduct. In United States v. Plotts, 347 F.3d 873 (10th Cir. 2003), for example, the Tenth Circuit upheld the constitutionality of the DNA Act, which requires persons convicted of specific offenses to provide DNA samples, as a valid exercise of Congressional authority under the Necessary and Proper Clause. The Tenth Circuit upheld the DNA Act holding that that statute is "a law necessary and proper to the Executive's constitutionally delegated law enforcement powers. First, as stated above, the crime * * * constitutes a valid exercise of Congress's Commerce Clause

- 11 -

powers.  Second, the Constitution invests the Executive with the duty 'to take Care that the Laws be faithfully executed.  It follows, then, that the Necessary and Proper Clause entrusts Congress with the power to pass laws to aid the Executive in prosecuting those who * * * violate federal criminal laws." 347 F.3d at 879.  Cf. United States v. Lue, 134 F.3d 79, 82 (2d Cir. 1998) (holding that the Necessary and Proper Clause enables Congress to pass laws to help effectuate the Article II Treaty Power)."  The Act similarly enables the Executive to prevent the commission of sex crimes.

Civil commitment is a plainly adapted and appropriate means to prevent the future commission of federal sex offenses by persons in the custody of BOP or the Attorney General who are likely, because of some incapacity, to commit sexually violent acts if released in the community. The challenged provision here permits courts to civilly commit the limited group of persons who have been medically or psychologically diagnosed to suffer from a serious mental condition, which makes it likely that he will commit sexually violent acts or molest children once released into society from federal custody.  As explained by the Supreme Court, "there are manifold restraints to which every person is necessarily subject for the common good.  On any other basis organized society could not exist with safety to its members."  Jackson v. Massachusetts, 197 U.S. 11, 26 (1905); see also Salerno,  481 U.S. at 747 (stating that "[t]here is no doubt that preventing danger to the community is a legitimate regulatory goal" and upholding federal interest in detaining persons post-arrest for the safety of the community).  Indeed, in the state legislation context, the Supreme Court has blessed as appropriate "measures to restrict the freedom of the dangerously mentally ill.  This is a legitimate non-punitive governmental objective and has been historically so regarded."  Kansas v. Hendricks, 521 U.S. 346, 363 (1997).  While the Court in Hendricks was not confronted with the federalism issue presented here, the Court's analysis confirms that it may be appropriate in certain

- 12 -

circumstances to involuntarily commit those persons in federal custody "who suffer from a volitional impairment rendering them dangerous beyond their control." Id. at 358.

Importantly, what is not at issue in this case is the plenary authority to commit any person that the government suspects may commit a federal crime at some point possibly in the future. This is not a case about prophylactic measures based on mere speculation. Instead, Congress has carved out a narrow class of persons who may be committed: only those in the BOP's or Attorney General's custody who have engaged or attempted to engage in sexually violent conduct or child molestation and who have been certified by trained professionals to have serious difficulty in refraining from sexually violent conduct or molesting children as a result of a mental illness, abnormality or disorder. In other words, to restrain those in federal custody who will probably commit sexually violent crimes in the future because of a mental condition. Where, as here, Congress has the power under the Commerce Clause to criminalize and punish such conduct, see, e.g., 18 U.S.C. §3559 (mandatory minimum term for violent crimes against children); 18 U.S.C. §§2241-45 (offenses and punishment for sexual misconduct); 18 U.S.C. §§2251-52 (criminalizing sexual exploitation of children), it has the "necessary and proper" authority to prevent their imminent or likely commission by persons in federal custody. Civil commitment of those in federal custody who are unable to refrain from sexually violent conduct has a decidedly rational relation to Congress's authority to proscribe such conduct by persons in its custody and to prevent harm to the public.

That the civil commitment statute may thwart the commission of purely state law sex offenses rather than federal crimes, is of no moment. In Perry, the Third Circuit was not concerned that Congress's legitimate concern in preventing the future occurrence of federal drug and firearms offenses may have had the effect of preventing purely state law drugs or firearms offenses. See 788

- 13 -

F.2d at 109.  That is for good reason.  In <u>Perry</u>, as here, it would likely have been difficult -- if not impossible -- for Congress to predict that commission of a federal crime would render it likely that the person in federal custody would recommit the same crime <u>in interstate commerce</u>.  Cf. <u>Gonzalez</u> v. <u>Raich</u>, 545 U.S. 1, 17 (2005) ("We have never required Congress to legislate with scientific exactitude.  When Congress decides that 'the total incidence' of a practice poses a threat to the national market, it may regulate the entire class."); <u>Westfall</u> v. <u>United States</u>, 274 U.S. 256, 259 (1927) ("[W]hen it is necessary to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so.").  While Congress has the institutional wisdom to find that a person in federal custody suffering from a mental abnormality is likely to commit violent conduct again, it is unsurprising that it would be difficult to predict, for example, the likelihood that the conduct would be committed in interstate commerce.

Nor is such a prediction necessary.  It is entirely rational for Congress to conclude that it may legislate so as to prevent the future commission of federal sex crimes by not releasing dangerous individuals in federal custody back into the community.  Under Necessary and Proper Clause jurisprudence, the legislation must simply be a rational means to safeguard Congressional authority.  Even dogmatic adherence to constrained views of Congressional authority does not require "Congress * * * to sit by and accept the risk of operations thwarted by local and state improbity." <u>Sabri</u>, 541 U.S. at 605.  Where the United States has in its custody a dangerous individual who has been found likely to commit acts underlying federal criminal offenses, it must not be that an artificially narrow view of "necessary," "proper," "appropriate," or "plainly adapted" requires the release of that person into the community, free to harm its members.  See <u>Ponzi</u> v. <u>Fessenden</u>, 258 U.S. 254, 262-63 (1922).  Under these circumstances, Congress has the authority to legislate to

prevent the commission of those harms by persons in federal custody.  See Sabri, 541 U.S. at 607 (rejecting challenge to law criminalizing bribes or kickbacks to persons in organizations receiving federal funding, even though law did not require a nexus between the bribe or kickback and federal funds, because the law "addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars" and because "corruption does not have to be that limited to affect the federal interest").

At bottom, the Constitution does not yoke Congress so that it is required to release from federal custody mentally ill persons found clinically unable to resist committing the acts of sexual violence or child molestation underlying its federal crimes.  At a minimum, Congress may legislate to ensure that those certified as unlikely to refrain from criminal conduct – owing to a mental incapacity – are not released to the public from federal custody to commit those crimes.  The Act therefore is a valid exercise of Congressional authority under the Necessary and Proper Clause, and this Court therefore need not reach the Commerce Clause question to conclude that Respondents' motion to dismiss should be denied.  See Pierce County. v. Guillen, 537 U.S. 129, 147 n.9 (2003) ("Because we conclude that Congress had authority under the Commerce Clause to enact both the original §409 and the 1995 amendment, we need not decide whether they could also be a proper exercise of Congress' authority under the Spending Clause or the Necessary and Proper Clause."); Plotts, 347 F.3d at 877 (not reaching Commerce Clause challenges to DNA Act because the court found adequate authority under the Necessary and Proper Clause).

- 15 -

## C.    The Act Does Not Transgress the Tenth Amendment

Respondents further contend that the Act exceeds Congress's power under the Necessary and Proper Clause because it conflicts with the federalist structure of the Constitution, as embodied in the Tenth Amendment. That contention fails both as a matter of jurisdiction and on the merits.

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. In Tennessee Elec. Power Co. v. Tennessee Valley Auth., 306 U.S. 118 (1939) ("TVA"), the Supreme Court held that private citizens lack standing to maintain Tenth Amendment claims, stating that "[a]s we have seen there is no objection to the Authority's operations by the states, and, if this were not so, the appellants, absent the states or their officers, have no standing in this suit to raise any question under the amendment." Id. at 144. That decision remains controlling. Thus, in Medeiros v. Vincent, 431 F.3d 25 (1st Cir. 2005), cert. denied, 126 S. Ct. 2968 (2006), the First Circuit affirmed the dismissal of a Tenth Amendment claim for lack of standing by a commercial fisherman to a provision of the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§5101-08. In doing so, the First Circuit rejected the contention that the above-quoted language in TVA was dictum or that it had been undermined by New York v. United States, 505 U.S. 144 (1992), stating that the court was obligated to adhere to the long-settled rule that "'[i]f a precedent of the [Supreme] Court has a direct application in a case, yet appears to rest on reasons rejected in some other line of cases, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" Medeiros, 431 F.3d at 34 (quoting Rodriquez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989)). Given that "[t]he TVA decision has direct application to the instant case,

in that it involved private parties attempting to assert Tenth Amendment claims, whereas New York did not," the First Circuit held that the commercial fisherman "lacks standing to pursue a Tenth Amendment claim that the Atlantic Coastal Act constitutes an unconstitutional commandeering of the Rhode Island legislative process." Id. at 36.

So here. Absent any involvement in these actions by the States or their officers, respondents lack standing to pursue a claim that the Act infringes on the federalist structure of the Constitution as embodied in the Tenth Amendment. See TVA, 306 U.S. at 144; Medeiros, 431 F.3d at 33-36. Consequently, that claim must be dismissed.

Even were respondents able to overcome this jurisdictional hurdle (which they are not), their Tenth Amendment challenge can be readily dispatched. As the language of that Amendment evinces, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States * * *." New York v. United States, 505 U.S. at 156. In other words, "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States [and] Congress may legislate in areas traditionally regulated by the States." Gregory v. Ashcroft, 501 U.S. 452, 460 (1991). The Supreme Court therefore "long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers." Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 291 (1981). As the Court explained, "[a]lthough such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result." Id. at 290; see also McConnell v. FEC, 540 U.S. 93, 186-87 (2003) ("It is not

- 17 -

uncommon for federal law to prohibit private conduct that is legal in some States.  Indeed, such conflict is inevitable in areas of law that involve both state and federal concerns.  It is not in and of itself a marker of constitutional infirmity.").

It therefore follows that, because the Act is a valid exercise of Congressional authority under the Necessary and Proper Clause, there can be no Tenth Amendment violation.[2]  See, e.g., Watters v. Wachovia Bank, N.A., 127 S. Ct. 1559 (2007) ("Regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses.  The Tenth Amendment, therefore, is not implicated.") (internal citation omitted); Raich v. Gonzales, --- F.3d ---, 2007 WL 754759, *13 (9th Cir. March 14, 2007) (holding that, because Controlled Substances Act was a valid exercise of Congressional authority under the Commerce Clause, "it would seem that there can be no Tenth Amendment violation in this case.").

## II.     THE ACT DOES NOT VIOLATE EQUAL PROTECTION

Respondents next contend (Brief at 23-30) that the Act is both underinclusive and overinclusive, and therefore violates the Equal Protection Clause.  With respect to the former claim, respondents assert that the Act "arbitrarily singles out a class of persons -- all federal prisoners,

---

[2]  The Act plainly does not implicate the commandeering line of cases, which involve attempts by Congress to direct states to perform certain functions, command state officers to administer federal regulatory programs, or to compel states to adopt specific legislation. See, e.g., Printz v. United States, 521 U.S. 898, 935 (1997); New York v. United States, 505 U.S. at 166.  The Act does not force the several States to take any action whatsoever, or command state officers to administer or enforce federal laws or regulations.  See, e.g., McConnell, 540 U.S. at 186 (Title I of Bipartisan Campaign Reform Act did not run afoul of Tenth Amendment because it "only regulates the conduct of private parties" and "imposes no requirements whatsoever upon States or state officials"); United States v. Jones, 231 F.3d 508, 515 (9th Cir. 2000) (federal statute regulating possession of firearms did not violate Tenth Amendment because it is "a federal criminal statute to be implemented by federal authorities; it does not attempt to force the states or state officers to enact or enforce any federal regulation.").

whether or not ever convicted of a sex crime -- as eligible for possible lifetime civil commitment as 'sexually dangerous.'"  With respect to the latter claim, respondents contend that the Act "arbitrarily subjects one class of mentally ill federal prisoners -- those with a disorder that results in a 'serious difficulty in refraining from sexually violent conduct or child molestation' -- to greater procedural and substantive burdens than those imposed on mentally ill federal prisoners whose disorder poses a generic 'substantial risk of serious bodily injury to another person.'"  Both arguments are insubstantial.

### A.    Standard of Review

As a preliminary matter, respondents' fairly half-hearted contention (Brief at 22-23) that the Act should be subjected to strict scrutiny can be readily dispatched.  Several courts have held that equal protection challenges to statutes governing sexually dangerous persons are revised under the rational basis test, see, e.g., In re Dutil, 437 Mass. 9, 21, 768 N.E.2d 1055, 1066 (2002) ("We have always applied a rational basis standard of review for equal protection claims brought by sexually dangerous persons.") (citing Commonwealth v. Tate, 424 Mass. 236, 239, 675 N.E.2d 772, 774-75 (1997); Westerheide v. State, 831 So.2d 93, 111-12 (Fla. 2002) (same); In re Turay, 139 Wash.2d 379, 409-10, 986 P.2d 790 (1999) (same), while other courts have similarly held that the difference between a prisoner and a non-prisoner also is subject to rational basis review.  See, e.g., Varner v. Monohan, 460 F.3d 861, 865 (7th Cir. 2006) (Easterbrook, J.) ("Rational-basis review applies here–the difference between a person who has been convicted of sex offenses (the SVPA) and one who has not (the SDPA) affects neither fundamental rights nor suspect classes."), cert. denied, 127 S. Ct. 1836 (2007); United States v. Weed, 389 F.3d 1060, 1071 (10th Cir. 2004) (applying rational basis test to equal protection challenge to civil commitment hearing under 18 U.S.C. §4243).

- 19 -

The only authority that respondents can muster for the contrary proposition is <u>Foucha</u> v. <u>Louisiana</u>, 504 U.S. 71 (1992), but the language upon which they rely -- "Freedom from physical restraint being a fundamental right, the State must have a particularly convincing reason, which it has not put forward, for such discrimination against insanity acquittees who are no longer mentally ill" -- is taken from Part III of the Court's decision in that case, which constituted only the <u>plurality</u> opinion of four Justices and which did not command a majority of the Court. <u>See id</u>. at 86 (plurality opinion of WHITE, J., joined by BLACKMUN, STEVENS, and SOUTER, JJ.).   It therefore constitutes neither binding nor controlling authority. <u>See</u> <u>Texas</u> v. <u>Brown</u>, 460 U.S. 730, 737 (1983) (discussion of a contested issue in a plurality opinion is "not a binding precedent" if it "has never been expressly adopted by a majority of this Court").

A majority of the Supreme Court <u>has</u> indicated, by contrast, that the difference between a prisoner and a non-prisoner neither affects a fundamental right nor a suspect class, and therefore is subject to rational basis review. <u>See</u> <u>Jones</u> v. <u>United States</u>, 463 U.S. 354, 363 n.10 (1983) ("[I]f the Due Process Clause does not require that an insanity acquittee be given the particular procedural safeguards provided in a civil-commitment hearing under [<u>Addington</u> v. <u>Texas</u>, 441 U.S. 418 (1979)], then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquittees. We agree, and therefore address petitioner's arguments in terms of the Due Process Clause.").   While some courts have read this language as dicta, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Sahhar</u>, 917 F.2d 1197, 1201 (9th Cir. 1990), most courts have found it to be controlling. <u>See</u>, <u>e.g.</u>, <u>Weed</u>, 389 F.3d at 1071; <u>Benham</u> v. <u>Ledbetter</u>, 785 F.2d 1480, 1485 n.4 (11th Cir. 1986); <u>State</u> v. <u>Miller</u>, 84 Hawaii 269, 276, 933 P.2d 606, 613 (1997); <u>Curnow</u> v. <u>Yarbrough</u>, 676 P.2d 1177, 1186 n.9 (Colo. 1984).   And, even if it were dicta, the First

Circuit has held that "[e]ven dicta in Supreme Court opinions is looked on with great deference." S.E.C. v. Rocklage, 470 F.3d 1, 7 n.3 (1st Cir. 2006) (citing United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993)).  Rational basis therefore is the appropriate standard of review in these cases.

Classifications subject to rational basis review are accorded "a strong presumption of validity" and must be sustained "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Heller v. Doe, 509 U.S. 312, 320 (1993). It therefore is the burden on those attacking the rationality of such classifications "to negative every conceivable basis which might support it." FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993).  The government thus "has no obligation to produce evidence to sustain the rationality" of a statute subject to rational basis review; to the contrary, the Supreme Court has made clear that "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." Heller, 509 U.S. at 320 (emphasis added).  Thus, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived as true by the governmental decisionmaker." Vance v. Bradley, 440 U.S. 93, 111 (1979).

### B.     The Act Does Not Violate Equal Protection By Being Underinclusive

Respondents first contend (Brief at 23-25) that, because only federal prisoners may be subject to civil commitment under the Act, the statute violates equal protection inasmuch as "[t]he class of persons in federal custody bears no correlation, let alone a rational relation, to the governmental purpose of incapacitating 'sexually dangerous' individuals."  It is at this starting point of the equal protection analysis that respondents' argument fails.  Sexually dangerous prisoners in the custody of the Bureau of Prisons or the Attorney General owing to mental incapacity are not similarly

situated with sexually dangerous persons not charged with a federal crime or serving a federal

sentence.  Indeed, "[t]he Constitution does not require things which are different in fact or opinion

to be treated in law as though they were the same."  Tigner v. Texas, 310 U.S. 141, 147 (1940); see

also Plyler v. Doe, 457 U.S. 202, 216 (1982) (equal protection clause requires similar treatment of

similarly situated persons; it does not require things which are different in fact or opinion to be

treated in law as though they were the same).

The First Circuit considered and rejected a nearly identical claim in Peterson v. Gaughan, 404

F.2d 1375 (1st Cir. 1968), a case involving a habeas challenge to M.G.L. 123A, relating to the care,

treatment, and rehabilitation of sexually dangerous persons.  In that case, the appellant, like

respondents here, argued that there was "no rational basis for not including persons serving

suspended sentences, former convicts, or citizens subject to some governmental scrutiny such as

students attending a state university."  Id. at 1378.  The First Circuit summarily dismissed this

argument, concluding that "[t]hese efforts to demolish the line that has been drawn are as capricious

as the line is not," noting that there would be problems as to invasion of privacy and interference

with individual liberty with any legislative attempt to subject persons who are not in custody and

have not committed acts subjecting them to prosecution for sexual misconduct to civil commitment.

Id. at 1378 & n.4 (citing Commonwealth v. Major, 354 Mass. 666, 669, 241 N.E.2d 822, 824

(1968)).

The Ninth Circuit also considered and rejected a nearly identical claim in Hubbart v. Knapp,

379 F.3d 773 (9th Cir. 2004), cert. denied, 543 U.S. 1071 (2005).  In that case, the California

Sexually Violent Predator Act ("CSVPA") provided for the civil commitment only of individuals

who were already in state custody.  Similar to the respondents' argument here, the petitioner in that

- 22 -

case challenged the distinction on equal protection grounds, arguing that California had "no constitutional authority to distinguish his case from those of other sex offenders who would be eligible for commitment under the SVPA but for the fact that they were not unlawfully 'in custody' pursuant to the former parole revocation regulation." Id. at 781.  The Ninth Circuit found no merit to that claim, agreeing with the California Court of Appeal's determination that "the state 'has a compelling * * * interest in identifying, confining, and treating persons who represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence,'" and that the SVPA "'is narrowly tailored to apply to a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders [who] can be identified while they are incarcerated.'"  Id. at 781 (quoting People v. Hubbart, 88 Cal.App.4th 1202, 1231, 106 Cal.Rptr.2d 490 (2001).  Although the Ninth Circuit noted that "we do not ordinarily apply strict scrutiny review to civil commitment schemes," the court held that "we need not disturb the California court's heightened analysis here" to sustain the SVPA against the equal protection challenge.  Id.

Here, the distinction between persons in federal custody and those who are not is the same as in Peterson and Hubbart, and likewise does not offend the Constitution.  The Act addresses a unique federal concern -- the control and treatment of dangerous persons within the federal criminal justice system.[3]  That distinction is a rational one and easily passes muster under the Constitution. See Sahhar, 917 F.2d at 1201-04 (upholding 18 U.S.C. §4246 against like equal protection challenge).  Indeed, an Act of Congress generally is not invalid under rationality review because it

---

[3]  As shown above, the Supreme Court has upheld the Federal Government's interest in protecting the community from persons who come into federal custody.  See Salerno, 481 U.S. at 747.  To the extent that respondents argue that persons outside of federal custody are not subject to federal commitment, those persons would not constitute a proper reference class for equal protection purposes.  See United States v. Antelope, 430 U.S. 641, 649 n.12 (1977).

is underinclusive.  Congress can "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," <u>Beach Communications</u>, 508 U.S. at 316, and "courts are compelled * * * to accept a legislature's generalizations even when there is an imperfect fit between means and ends." <u>Heller</u>, 509 U.S. at 321.

### C.    The Act Does Not Violate Equal Protection By Being Overinclusive

Respondents also contend (Brief at 25-29) that the Act is overinclusive because individuals who are committed under section 4248 "are subjected to a civil commitment scheme that confers fewer procedural rights and imposes more substantive burdens than the pre-existing civil commitment scheme applicable to federal prisoners who pose some other kind of 'substantial risk of serious bodily injury to another person.'" Specifically, respondents note that the Act applies to anyone who is in federal custody, while the pre-existing civil commitment scheme applies only to persons in custody who are already hospitalized for a mental disorder.  But that is because Congress intended <u>all</u> persons in federal custody determined to be "sexually dangerous persons" to be civilly committed, not merely those who have been hospitalized for a mental disorder.  And there is a rational basis for this distinction.  As the Seventh Circuit has held, "it is not unreasonable for the State to believe that a person with a mental disorder of a sexual nature is qualitatively more dangerous than another mental patient who nonetheless threatens danger to himself or others. Wisconsin has a rational basis for drawing [these] distinctions * * *." <u>Thielman</u> v. <u>Leean</u>, 282 F.3d 478, 485 (7th Cir. 2002).

Indeed, state courts have uniformly upheld differences in treatment between sexually dangerous persons and mentally ill individuals against equal protection challenges on the ground that the former are more dangerous than the latter.  <u>See</u>, <u>e.g.</u>, <u>In re Young</u>, 122 Wash.2d 1, 45, 857 P.2d

- 24 -

989, 1010 (1993) ("It is important to note at the outset that there are good reasons to treat mentally

ill people differently than violent sex offenders," most particularly that "[s]exually violent predators

are generally considered more dangerous to others than the mentally ill."); In the Matter of the

Treatment and Care of Luckabaugh, 351 S.C. 122, 150, 568 S.E.2d 338, 352 (2002) ("To require the

Legislature to treat the two groups similarly would require overruling a rational determination that

sexually violent predators have certain characteristics that make their treatment needs different from

other involuntarily committed individuals.  The potential danger to the community provides a

rational reason why sexually violent predators should be treated differently than other committed

patients."); In re Detention of Williams, 628 N.W.2d 447, 454 (Iowa 2001) ("[T]he specialized

treatment needs of [sexually violent predators], when compared to others who suffer from different

mental abnormalities, justify the different classification and treatment chosen by the legislature.");

People v. Pembrock, 62 Ill.2d 317, 322, 342 N.E.2d 28, 30 (1976) ("A 'sexually dangerous person'

creates different societal problems, and his past conduct is different in degree and kind from the

conduct of persons in the larger, more inclusive class defined under the Mental Health Code.  The

defendant has failed to show why, in light of these factors, the legislature is not justified in

prescribing a different manner of treatment."); Peterson v. State, 104 Wash.App. 283, 290, 36 P.3d

1053, 1057 (2000) ("Because sexually violent predators are more dangerous than mentally ill

individuals under RCW 71.05, it is rational to impose a show cause hearing and a full evidentiary

hearing prior to their release.") (emphasis in original, internal footnote omitted); Martin v. Reinstein,

195 Ariz. 293, 311, 987 P.2d 779, 797 (Ariz. App. Div. 1999) ("The legislature has found that

members of Petitioner's class tend to repeat their criminal acts and pose a higher risk of danger than

do other classes of mentally ill or mentally disabled persons. * * * Given the differences between

- 25 -

the groups, the legislature has determined that the underlying mental conditions of members of Petitioner's class render them unamenable to or inappropriate for existing involuntary commitment procedures. * * * We hold that it was not irrational or unreasonable for the legislature to create a different classification for Petitioners.").

Respondents' reliance on Jackson v. Indiana, 406 U.S. 715 (1972), Baxstrom v. Herold, 383 U.S. 107 (1966), and Humphrey v. Cady, 405 U.S. 504 (1972), therefore is misplaced..  Sexually dangerous persons are not similarly situated to those who have been hospitalized under section 4246, and Congress therefore had a rational basis for providing for different civil commitment schemes for those two classes.  .

Respondents also contend that subsection 4246(d) requires ongoing efforts by the Attorney General to transfer committed persons to state custody, see 18 U.S.C. §4246(d) ("The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care and treatment."), while the Act assertedly contains no parallel provision.  Not so.  Subsection 4248(d) contains nearly identical language to subsection 4246(d), providing that: "The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment.  The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility."  To be sure, subsection 4246(d) expressly provides that such efforts shall be made "periodically" while subsection 4248(d) does not, but that requirement inheres in the statutory command that the Attorney General "shall make all reasonable efforts to cause such a State to assume such responsibility."  18 U.S.C. §4248(d).  And respondents offer no

plausible explanation as to why this distinction, in any event, is constitutionally significant in any meaningful sense.

### III.   THE ACT IS A NON-PUNITIVE CIVIL COMMITMENT STATUTE, NOT SUBJECT TO CRIMINAL PROTECTIONS

Respondents next contend that the Act is facially unconstitutional because it subjects them to criminal proceedings without affording them the constitutional protections attendant to criminal proceedings.  As we now show, that contention is insubstantial.

### A.   Standards

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme Court rejected the claim that Kansas's Sexually Violent Predator's Act established criminal proceedings, and therefore violated the Constitution's Double Jeopardy and Ex Post Facto Clauses.  In analyzing that claim, the Court held that: "The categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction.'  We must first initially ascertain whether the legislature meant the statute to establish 'civil' proceedings."  Id. at 361 (quoting Allen v. Illinois, 478 U.S. 364, 368 (1986)). "If so," the Court held, "we ordinarily defer to the legislature's stated intent"; indeed, "we will reject the legislature's manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'"  Id. (quoting United States v. Ward, 448 U.S. 242, 248-49 (1980)); see Flemming v. Nestor, 363 U.S. 603, 617 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the ground that the 'history and scope' of the statute reveal a punitive purpose notwithstanding the legislative intent].").

- 27 -

In making this latter determination, the Supreme Court has held that the factors listed in Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963), "provide useful guideposts." Hudson v. United States, 522 U.S. 93, 99 (1997). Those factors include: (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter "; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned." Mendoza-Martinez, 372 U.S. at 168-69. The Court has emphasized, however, that "'these factors must be considered in relation to the statute on its face,' and 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Hudson, 522 U.S. at 100 (quoting, respectively, Mendoza-Martinez, 372 U.S. at 169, and United States v. Ward, 448 U.S. at 249). Moreover, the Court made clear in Mendoza-Martinez that, because these factors "may often point in differing directions," no single factor is dispositive. See 372 U.S. at 169; see Hudson, 522 U.S. at 101 (disavowing the method of analysis used in United States v. Halper, 490 U.S. 435, 448 (1989), in part because the Court in Halper had "elevated a single Kennedy factor-whether the sanction appeared excessive in relation to its nonpunitive purposes-to dispositive status.").

Judged by these standards, it is plain that Congress intended to create a civil commitment proceeding when it enacted the Act, and that nothing in the Act is not so punitive in purpose or effect to override that Congressional intent.

- 28 -

**B.      Congress Intended to Create a Civil Commitment Proceeding**

In ascertaining whether Congress intended the Act to establish civil or criminal proceedings, this Court "'must first ask whether, in establishing the penalizing mechanism, [Congress] indicated either expressly or impliedly a preference for one label or the other.'" Smith v. Doe, 538 U.S. 84, 93 (2003) (quoting Hudson, 522 U.S. at 99). The answer to that question is yes. Congress expressed its clear intent to create a civil commitment proceeding by entitling the Act "Civil commitment of a sexually dangerous person," 18 U.S.C. §4248, and by codifying the Act in Chapter 313 of Title 18 of the United States Code, alongside the other federal civil commitment provisions for Offenders with Mental Diseases or Defects, including 18 U.S.C. §§4241, 4243, 4245, & 4246. Hence, as with the Kansas statute, nothing on the face of the Act suggests anything other than Congress's intention to create a civil commitment scheme. See Hendricks, 521 U.S. at 361 ("Kansas' objective to create a civil proceeding is evidenced by its placement of the Act within the Kansas probate code, instead of the criminal code, as well as its description of the Act as creating a 'civil commitment procedure.'").

Neither of the arguments which respondents make to the contrary has force. Respondents first contend (Brief at 31-32) that Congress's definition of a "sexually dangerous person" as one who is "sexually dangerous to others" renders the Act criminal in nature because it is focused on the preventive incarceration of persons for the protection of society, while other civil commitment schemes focus equally on concern for the welfare of the committed person. To begin with, this argument goes to whether the Act is punitive in purpose or effect, not whether Congress's stated intent was to enact a civil or criminal commitment proceeding. But, in any event, it is utterly lacking in foundation. In Hendricks, the Supreme Court held that:

> The State may take measures to restrict the freedom of the dangerously mentally ill.   This is a legitimate nonpunitive governmental objective and has been historically so regarded.  The Court has, in fact, cited the confinement of 'mentally unstable individuals who present a danger to the public' as one classic example of nonpunitive detention.  If detention for the purpose of protecting the community from harm <u>necessarily</u> constituted punishment, then all involuntary civil commitments would have to be considered punishment.   But we have never so held.

521 U.S. at 363 (emphasis in original) (citing <u>Salerno</u>, 481 U.S. at 748-49).  This language enervates any suggestion that commitment for purposes of public safety renders a commitment proceeding criminal in nature.  Finally, the Act does contemplate treatment for committed persons.  <u>See</u> 18 U.S.C. §4248(d).

Respondents also miss the mark in contending (Brief at 32-33) that the fact that the Act was placed in Title 18 of the United States Code, which generally governs criminal prohibitions, indicates Congress's intent that it is a criminal proceeding.  As we have shown above, that chapter of Title 18 in which the Act was placed -- Chapter 313 --- contains other civil commitment provisions which the federal courts have uniformly found to be civil in nature.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Baker</u>, 45 F.3d 837, 842 (4th Cir. 1995) ("A commitment hearing [under 18 U.S.C. §4245] is a civil matter.  Thus, the constitutional rights to which a defendant in a criminal trial is entitled do not adhere to a respondent in a commitment hearing.") (internal citations omitted); <u>United States</u> v. <u>Veltman</u>, 9 F.3d 718, 721 (8th Cir. 1993) ("The waiver was with respect to civil commitment proceedings under section 4245(a), seeking to determine whether and where treatment would be given for Veltman's mental condition, as part of the service of his sentence.  Unlike a criminal trial which requires proof beyond a reasonable doubt, such proceedings seek to resolve only limited issues * * *."); <u>United States</u> v. <u>Phelps</u>, 955 F.2d 1258, 1262 (9th Cir. 1992) (district court "correctly determined that [18

U.S.C. §4243(f)] is 'civil' in nature."); <u>Sahhar</u>, 917 F.2d at 1205-06 ("[F]ederal commitment serves a regulatory, rather than punitive, purpose and section 4246 need not incorporate the right to a jury trial.").

What is more, Title 18 as a whole does not simply govern crimes and criminal procedure, as respondents suggest, but rather contains many other provisions that involve civil proceedings or remedies.  <u>See</u>, <u>e.g.</u>, 18 U.S.C. §981 (civil forfeiture proceedings); 18 U.S.C. §1345 (injunction against fraud); 18 U.S.C. §1964 (federal civil RICO remedies); 18 U.S.C. §2520 (provision for recovery of civil damages for interception of wire, oral, or electronic communications).  Thus, like the Alaska Sex Offender Registration Act that the Supreme Court in found to be a civil in nature, the codification of section 4248 in Title 18 does not undermine the conclusion that Congress intended the Act to be a civil proceeding.  <u>See</u> <u>Smith</u> v. <u>Doe</u> 538 U.S. at 1148 ("Title 12 of Alaska's Code of Criminal Procedure (where the Act's registration provisions are located) contains many provisions that do not involve criminal punishment * * *.  The partial codification of the [Alaska] Act in the State's criminal procedure code is not sufficient to support a conclusion that the legislative intent was punitive."); <u>see also</u> <u>United States</u> v. <u>Mohammed</u>, 165 F.3d 327, 333 (5th Cir. 1999) (rejecting like argument that 18 U.S.C. §4245 was not civil in nature because it was placed in Title 18 of the United States Code).

### C.      The Act is Not Punitive in Purpose or Effect

In order to show that the Act is criminal in nature, respondents thus must satisfy the "heavy burden" of showing "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."  <u>Hendricks</u>, 521 U.S. at 361 (quoting <u>United States</u> v. <u>Ward</u>, 448 U.S. at 248-49).  They cannot come close to making this showing.

In <u>Hendricks</u>, the Supreme Court found that the Kansas statute was not punitive either in purpose or effect because it (1) "does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence"; (2) that no finding of scienter was required, instead, the commitment determination is made based on a "mental abnormality" or "personality disorder" rather than on one's criminal intent; (3) that the Kansas legislature did not intend the statute to function as a deterrent, particularly inasmuch as "persons committed under the Act are, by definition, suffering from a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior," and "are therefore unlikely to be deterred by the threat of confinement"; (4) that although the statute involved an affirmative restraint, "[t]he State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded"; (5) that the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others"; (6) that commitment under the Act was only <u>potentially</u> indefinite, and had to be annually renewed; (7) that Kansas's decision to provide some of the safeguards applicable in criminal trials did not transform those proceedings into criminal prosecutions; and (8) that any the lack of treatment did not alter this conclusion, for "we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." <u>Id</u>. at 361-68.

A consideration of these very same factors compels the conclusion that, like the Kansas statute, the Act is intended to meet the legitimate non-punitive government objective of protecting the public from harm from sexually dangerous persons. Like the Kansas statute, because section 4248 covers only persons with volitional problems, it thereby does not seek to punish by seeking

retribution or deterrence.  Like the Kansas statute, no finding of scienter is required, meaning that the commitment determination is made based on a mental abnormality or personality disorder rather than on one's criminal intent.  Like the Kansas statute, Congress did not intend the Act to function as a deterrent, inasmuch as those committed under the Act necessarily suffer " from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released," 18 U.S.C. §4247(a)(6).  Like the Kansas statute, although the Act involves an affirmative restraint, "a legitimate nonpunitive governmental objective [that] has been historically so regarded," Hendricks, 521 U.S. at 363.  Like the Kansas statute, the Act's confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until he or she "is no longer sexually dangerous to others," 18 U.S.C. §4248(e).  Like the Kansas statute, commitment under section 4248 is only potentially indefinite, see 18 U.S.C. §4248(e), and the director of the facility where the person is committed is required to file annual reports "concerning the mental condition of the person and containing recommendations concerning the need for his continued commitment," 18 U.S.C. §4247(e)(1)(B).  And like the Kansas statute, any lack of treatment with the goal of reintegration into society does not alter this conclusion,  for  "we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others."  Id. at 366.

At bottom, respondents cannot show by "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."  Id. at 361 (quoting United States v. Ward, 448 U.S. at 248-49).

- 33 -

### D.  The Act Does Not Require the Constitutional Protections Required in Criminal Proceedings

Because, as we have shown above, the Act is a civil commitment proceeding, the constitutional protections required in criminal proceedings are not implicated.  See, e.g., Hendricks, 521 U.S. at 370-71 (Ex Post Facto Clause); United States v. Janis, 428 U.S. 433, 454 (1976) (Fourth Amendment); Mackin v. United States, 117 U.S. 348, 351 (1886) (Fifth Amendment's grand jury clause); United States v. Ward, 448 U.S. at 248 (Fifth Amendment's self-incrimination clause and Sixth Amendment); Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979) (Eighth Amendment).

## V.  THE ACT DOES NOT VIOLATE DUE PROCESS

Respondents next contend (Brief at 43-57) that the Act violates due process because it (1) authorizes the indefinite commitment of persons who have never been convicted of or charged with a sex crime; (2) deprives them of liberty without a preliminary hearing or "probable cause" determination; and (3) fails to provide for adequate notice, proof beyond a reasonable doubt, and trial by jury.  Each of those contentions is baseless.

### A.  Standards

The Supreme Court has held that the Due Process Clause protects certain "fundamental rights and liberties" from deprivation by the government, regardless of the procedures provided, "'unless the infringement is narrowly tailored to serve a compelling state interest.'"  Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)).  In the absence of a fundamental right, the Court requires that the challenged prohibition or classification be "rationally related to legitimate state interests."  Id. at 728 n.21.

- 34 -

**B.      The Act Does Not Violate Due Process By Authorizing the Commitment of Persons Who Have Not Been Convicted or Charged With a Sex Crime**

Respondents first contend (Brief at 42-46) that the Act violates due process because it authorizes the "indefinite commitment" of persons who have never been convicted of or charged with a sex crime.  That claim is unavailing.

The Supreme Court has consistently upheld involuntary commitment statutes designed to civilly commit people who are unable to control their behavior, and thus pose a danger to the public safety.  See Hendricks, 521 U.S. at 357 (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992), and Addington v. Texas, 441 U.S. at 426-27).  More specifically, the Supreme Court has determined that sexually dangerous persons may be civilly committed without violating the Constitution.  See Kansas v. Crane, 534 U.S. 407 (2002) (upholding constitutionality of Kansas Sexually Violent Predator Act); Hendricks, 521 U.S. at 357 (same); Allen v. Illinois, 478 U.S. at 368 (upholding Fifth Amendment challenge to Illinois Sexually Dangerous Persons Act).

The Supreme Court considered and addressed the particular requirements of substantive due process in Hendricks, and again in Crane, in reviewing Kansas's Sexually Violent Predator Act.  The Kansas statute authorized the civil commitment of "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the [sic] predatory acts of sexual violence." Hendricks, 521 U.S. at 352.

In Hendricks, the Court was asked to decide whether the civil commitment of a person as a result of a mental abnormality like pedophilia, in the absence of a more traditional mental illness, is a violation of substantive due process. Id. at 356.  Prior to concluding that a mental abnormality,

- 35 -

may serve as the basis for civil commitment, the Court explained that dangerousness, by itself, will not ordinarily justify civil commitment. Id. at 358.  The Court held however, that dangerousness influenced by a mental illness or abnormality is a sufficient basis for civil commitment because such a combination "narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." Id.  The Court concluded that as long as the committed person's mental condition affects the person's ability to control his or her dangerousness, civil commitment does not violate due process. Id. at 358-60.

Five years later in Kansas v. Crane, the Court once again reviewed a constitutional question arising from the application of the Kansas Act.  Crane, 534 U.S. at 409.  Following Hendricks, the Kansas Supreme Court seemed to conclude that the Constitution requires a showing that a person completely lacks the capacity to control his or her dangerousness to justify civil commitment.  Id. at 411.  In Crane, the State challenged the conclusion that the Constitution requires a complete lack of control.  Id.

The Crane Court agreed with the State that a sexually dangerous person may be civilly committed even if that person possesses some capacity to control his or her behavior.  Id. at 411-12. The Court noted that "most severely ill people – even those commonly termed 'psychopaths'-- retain some ability to control their behavior."  Id. at 412.  The Court emphasized, however, that a demonstration of some lack of control is required, but stopped short of attempting to define the necessary degree of impulsivity with "mathematical precision."  Id. at 412-13.  In the Court's view, "proof of serious difficulty in controlling behavior" is needed to distinguish civil commitment from criminal prosecution with its attendant goals of general deterrence and retribution.  Id.  The Court moderated this finding by explaining that it does not erase the "considerable leeway" that states

- 36 -

possess "in defining the mental abnormalities and personality disorders that make an individual eligible for commitment." Id. at 413.

The federal civil commitment scheme at issue in this case was carefully drafted with these Supreme Court precedents in mind.[4]  As a result, Congress intended that the Act only provide for commitment of a narrow class of mentally ill and sexually dangerous individuals in federal custody. Specifically, a person in federal custody may only be committed under the Act where the government proves that a person has engaged or attempted to engage in sexually violent conduct or child molestation; suffers from a serious mental illness, abnormality, or disorder; and, that as a result, would have serious difficulty refraining from sexually violent conduct or child molestation if released.  Therefore, based on the substantive provisions of the Act and considering the due process limits set forth in Hendricks, Crane, and Allen, the scheme does not violate due process.

Respondents' attempt (Brief at 44-45) to distinguish 18 U.S.C. §4248 from the Kansas Act at issue in Hendricks is of no consequence.  Respondents argue that Hendricks requires that a person be convicted of or charged with a sexually violent offense in order to pass constitutional muster. However, even though the Kansas Act at issue in Hendricks requires a charge or conviction, the Supreme Court recognized that where a statute requires "evidence of past sexually violent behavior" coupled with "some additional factor, such as a 'mental illness' or 'mental abnormality,'" the statute

---

    [4]  This has been the sense of Congress since beginning consideration of a federal sexually dangerous person commitment scheme.  Prior bills and committee testimony considering the same scheme for passage have specifically referenced the fact that Congress carefully considered Hendricks and Crane when crafting the legislation.  See e.g., H.R. Rep. 109-218(I), 2005 WL 2210642 (recognizing that the proposed civil commitment scheme is substantively similar to those approved by the Supreme Court in Hendricks and Crane); 151 Cong. Rec. 7887 (2005) (Mr. Sensenbrenner, recognizing that "[civil commitment scheme] has been carefully drafted to ensure compliance with the Supreme Court decisions approving such laws in Kansas v Hendrick 1997, and Kansas v. Crane in 2002.")

will not violate due process.  Hendricks, 521 U.S. at 357-58 (emphasis added, citations omitted).

Accordingly, due process is protected where there is the presence of a mental ailment coupled some

evidence of past sexually violent behavior.  This is precisely what the Act at issue here requires.

### C.   Respondents Cannot Show on a Facial Challenge that the Deprivation of Liberty Without a Preliminary Hearing or Probable Cause Determination Violates Due Process

Respondents next contend (Brief at 46-49) that they are "currently stayed beyond the dates

when they were to have been released from custody imposed by criminal conviction and judgment,"

and that "given the time allowed for a court-ordered psychiatric evaluation, the complexity of factual

and scientific proof at issue, and the schedules of counsel and the court, Defendants are likely, as a

practical matter, to spend many months in detention before the court is able to hold a full hearing on

the merits and make a final commitment determination."  That, respondents contend, violates due

process.

Respondents' focus on the specifics of their particular cases in making this due process claim

is misplaced for two reasons.  First, respondents have waived any as-applied due process claim to

their detention, having requested that the hearings in their individual cases be postponed until after

briefing and a decision on their constitutional challenges.  Second, this is a facial challenge to the

prehearing detention provision of subsection 4248(a), and the circumstances of their individual cases

therefore matters not.  Rather, to succeed on their facial challenge to the Act, respondents must show

that "that no set of circumstances exists under which the Act would be valid."  Salerno, 481 U.S. at

745.  Thus, for example, the Supreme Court has upheld the Bail Reform Act against a facial

constitutional challenge because, even if under some circumstances it operates unconstitutionally,

there are circumstances where it would operate constitutionally.  See Schall v. Martin, 467 U.S. 253, 264, 269 n.18 (1984).

Given this standard, respondents' facial challenge fails because there are numerous scenarios under which staying the release of a person pending completion of the Act's procedures would unquestionably be constitutionally valid.  For example, if the government issued a certification, the person underwent a court-ordered psychiatric or psychological examination, and the court found the person to be a "sexually dangerous person" after a hearing -- all before defendant's scheduled release date -- the Act unquestionably would comport with the Due Process Clause because any liberty interest would be protected because the commitment procedures would have been completed before the person's sentence expired.  Respondents do not allege, nor could they, that if the section 4248 commitment hearing at which the court found him to be a "sexually dangerous person" occurred prior to his scheduled release date, the stay of his release, as directed by section 4248(a), would violate due process.

Similarly, if the certification, court-ordered psychiatric or psychological examination, and hearing took place within forty-five days of the person's confinement, it would also comport with due process.  This conclusion follows from the Supreme Court's summary affirmance in Logan v. Arafeh, 346 F. Supp. 1265 (D. Conn. 1972), aff'd sub nom. Briggs v. Arafeh, 411 U.S. 911 (1973), upholding a three-judge district court determination that an individual could be confined for up to forty-five days without a judicial hearing without offending due process.  See Hicks v. Miranda, 422 U.S. 332, 344-45 (1975) (inferior federal courts bound by summary decisions of the Supreme Court unless informed otherwise); Auburn Police Union v. Carpenter, 8 F.3d 886, 894 (1st Cir. 1993) ("The Supreme Court's summary disposition of an appeal to it is an adjudication on the merits that

must be followed by lower courts, subject, of course, to any later developments that alter or erode its authority.").

Accordingly, because, in at least some sets of circumstances, section 4248's stay of release pending commitment proceedings would readily be constitutional, and respondent's facial challenge to this provision fails.

### D.     Due Process Does Not Require Proof Beyond a Reasonable Doubt or Trial by Jury in These Civil Commitment Proceedings

Respondents also contend (Brief at 49-57) that due process requires adequate notice, proof beyond a reasonable doubt, and trial by jury before they may be committed as a sexually dangerous person.  Respondents contend that the civil commitment scheme is governed by the Supreme Court's decisions in Application of Gault, 387 U.S. 1 (1967), In re Winship, 397 U.S. 358 (1970), and Duncan v. Louisiana, 391 U.S. 145 (1968), rather than the standards announced in Addington v. Texas, which considered civil commitment proceedings for mentally ill persons posing a danger to themselves or others under a clear and convincing standard of proof.  Principally relying on (1) restrictions on their liberty; (2) stigma; and (3) a required factual finding that they engaged or attempted to engage in sexually violent conduct or child molestation, respondents contend that the Act violates the Due Process Clause by not affording them adequate notice, requiring proof beyond a reasonable doubt, or providing for trial by a jury.

As an initial matter, respondents each have been convicted of and adjudged beyond a reasonable doubt to have committed a sex crime.  But, more importantly, the commitment scheme at issue here is decidedly civil.  And "[u]nlike the delinquency proceeding in Winship, a civil commitment proceeding can in no sense be equated to a criminal prosecution." Addington v. Texas,

441 U.S. at 428.  Indeed, in <u>Addington</u>, the Supreme Court considered the liberty constraints, stigma concerns and factual findings attendant to mental illness commitments articulated by Respondent here and nonetheless concluded that the beyond a reasonable doubt standard was not constitutionally required.  See <u>id.</u> at 425-26.  Because the beyond a reasonable doubt standard "is regarded as a critical part of the moral force of the criminal law," the Supreme Court cautioned that it "should hesitate to apply it too broadly or casually in noncriminal cases."  <u>Id.</u> at 428 (internal quotation and citation omitted).

The Court further explained that the beyond a reasonable doubt standard is not required in civil commitment proceedings because interpretive, psychiatric diagnoses are critical.

> Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the <u>meaning</u> of the facts which must be interpreted by expert psychiatrists and psychologists.  Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous.

<u>Id</u>. at 429.  Thus, unlike the juvenile delinquency proceedings in <u>Winship</u> where the "basic issue" was "whether the individual in fact committed the criminal act," the Court considered significant the "subtleties and nuances of psychiatric diagnosis [that] render certainties beyond reach in most situations" in civil commitment proceedings.  <u>Id.</u> at 430.  "[T]he beyond a reasonable doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet * * *."  <u>Id.</u> at 430, 432.  Rather, the Court regarded the clear and convincing standard as an appropriate balance "between what is possible to prove and what protects the rights of the individual."  <u>Id.</u> at 430.

- 41 -

The considerations articulated in Addington inhere in section 4248 civil commitment proceedings to determine whether a person is a "sexually dangerous" as well.  The central inquiry in such a proceeding is whether a "person suffers from a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. §4247(a)(6).  The question turns, as in Addington, on the meaning of facts which must be interpreted by expert psychiatrists or psychologists.  Indeed, the civil commitment scheme provides for court-ordered psychiatric or psychological examinations, id. §4248(b), and a report with the "examiner's opinions as to diagnosis, prognosis, and * * * whether the person is a sexually dangerous person."  Id. §§4247(b), (c)(4)(D).

As in Addington, that "[t]here may be factual issues to resolve in a commitment proceeding" does not compel a beyond a reasonable doubt standard.  See 441 U.S. at 429.  Those factual issues -- including whether one has previously engaged or attempted to engage in sexually violent conduct or child molestation -- "represent only the beginning of the inquiry."  Id.  Thus, unlike Winship, there is a "meaningful distinction" between the civil commitment scheme and criminal prosecutions: "specific, knowable" facts are buttressed by and interpreted through psychological diagnosis.  Id. at 430.  A finding here that respondents once "engaged or attempted to engage in sexually violent conduct or child molestation," though necessary, would be insufficient to merit civil commitment standing alone.  Rather, the government must additionally prove that respondents suffer from a mental illness, disorder or abnormality causing serious difficulty in ability to refrain from sexually violent conduct or child molestation.  As with the civil commitment proceedings at issue in Addington, section 4248 commitments depend on "medical impressions drawn from subjective analysis and filtered through the experience of diagnostician."  Id.

- 42 -

The clear and convincing burden of proof serves properly to allocate the risk of an erroneous commitment between the government -- which has an interest in protecting the members of the community from mentally incapacitated persons in federal custody who are likely to engage in sexually violent conduct or child molestation by preventing their likely future commission -- and the Respondent.[5]  See Hollis v. Smith, 571 F.2d 685, 695 (2d Cir. 1978) (holding that the "ultimate issue" in New York state's sex offender commitment statute "is not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character" and finding the clear and convincing standard constitutional); Rivera v. Rogers, 2006 WL 3399427, *12 (D.N.J. Nov. 20, 2006) (applying clear and convincing standard to New Jersey state sex offender commitment statute); but see Stachulak v. Coughlin, 520 F.2d 931, 936-37 (7th Cir. 1975) (pre-Addington decision relying on Winship and holding that Illinois state sex offender statute that was an alternative to criminal prosecution required a beyond a reasonable doubt standard because of constraints to liberty and stigma).[6]  As in Addington, "even though an erroneous commitment should be avoided in the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and

---

[5]  In considering the respondents' interests in freedom from constraint and stigma, the Supreme Court has noted that persons who are suffering from mental illnesses and in need of treatment are neither wholly at liberty nor free of stigma.  See Addington, 441 U.S. at 429.

[6]  In fact, nine states (of eighteen with sexually violent predator commitment statutes) have legislatively or judicially adopted the clear and convincing standard for their state commitment schemes.  See Florida (F.S.A. §394.912); Minn. (M.S.A. §253B.02); Missouri (V.A.M.S. §632.480); New Jersey (N.J.S.A. §30:4-27.26); New York (2007 Sess. Laws N.Y. Ch. 7 §3318); North Dakota (N.D. St. §25-03.3-01); Oregon (O.R.S. §426.510); Penn. (42 Pa.C.S.A. § 6402); Virginia (Va. Code § 7.2-900).  "That some states have chosen * * * to adopt the criminal law standard gives no assurance that the more stringent standard of proof is needed or is even adaptable to the needs of all states."  Addington, 441 U.S. at 430-31.  At base, the Supreme Court has held that "it is unnecessary to require states to apply the strict, criminal standard."  Id. at 431.

- 43 -

friends generally will provide continuous opportunities for an erroneous commitment to be corrected." 441 U.S. at 428-29.  Under the Act here, respondents' counsel may, "at any time during [his] commitment, file with the court that ordered the commitment a motion for a hearing to determine whether the person should be discharged from the facility" if no court had ordered commitment within 180 days, 18 U.S.C. §4247(h).  Additionally, at any time that the Director of the facility believes that the person is no longer sexually dangerous to others, he is required to file a certificate of discharge.  18 U.S.C. §4248(e); see also id. § 4247(e) (requiring periodic yearly reports concerning the mental condition of a committed person).  The Supreme Court's approval of the clear and convincing standard in Addington governs the standard required for the similar civil commitment scheme here.  A clear and convincing finding that the Respondent is a "sexually dangerous person" is constitutionally adequate.[7]

For similar reasons, and because (as we have shown above) the Act is a civil proceeding, respondents have no constitutional right to a jury trial.  See, e.g., Poole v. Goodno, 335 F.3d 705, 710-11 (8th Cir. 2003) ("There is no clearly established Supreme Court law which holds that due

---

[7] Respondents also contend, albeit only in a footnote (Brief at 56 n.6) that the discharge provision of subsection 4248(e) violates due process if that provision is read to require impermissible "burden shifting" because they purportedly would be required, if committed, to prove that they were no longer "sexually dangerous" to secure release.  That claim is premature.  "For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions,' are requisite" Golden v. Zwickler, 394 U.S. 103, 108 (1969) (internal citation omitted).  While a person need not wait until he has been subjected to the force of a law before he may challenge the statute in court, "the mere existence of a statute * * * is not ordinarily enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms."  Nat'l Student Assoc. v. Hershey, 412 F.2d 1103, 1110 (D.C. Cir.1969); see also Texas v. United States, 523 U.S. 296 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed, may not occur at all.'").  Here, because the respondents have not yet been committed and therefore have not yet attempted to invoke subsection 4248(e), their challenge to that provision is premature.

process requires a jury trial in civil commitment proceedings or that incorporates the Seventh Amendment right to a jury for such cases."); Sahhar, 917 F.2d at 1207 (holding that "trial by jury is neither a necessary element of the fundamental fairness guaranteed by the due process clause, nor an essential component of accurate factfinding.") (citing McKeiver v. Pennsylvania, 403 U.S. 528, 543 (1971)); Commonwealth v. Barboza, 387 Mass. 105, 111-113, 387 N.E.2d 1064, 1069-70 (1982) (rejecting contention that respondent had constitutional right to a jury trial under M.G.L. 123A).

## V.  THE ACT IS NOT VOID FOR VAGUENESS

Respondents also contend (Brief at 57-61) that the Act is facially unconstitutionally vague because Congress failed to adequately define the terms "sexually dangerous person" and "sexually dangerous to others" in 18 U.S.C. §§4247(a)(5) & (6), in violation of Due Process Clause of the Fifth Amendment and Article I, §1 of the Constitution.  That contention also is unavailing.

### A.    Standards

To withstand a facial vagueness challenge, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and must "provide explicit standards" to prevent arbitrary or discriminatory enforcement.  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  The degree of linguistic precision that will satisfy these requirements, however, varies with the nature of the statutory provision, including whether it provides for criminal or civil enforcement.  See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) ("The degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depends in part on the nature of the enactment.").  Thus, for example, "[t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement."  Winters v. New York, 333 U.S.

- 45 -

507, 515 (1948); see also Village of Hoffman Estates, 455 U.S. at 498-99.  Even where assertedly

protected conduct is at issue, for vagueness purposes, the statute need only "define the criminal

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited

and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v.

Lawson, 461 U.S. 352, 357 (1983).

Hence, "speculation about possible vagueness in hypothetical situations not before the Court

will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended

applications'"  Hill v. Colorado, 530 U.S. 703, 733 (2000) (citation omitted)).  Rather, to sustain a

challenge to the Act, respondents "must prove that the enactment is vague 'not in the sense that it

requires a person to confirm his conduct to an imprecise but comprehensible normative standard, but

rather in the sense that no standard of conduct is specified at all.'" Hoffman Estates, 455 U.S. at 495

n.7 (emphasis supplied) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971)).

### B.       The Act is Not Unconstitutionally Vague

Judged by these standards, the Act is not unconstitutionally vague.  In Peterson v. Gaughan,

404 F.2d 1375 (1st Cir. 1968), the First Circuit rejected a similar vagueness challenge to the

Massachusetts statute regarding sexually dangerous persons, M.G.L.. c. 123A, and its reasoning is

relevant here.  The petitioner in that habeas proceeding argued that the phrases "misconduct in sexual

matters", "likely to attack or otherwise inflict injury on the objects of his uncontrolled * * * desires",

and "general lack of power to control his sexual impulses," all were unconstitutionally vague.  In

rejecting that claim, the First Circuit noted that the Massachusetts statute had been borrowed almost

verbatim from the interpretation placed on a "much vaguer" Minnesota statute by the Minnesota

Supreme Court, and that the Supreme Court of the United States had accepted that gloss as adding

- 46 -

sufficient definiteness to the statute.  See Peterson, 404 F.2d at 1377 (citing Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 273 (1940).  The First Circuit's decision in Peterson has been found to foreclose vagueness challenges to the Massachusetts statute.  See Rancourt v. Commonwealth of Massachusetts, 1988 WL 73437, *1 (D. Mass. June 27, 1988).  Although the terms in section 4247 and M.G.L. c. 123A are not in all respects identical, the First Circuit's decision in Peterson strongly suggests that that court would reject a vagueness challenge to the Act.

Moreover, although 18 U.S.C. §4247(a)(6) does not define "serious difficulty in refraining from sexually violent conduct," state courts have found like terms to satisfy the Constitution.  See, e.g., In re K.A.P., 916 A.2d 1152, 1159 (Pa. Super. 2007) (phrase "serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence" is not unconstitutionally vague).  Many state courts, for example, have held that the term "likely"-– which is at least as exacting of a standard as "serious difficulty in refraining" -- and other similar terms in state civil commitment statutes referring to the future risk posed by such civil committees are not unconstitutionally vague.  See e.g., Westerheide v. State, 831 So.2d 93, 106 (Fla. 2002) (rejecting a due process vagueness challenge to the term "likely to engage in acts of sexual violence" as having no merit as the term "likely" is a "widely used term that is commonly understood by men and women of common intelligence to mean highly probable or probable and having a better chance of existing or occurring than not."); Martin v. Reinstein 195 Ariz. 293, 317-18, 987 P.2d 779, 803-04 (Ariz. Ct. App., 1999) (finding the term "likely" is reasonably understood and effectively used in the state's civil commitment statute); In re Young, 122 Wash.2d 1, 50-51, 857 P.2d 989, 1013 (1993) (rejecting the claim that the terms "mental abnormality" and "likely" are unconstitutionally vague).

Accordingly, the terms of the Act more than satisfy the constitutional requirement that the legislature "establish minimal guidelines to govern law enforcement," and therefore are not unconstitutionally vague.

## VI.   RESPONDENTS' CHALLENGE TO THE GOVERNMENT'S ANTICIPATED EXPERT TESTIMONY DOES NOT RAISE A CONSTITUTIONAL QUESTION, IS PREMATURE, AND LACKS MERIT

Respondents lastly contend (Brief at 61-73) that the expert testimony required by the Act is insufficiently reliable to provide clear and convincing evidence needed to commit an individual as a sexually dangerous person, thereby violating the Constitution.  Specifically, respondents maintain (Brief at 66) that "while psychiatric or psychological evidence is necessary for commitment under the statute -- to establish the requisite 'serious mental illness' etc. and causally link that illness to the requisite, 'serious difficulty in refraining from sexually violent conduct or child molestation if released,' Sections 4247(a)(5) and (a)(6) -- the available science in the field is not sufficiently reliable to meet the current evidentiary standards established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)."  This, respondents aver, "denies defendants due process of law by subjecting them [to] the unjustifiable risk of an erroneous deprivation of liberty based on unreliable evidence."  As we now show, this contention reflects a fundamental misunderstanding of Daubert and its progeny, which did not announce a constitutional rule but rather was based on an analysis of the Federal Rules of Evidence, is premature, and, in any event, lacks merit.

### A.   Standards

In Daubert, the Supreme Court held that the district court must function as a "gatekeeper" to ensure that the offered expert testimony is both relevant and reliable.  Id. at 589.  Specifically, the

- 48 -

Court held that when a trial judge is faced with the decision to accept or reject a proffer of expert

scientific testimony, the judge must determine under the Federal Rules of Evidence whether the

expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to

understand or determine a fact in issue, which requires a preliminary assessment of whether the

reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning and methodology properly can be applied to the facts in issue.  Id. at 592-93; see also

Kumho Tire Co., 526 U.S. at 141 (extending Daubert's two-prong gatekeeping test to all expert

testimony).

In 2000, Congress codified the Daubert standard by amending Rule 702 of the Federal Rules

of Evidence to incorporate the Daubert decision and its progeny.  The Amended Rule 702 of the

Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise.

Fed. R. Evid. 702.

### B.    Daubert Did Not Announce a Constitutional Rule

As a threshold matter, the very premise of respondents' argument -- that the available science

regarding whether a person meets the criteria in 18 U.S.C. §§4247(a)(5) and (a)(6) are not

sufficiently reliable under Daubert and Kumho Tire, thereby denying them due process of law -- is

mistaken.  Contrary to respondents' suggestion, the Supreme Court did not hold in Daubert that the

introduction of scientifically unreliable evidence runs afoul of the Due Process Clause or otherwise

violates the Constitution.  To the contrary, as the Eighth Circuit has explained, "Daubert is an

- 49 -

exegesis of Rule 702 of the Federal Rules of Evidence and governs the admission of expert evidence in federal trials only.  Daubert does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution."  Kinder v. Bowersox, 272 F.3d 532, 545 n.9 (8th Cir. 2001).  Both the First Circuit and other courts of appeals have likewise held that the Supreme Court did not announce a constitutional rule in Daubert, meaning that the States were not compelled to adhere to its holding.  See Mitchell v. United States, 141 F.3d 8, 16 n.2 (1st Cir. 1998) ("We note that the Supreme Judicial Court has adopted Daubert 'in concept,' but unlike a federal court, it reviews de novo a trial court's ruling on the admissibility of scientific expert testimony."); Keller v. Larkins, 251 F.3d 408, 419 (3d Cir. 2001) (Alito, J.) (even if testimony failed to meet Daubert standard, "[t]his case, however, is not a direct appeal from a federal trial in which counsel objected to the admission of expert testimony under Fed. R. Evid. 702.  Keller was tried in state court, and the admission of expert testimony in a state trial presents a question of state law -- unless, of course, the evidence violates due process or some other constitutional right * * *.") (internal footnote omitted); Norris v. Schotten, 146 F.3d 314, 335 (6th Cir. 1998) ("Appellant relies primarily on [Daubert]; however, we agree with the district court that Daubert concerned the Federal Rules of Evidence which is not relevant to appellant's conviction."); Milone v. Camp, 22 F.3d 693, 702 (7th Cir. 1994) ("The standard, then, is not whether the testimony satisfied the Frye or Daubert tests -- neither of which purports to set a constitutional floor on the admissibility of scientific evidence -- but rather is whether the probative value of the state's evidence was so greatly outweighed by its prejudice to Milone that its admission denied him a fundamentally fair trial."); Smith v. Borg, 1 F.3d 1247, *1 (9th Cir. 1993) (Mem.) ("We observe that since this case arises on

state habeas, the Supreme Court's decision in [Daubert] * * * is not relevant here.  Questions of the admissibility of evidence are matters of state law unless the ruling violates federal due process.").

These cases confirm that a Daubert violation, in itself, does not constitute a violation of the Due Process Clause.  If that were so, of course, then Daubert would be equally binding on the States.  And, indeed, none of the cases upon which respondents rely (Brief at 68-70) hold that the introduction of evidence that is scientifically unreliable runs afoul of the Constitution.  Hence, even assuming arguendo that respondents are correct that the criteria in 18 U.S.C. §§4247(a)(5) and (a)(6) are not sufficiently reliable under Daubert and Kumho Tire, that would constitute at most a violation of Rule 702 of the Federal Rules of Evidence, not of the Due Process Clause.  And respondents have made no showing that the introduction of such evidence, separate and apart from the Daubert issue, raises due process concerns.  Accordingly, respondents' facial constitutional challenge to the scientific reliability of the criteria in 18 U.S.C. §§4247(a)(5) and (a)(6) necessarily must fail.

C.    **Respondents' Daubert Challenge is Premature**

Respondents' Daubert challenge suffers from yet another threshold defect.  The schedule agreed to by the parties and adopted by this Court at the status conference of January 8, 2007, provided that respondents would first present their constitutional challenges to the Act and, only thereafter, would further proceedings go forward.  See Electronic Clerk's Notes for proceedings held before Judge Patti B. Saris: Status Conference held on 1/8/2007.  Hence, properly understood as an evidentiary rather than constitutional challenge, respondents' Daubert challenge is premature.

Moreover, the government has not yet identified the experts or tendered the expert reports it anticipates utilizing in these cases.  Nor, for that matter, has this Court ordered and received the independent psychiatric or psychological examination as provided for in 18 U.S.C. §4248(b).  That

perhaps is unsurprising, inasmuch as respondents deliberately chose to forego immediate hearings

in these cases, preferring instead to present their facial constitutional challenges before challenging

the merits of the government's certifications.  Regardless, for this reason as well, respondents'

challenge to the scientific reliability of the criteria in 18 U.S.C. §§4247(a)(5) and (a)(6) is premature,

as numerous courts have held in like circumstances.[8]

### D.    Respondents' <u>Daubert</u> Challenge In Any Event Lacks Merit

Even were this Court to entertain respondents' premature <u>Daubert</u> challenge, it lacks merit.

To show that the Act does not satisfy the requirements of <u>Daubert</u>, respondents must show that there

are no methods of scientific methodology by which an expert could render an opinion regarding

---

[8]    <u>See</u>, <u>e.g.</u>, <u>Watson</u> v. <u>Fleetwood Motor Homes of Indiana, Inc.</u>, 2007 WL 1521144, *1
(W.D.N.C. May 22, 2007) ("As a matter of federal law, plaintiffs' motion is premature in that it seeks
a pretrial determination that an expert witness is not qualified to testify."); <u>Brooks</u> v. <u>Lyon County</u>,
2007 WL 1146612, *1 (D. Kan. April 17, 2007) ("The court finds that plaintiff's request for a
<u>Daubert</u> hearing is premature.  This court does not ordinarily determine whether a <u>Daubert</u> hearing
is appropriate until after discovery is completed and the evidence in support of the claims has been
identified."); <u>United States</u> v. <u>Bridges</u>, 2006 WL 3716653, *15 (E.D. Tenn. Dec. 20, 2006)
("Additionally, because Defendant has not received any discovery regarding the expert witnesses
which the government will call to testify, if any, the Court finds that there is no basis for the Court
to conduct a pretrial <u>Daubert-Kuhmo Tire</u> hearing at this time.  Accordingly, the Court finds that
Defendant's motion [Doc. 138] is premature and, thus, is DENIED."); <u>Assicurazioni Generali S.p.A.</u>
v. <u>Distribution Unlimited, Inc.</u>, 2005 WL 3531458, *3 (N.D.N.Y. Dec. 22, 2005) ("Altone seeks an
evidentiary ruling, pursuant to the <u>Daubert</u> standard, that would preclude Schneiders' expert
testimony at trial.  This request, more properly brought as a motion in limine before trial, is
premature at this juncture.") (internal footnote omitted); <u>United States</u> v. <u>Roberts</u>, 2001 WL
1646732, *11 (S.D.N.Y. Dec. 17, 2001) ("Toback requests a hearing to determine whether the
Government's proof that 1,4 butanediol is an analogue of GHB is based on 'professionally reliable
 sources.'  Presumably, Toback seeks a hearing pursuant to [<u>Daubert</u>] to determine whether the
Government's expert evidence is admissible.  This request, made prior to expert discovery, is
premature and is therefore denied."); <u>In re Monosodium Glutamate Antitrust Litigation</u>, 205 F.R.D.
229, 234 (D. Minn. 2001) ("Even assuming that there are problems with Dr. Beyer's methodology,
however, Defendants' attack on that methodology is premature.  The <u>Daubert</u> inquiry requires a more
searching analysis than is appropriate at this preliminary [class certification] stage.").

scientific reliability of the criteria in 18 U.S.C. §§4247(a)(5) and (a)(6), whether clinical, actuarial, or otherwise.  They cannot come close to making that showing.

The Supreme Court has approved the use of expert psychiatric testimony on the issue of an offender's future dangerousness, holding that "[t]he suggestion that no psychiatrists's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel."  Barefoot v. Estelle, 463 U.S. 880, 896-97 (1983).  State courts also have uniformly held that expert testimony regarding future sexual dangerousness is admissible, whether under Daubert or Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).   See, e.g., In re Detention of Thorell, 149 Wash.2d 724, 72 P.3d 708 (2003) ("[W]e have accepted evidence of predictions of future dangerous in [Sexually Violent Predator] commitment hearings as based on established scientific methodology. * * * Based on our established precedent, we reiterate that the Frye standard has been satisfied by both clinical and actuarial determinations of future dangerousness."), cert. denied, 541 U.S. 990 (2004); In re Commitment of Simons, 213 Ill.2d 523, 535-36, 821 N.E.2d 1184, 1192 (2004) ("After careful consideration, we emphatically agree * * * that, whether or not actuarial risk assessment is subject to Frye, there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law.  As of this writing, experts in at least 19 other states rely upon actuarial risk assessments in forming their opinions on sex offenders' risks of recidivism."); In re Commitment of R.S., 173 N.J. 134, 137, 801 A.2d 219, 221 (2002) ("We conclude, as did the courts below, that actuarial risk assessment instruments may be admissible in evidence in a civil commitment proceeding under the [Sexually Violent Predator Act] when such tools are used in the formation of the basis for a testifying expert's opinion concerning the future dangerousness of a sex offender."); Commonwealth

- 53 -

v. <u>Gomes</u>, 355 Mass. 479, 483, 245 N.E.2d 429, 431-32  (1969) ("The defendant urges also that the concept 'sexually dangerous person' is inexact and without medical significance for psychiatrists. It is our view that the conclusions of expert physicians who have observed the conduct of emotionally afflicted persons having a history of aggressive, sexual misconduct can be of help to the [fact finder] * * *..") (citation omitted).  Indeed, in <u>In re Commitment of R.S.</u>, 339 N.J. Super. 507, 773 A.2d 72 (N.J. Super. A.D. 2001), <u>aff'd</u>, 173 N.J. 134, 801 A.2d 219 (2002), the New Jersey Superior Court, Appellate Division, noted that  "[o]ur research has revealed <u>no</u> state appellate court decision which has found actuarial instruments inadmissible at [Sexually Violent Predator] proceedings." <u>Id</u>. at 547, 773 A.2d at 96 (emphasis added).

Against this weight of authority, respondents offer a single affidavit from Dr. Daniel Kriegman, which assertedly "outlines the inadequacies in predictions of dangerousness or sexual dangerousness based on clinical judgment," and also discusses the reliability of actuarial instruments. Dr. Kriegman's affidavit is curious, given that he apparently has regularly used the very same methods which he now critiques in providing expert testimony in state court.  <u>See</u> <u>Commonwealth</u> v. <u>Gross</u>, 64 Mass.App.Ct. 829, 833 n.6, 835 N.E.2d 1147, 1152 n.6 (2005) ("In February of 2005, shortly before filing the motion for summary judgment, the defendant filed with the court reports from Drs. Daniel Kriegman and Joseph J. Plaud, which set forth their expert opinions that the defendant did not meet the statutory definition of a sexually dangerous person."); <u>Commonwealth</u> v. <u>Pike</u>, 2005 WL 704952, *1 (Mass. Super. 2005) ("The expert who testified on behalf of the respondent, Dr. Daniel Kriegman, used an actuarial instrument, the Sex Offender Recidivism Actuarial Guide ('SORAG'), in addition to his clinical judgment.").  Indeed, Dr. Kriegman appears to have provided testimony that he "does not approve of the clinical method <u>but the adjusted</u>

actuarial method instead." Commonwealth v. Parks, 2005 WL 1367112, * 2 (Mass. Super. 2005).

Given this, and in the face of uniform authority rejecting the contention that the determination of

whether an individual is a "sexually dangerous person" is scientifically unreliable, respondents'

facial evidentiary challenge should be rejected.

**CONCLUSION**

For the foregoing reasons, respondents' motion to dismiss should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Mark T. Quinlivan
RAYFORD A. FARQUHAR
MARK T. QUINLIVAN
MARK GRADY
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3606

Dated: June 29, 2007