UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 06-10427-PBS |
| | ) | |
| JEFFREY SHIELDS | ) | |
| | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 06-10439-PBS |
| | ) | |
| JOEL WETMORE | ) | |
| | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DOCKET NO.: 06-10449-PBS |
| | ) | |
| CHARLES PEAVEY | ) | |

**DEFENDANTS' RESPONSE TO SUPPLEMENTAL MEMORANDUM OF THE UNITED STATES**

In its October 1, 2007 Supplemental Memorandum ("Supp. Mem."), the government makes three major assertions. First, the government contends that it has turned back what it calls the defendants' "federalism challenge" to 18 U.S.C. Section 4248 ("the Act" or "Section 4248").[1] *See Supp. Mem.* at pp. 2-3. Second, the government claims that this Court may both engraft a probable cause hearing and a beyond a reasonable doubt standard of proof on to the Act and sever the existing clear and convincing evidence standard to save the Act from unconstitutionality. *See Id.* at pp. 4-5. Third, in response to this Court's expressed concerns, the

---

[1] Defendants' arguments are more aptly characterized as a challenge to Congress' authority to enact Section 4248 ("the Act") and, assuming *arguendo* that Congress had that authority, a contention that the means Congress chose to accomplish its ends were not necessary and proper. The federalism concerns raised by the defendants are the inevitable effects of *ultra vires* congressional actions, not the axis of the defendants' positions.

government contends that, "[s]ex offender treatment will be provided to inmates committed as sexually dangerous persons." *Supp. Mem.* at pg. 6. For the following reasons, the government's assertions are flawed.

I. **CONGRESS LACKED THE AUTHORITY TO ENACT SECTION 4248 BECAUSE THE ACT IS NOT FOUNDED ON ANY ENUMERATED POWER. EVEN IF CONGRESS POSSESSED THE AUTHORITY TO PASS SECTION 4248, IT IS NOT A NECESSARY AND PROPER MEANS OF FURTHERING ANY ENUMERATED POWER.**

Quoting isolated language from the *Perry*[2] and *Salerno*[3] majority opinions, plus a footnote from the *Salerno* dissent, the government suggests that it has shown that the Act is "a valid exercise of Congressional authority pursuant to the Necessary and Proper Clause" (*Supp. Mem.* at pg. 2) and asserts that those cases stand for the proposition that Congress possesses an inherent (but apparently unenumerated) power to enact legislation "'preventing danger to the community.'" *(Supp. Mem.* at pg. 3). A fuller review of *Perry* and *Salerno*, however, demonstrates that the courts in those cases decided: I) that Congress possesses no such general "danger prevention" power; and ii) that the Bail Reform Act could be upheld only if understood as a narrowly tailored device for furthering the exercise of an enumerated power committed to the Congress. As the court stated in *Perry*, "Congress may concern itself with 'the safety of the community' only to the extent that other grants of specific power so permit." (*Id.*, 768 F.2d at 109).

In both *Perry* and *Salerno*, the enumerated power was the authority of Congress to criminalize conduct having a definite federal nexus and to provide for the arrest and prosecution

---

[2] *United States v. Perry*, 788 F.2d 100 (3d. Cir. 1986).

[3] *United States v. Salerno*, 481 U.S. 739 (1987)

of those alleged to have violated the federal criminal laws. *Perry*, expressly, and *Salerno*, implicitly, found an accompanying power, under the Necessary and Proper Clause, to create a system of bail administration *expressly designed to prevent the violation of specific federal criminal statutes by those arrested for specific federal crimes*. See *Salerno*, 481 U.S. at 750 (Bail Reform Act "operates only on individuals who have been arrested for a specific category of extremely serious offenses..." and is not "...by any means a scattershot attempt to incapacitate those who are merely suspected of these serious crimes."); *Perry*, 788 F.2d at 110-11 (finding presumption for detention in Bail Reform Act constitutional only when read as intended to prevent specific harm to community stemming from violations of four specific federal criminal laws because "Congress may not...authorize commitment simply to protect the general welfare of the community at large."); *See also Greenwood v. United States*, 350 U.S. 366, 375-76 (1956) (constitutionality of predecessor statutes to 18 U.S.C. §§ 4241 & 4246 rests on existence of pending indictment and continued possibility of federal prosecution).

  Unlike the Bail Reform Act, the operation of the Act challenged here is not linked to federal crimes in any way.  It does not require conviction for – or even an accusation of – a federal sex crime for its operation.  See 18 U.S.C. § 4247(a)(5).  It does not require, as a predicate to indefinite commitment, a finding by the Court that the accused will have serious difficulty in refraining from the commission of a federal sex crime.  See 18 U.S.C. § 4247(a)(6). Further, the broad regulatory definition of "sexually violent conduct" adopted by the Bureau of Prisons virtually guarantees that accusations of conduct violating no federal law will result in commitment proceedings.  See 72 FR 43205 et seq.  Thus, the Act is precisely the kind of "general welfare" legislation that the *Perry* Court specifically noted Congress lacks the power to

enact. *Perry*, 788 F.2d at 110-11.[4]

Even assuming, *arguendo*, Congress possessed the authority to enact the Act, the Act is not a Necessary and Proper means of furthering an enumerated power. The Necessary and Proper Clause is not a blank check for the exercise of unlimited federal authority. *See Sabri v. United States*, 541 U.S. 600, 612 (2004) (Thomas, J., concurring). Even a piece of legislation founded on an enumerated power must meet two additional requirements to be constitutional: 1) it must not contravene a constitutional guarantee; and 2) it must be "plainly adapted to" the furtherance of the enumerated power from which it ultimately derives its legitimacy. *See M'Culloch v. Maryland*, 17 U.S. 316, 421 (1819).

In these cases, the defendants have demonstrated that the Act violates numerous constitutional guarantees including – but not limited to – the Fifth Amendment's requirement of procedural due process in its failure to provide for a probable cause finding as a predicate to the deprivation of liberty, its failure to require a conviction for a sex crime as a predicate to commitment, and its failure to mandate proof beyond a reasonable doubt of sexually dangerous person status. *See Memorandum in Support of Defendants' Motion to Dismiss* at pp. 42-57.

---

[4] Although not revisited as an issue by the government, *Salerno* itself makes clear why the standard for "facial challenges" articulated in that case – assuming *arguendo* that the *Salerno* standard accurately states the current law – has no bearing on the question whether Congress had the *authority* to enact the Act. *Salerno* addressed only whether the Bail Reform Act could ever *operate* constitutionally – i.e., without violating a constitutional protection like substantive due process. *See Salerno*, 481 U.S. at 745-46; *See also Supp. Mem.* at pg. 2.
　　Here, in contrast, the initial question is whether the very existence of the Act is legitimate; whether the Act rests on *any* enumerated power committed to Congress by the Constitution. If Congress lacked the authority to pass the Act, it would *necessarily* be unconstitutional as applied to anyone. *See United States v. Comstock*, 2007 WL 2588815 (E.D.N.C. 2007).

enact. *Perry*, 788 F.2d at 110-11.[4]

Even assuming, *arguendo*, Congress possessed the authority to enact the Act, the Act is not a Necessary and Proper means of furthering an enumerated power. The Necessary and Proper Clause is not a blank check for the exercise of unlimited federal authority. *See Sabri v. United States*, 541 U.S. 600, 612 (2004) (Thomas, J., concurring). Even a piece of legislation founded on an enumerated power must meet two additional requirements to be constitutional: 1) it must not contravene a constitutional guarantee; and 2) it must be "plainly adapted to" the furtherance of the enumerated power from which it ultimately derives its legitimacy. *See M'Culloch v. Maryland*, 17 U.S. 316, 421 (1819).

In these cases, the defendants have demonstrated that the Act violates numerous constitutional guarantees including – but not limited to – the Fifth Amendment's requirement of procedural due process in its failure to provide for a probable cause finding as a predicate to the deprivation of liberty, its failure to require a conviction for a sex crime as a predicate to commitment, and its failure to mandate proof beyond a reasonable doubt of sexually dangerous person status. *See Memorandum in Support of Defendants' Motion to Dismiss* at pp. 42-57.

---

[4] Although not revisited as an issue by the government, *Salerno* itself makes clear why the standard for "facial challenges" articulated in that case – assuming *arguendo* that the *Salerno* standard accurately states the current law – has no bearing on the question whether Congress had the *authority* to enact the Act. *Salerno* addressed only whether the Bail Reform Act could ever *operate* constitutionally – i.e., without violating a constitutional protection like substantive due process. *See Salerno*, 481 U.S. at 745-46; *See also Supp. Mem.* at pg. 2.

　　Here, in contrast, the initial question is whether the very existence of the Act is legitimate; whether the Act rests on *any* enumerated power committed to Congress by the Constitution. If Congress lacked the authority to pass the Act, it would *necessarily* be unconstitutional as applied to anyone. *See United States v. Comstock*, 2007 WL 2588815 (E.D.N.C. 2007).

Because the Act violates due process and other constitutional guarantees it cannot be a "necessary and proper" means of furthering an enumerated power.[5]

Additionally, it is far from clear that the Act is "plainly adapted" to further the exercise of any enumerated power. Assuming *arguendo* that the Act is intended to forestall future violations of federal sex crime laws, it is woefully ill suited to that purpose. As noted *supra*, there is absolutely nothing in the scheme of the Act that tailors it to the prevention of federal sex crimes, or otherwise confines its operation to violations of the federal criminal code.  It is thus not even a *rational* means of preventing federal sex offenses. But even mere means-end rationality would not be enough to sustain the Act:

> "[A]ppropriate" and "plainly adapted" are hardly synonymous with "means-end rationality." Indeed, "plain" means "evident to the mind or senses: OBVIOUS," "CLEAR," and "characterized by simplicity: not complicated." Webster's Ninth New Collegiate Dictionary 898 (1991); see also N. Webster, American Dictionary of the English Language (1828) (facsimile edition) (defining "plainly" as "[i]n a manner to be easily seen or comprehended," and "[e]vidently; clearly; not obscurely"). A statute can have a "rational" connection to an enumerated power without being obviously or clearly tied to that enumerated power. To show that a statute is "plainly adapted" to a legitimate end, then, one must seemingly show more than that a particular statute is a "rational means,"  to safeguard that end; rather, it would seem necessary to show some obvious, simple, and direct relation between the statute and the enumerated power. Cf. 8 Writings of James Madison 448 (G. Hunt ed.1908).

*Sabri*, 541 U.S. at 612 (Thomas, J. concurring).  One might imagine a federal sex offender commitment statute that bore an "obvious, simple, and direct relation" to Congress' power to proscribe certain kinds of sexually violent activities having a federal nexus – it would likely apply only to those convicted of federal sex offenses, and require a judge or a jury to find that the

---

[5] Moreover, as argued *infra* at pp. 5-8, the Court may not remedy this problem by adding to, or subtracting from, the statutory scheme.

defendant was likely to commit a federal sex offense in the future.  That imaginary statute is not, of course, Section 4248.

**II.    THE COURT MAY NOT ENGRAFT A PROBABLE CAUSE HEARING OR A PROOF BEYOND A REASONABLE DOUBT STANDARD ON TO SECTION 4248, OR SEVER THE CLEAR AND CONVINCING EVIDENCE STANDARD FROM IT, TO SAVE THE ACT FROM UNCONSTITUTIONALITY.**

The government argues, relying on *Zadvydas v. Davis*, 533 U.S. 678 (2001) and *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987), that this Court may, to avoid declaring the Act wholly unconstitutional, both engraft a probable cause hearing requirement on to the statutory scheme, and sever the Act's clear and convincing standard of proof, substituting a beyond a reasonable doubt standard.  *See Supp. Mem.* at 4-5.  The government's erroneous positions rely on a selective reading of the cases it cites.

Both the *Zadvydas* and *Alaska Airlines* Courts sought to divine Congress' intent by interpreting the statutes at issue.  Thus, while the government is correct that the *Zadvydas* Court employed the doctrine of constitutional avoidance in reaching its holding, it clearly did so *only because* it recognized that nothing about the text, structure, or history of the immigration statutes it was interpreting supported the government's contention that Congress clearly intended to authorize the indefinite detention of aliens at the discretion of the Attorney General:

> We have found nothing in the history of these statutes that *clearly demonstrates a congressional intent* to authorize indefinite, perhaps permanent, detention. *Consequently*, interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute.

*Zadvydas*, 533 U.S. at 699 (emphasis added); *See also Id.* at 705-18 (Kennedy, J., dissenting, and

making clear that the majority versus minority divide turned on whether the majority correctly interpreted the statute to effectuate congressional intent). Similarly, in *Alaska Airlines*, the Court flatly stated: "The more relevant inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines*, 480 U.S. at 685 (emphasis in original).

      Hence, in deciding whether it may engraft a probable cause hearing on to the Act, and in deciding whether it may sever the clear and convincing evidence standard of proof and substitute a beyond a reasonable doubt standard, this Court's task is precisely the same. The Court must ask: Looking at the text, structure, and history of Section 4248, is there *clear evidence that Congress intended* that the defendants would be afforded a probable cause hearing and finding, and/or a final hearing at which the beyond a reasonable doubt standard of proof would be employed by the fact finder? There is not; rather, it is clear that Congress did not intend §4248 to permit either and that the addition of a probable cause hearing and the substitution of a beyond a reasonable doubt burden of proof for the clear and convincing standard in the statute "would be to create a program quite different from the one the legislature actually adopted." *Sloan v. Lemon*, 413 U.S. 825, 834 (1973) (rejecting argument that statutory provisions should be declared severable as "thoroughly spurious" (*id.* at 834)).

      As the text and structure of Section 4248 clearly show and the *government itself* argues *(see Supp. Mem. at pg. 5)*, Congress' evident purpose in enacting the Act was to provide for the sure and certain detention of certified persons by minimizing procedural and substantive obstacles to their detention. Adding a probable cause hearing and a proof beyond a reasonable doubt standard to the Act while severing the existing clear and convincing evidence burden

would only frustrate Congress' intent by introducing more stringent safeguards against detention and commitment into the statutory scheme.

The government cites no evidence that Congress intended a probable cause hearing and finding to take place. *See Supp. Mem.* at pg. 4. Moreover, the text and structure of the statute itself clearly show that Congress did *not* intend for the defendants to receive the benefit of such a hearing and finding. Instead, Congress substituted an administrative preliminary certification of sexual dangerousness as the predicate triggering deprivation of the defendants' liberty. *See* 18 U.S.C. § 4248(a). That such a mechanism is unconstitutional does not make it any less the *clear design* of the Congress, and an effort by this Court to circumvent Congressional design by engrafting judicial review on to the statutory scheme would clearly frustrate Congress' intent to detain certified persons by creating the possibility that a court might disagree with the administrative determination. *See Zadvydas*, 533 U.S. at 692 ("This Court has suggested...that the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights.") (internal quotation and citation omitted).

Likewise, there is nothing in the text or structure of the Act to clearly show that Congress intended or even contemplated that Section 4248 would survive the severance of the clear and convincing standard of proof and the substitution of a beyond a reasonable doubt burden. *See* 18 U.S.C. § 4248(d). Substituting a beyond a reasonable doubt standard would contravene Congress' express intent that the government be required to prove sexual dangerousness only by clear and convincing evidence. Just as the addition of a probable cause hearing might diminish the certainty that certified persons would be detained pending a final hearing, the introduction of the proof beyond a reasonable doubt burden might diminish the certainty that certified persons

would ultimately be committed as sexually dangerous persons. Thus, the government's suggestion that Congress' design would not be frustrated by the imposition of the beyond a reasonable doubt standard of proof is at odds with its own, *correct*, understanding of Congress' purpose in enacting Section 4248 – to ensure, as far as possible, that certified persons remain incarcerated – as well as the express terms of the statute. *See Supp. Mem.* at pg. 5; *Accord Zadvydas*, 533 U.S. at 706 (Kennedy, J., dissenting) ("One can accept the premise that a substantial constitutional question is presented by the prospect of lengthy, even unending, detention in some instances; but the statutory construction the Court adopts should be rejected in any event. The interpretation has no basis in the language or structure of the INA and in fact contradicts and defeats the purpose set forth in the express terms of the statutory text.").

**III.   THE GOVERNMENT HAS FAILED TO PROVIDE EVIDENCE THAT DEFENDANTS WILL RECEIVE TREATMENT IF COMMITTED.**

At the October 1, 2007 status hearing, this Court expressed concern that the government had not provided specific information about the sex offender treatment planned for persons committed pursuant to Section 4248. In response, the government has simply asserted: "Sex offender treatment will be provided to inmates committed as sexually dangerous." *See Supp. Mem.* at pg. 6. It has also stated that "[t]here is no formal sex offender treatment program for certified inmates, as it has not been ordered by a court." *See Supp. Mem.* at pg. 6. The remainder of the information provided pertains to general conditions of confinement and non-sex offender specific therapy. *See Supp. Mem.* at 5-6.

As Justice Breyer, joined by three other members of the Supreme Court, wrote in dissent in *Kansas v. Hendricks*, 521 U.S. 346, 382 (1997):

> The *Allen* Court's focus upon treatment, as a kind of touchstone helping to distinguish civil from punitive purposes, is not surprising, for one would expect a nonpunitive statutory scheme to confine, not simply in order to protect, but also in order to cure. That is to say, one would expect a nonpunitively motivated legislature that confines *because of* a dangerous mental abnormality to seek to help the individual himself overcome that abnormality (at least insofar as professional treatment for the abnormality exists and is *383 potentially helpful, as Kansas, supported by some groups of mental health professionals, argues is the case here, see *supra,* at 2090). Conversely, a statutory scheme that provides confinement that does not reasonably fit a practically available, medically oriented treatment objective, more likely reflects a primarily punitive legislative purpose.

*See also Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

The government's bald assertion that undescribed "sex offender treatment" will be provided to persons committed under Section 4248 can hardly serve as a "touchstone" to distinguish the Act from a *de facto* punitive measure, and certainly cannot constitute a sufficient guarantee that the government intends to meaningfully attempt to provide those committed under the Act with the tools to overcome the conditions claimed to justify their indefinite confinement. The government's assertion is not even an adequate showing that any treatment that *is* afforded will be administered, as required by due process, according to the best judgment of a qualified professional. *See Youngberg*, 457 U.S. at 322; *See also Doe v. Gaughan*, 808 F.2d 871, 884 (1st Cir. 1986) (*Youngberg's* requirements extend to mentally ill involuntary committees). Lastly, the paucity of information about proposed treatment and conditions of confinement for Section 4248 committees that the government has thus far offered effectively prohibits defendants from

mounting meaningful "as applied" challenges to certain aspects of the Act, should that become necessary.

        JEFFREY SHIELDS
        JOEL WETMORE
        CHARLES PEAVY
        By their attorneys,

        /s/ Page Kelley
        Page Kelley
          B.B.O. #548237
        William Fick
          B.B.O. #650562
        Judith Mizner
          B.B.O. #350160
        Federal Defender Office
        408 Atlantic Avenue, 3rd Floor
        Boston, MA  02110
        Tel: 617-223-8061


        /s/ John Swomley
        John Swomley
          B.B.O. #551450
        Swomley & Associates
        227 Lewis Wharf
        Boston, MA 02110
        Tel: 617-227-9443

October 22, 2007


## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 22, 2007.

        /s/ Page Kelley
        Page Kelley