```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,         )
                                  )
                 Petitioner       )
                                  ) MC No. 06-10427
          -VS-                    ) MC No. 06-10449
                                  ) MC No. 06-10439
JEFFREY SHIELDS, CHARLES PEAVY,   ) Pages 1 - 41
JOEL WETMORE,                     )
                                  )
                 Respondents      )
```

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts  02210
October 1, 2007, 3:00 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

7cbb8355-83ac-4624-8d05-997150976cb0

1    A P P E A R A N C E S:

2        MARK T. QUINLIVAN, ESQ. and RAY FARQUHAR, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.
4
         PAGE KELLEY, ESQ. and WILLIAM FICK, ESQ.,
5    Federal Defender Office, 408 Atlantic Avenue, Boston,
     Massachusetts, 02210, for the Respondents.
6
         JOHN G. SWOMLEY, ESQ. and ERIC TENNEN, ESQ.,
7    Swomley & Associates, 227 Lewis Wharf, Boston,
     Massachusetts, 02110-3927, for the Respondents.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  The case of the United States V.

3   Jeffrey Shields, Miscellaneous Case No. 06-10427, United

4   States V. Charles Peavy, Miscellaneous Action No. 06-10449,

5   and United States J. Joel Wetmore, Miscellaneous

6   No. 06-10439, will now be heard before this Court.  Will

7   counsel please identify themselves for the record.

8          MR. QUINLIVAN:  Good afternoon, your Honor.  Mark

9   Quinlivan for the United States in all cases.

10          MR. FICK:  Good afternoon, your Honor.  William

11   Fick for Mr. Peavy.

12          MR. SWOMLEY:  Good afternoon.  John Swomley for

13   Mr. Peavy, Mr. Wetmore, and Mr. Shields at this point.

14          MR. TENNEN:  Good afternoon, your Honor.  Eric

15   Tennen with John Swomley, the same.

16          MS. KELLEY:  Good afternoon.  Page Kelley.  I

17   represent Jeffrey shields and Joel Wetmore.

18          THE COURT:  Good, thank you.  So we were going to

19   accomplish several things this afternoon, and I noticed as

20   well that various motions had been file.

21          Mr. Farquhar, are you part of this.

22          MR. FARQUHAR:  Yes, your Honor.  Thank you very

23   much.

24          THE COURT:  Come on up.  So the first issue was

25   going to be whether or not any of the individual defendants

1   would like a probable cause hearing.

2          MS. KELLEY:  On behalf of Mr. Shields and

3   Mr. Wetmore, the answer is "no," your Honor, but we would

4   like to preserve our objection to the constitutionality of

5   the statute, in that it does not provide for one.

6          MR. FICK:  The same for Mr. Peavy, your Honor.

7   Simply in the interest of time to get going with the actual

8   hearing, I think we'd prefer to forgo the probable cause

9   hearing.

10          THE COURT:  All right.  So let's talk about each

11   individual person.  I've never done one of these before, so

12   let's talk about whether I should be doing a colloquy.  So

13   it's who, Mr. Peavy, Mr. Shields, and --

14          MS. KELLEY:  Mr. Wetmore.  I think, your Honor,

15   where the statute does not provide for a probable cause

16   hearing, there's no need for you to safeguard the

17   defendants' rights to that at this stage, if that's what --

18          THE COURT:  Well, it may well be the statute

19   doesn't, but the Constitution does.  And let me just say

20   that -- let me ask you --

21          MS. KELLEY:  If you would like to inquire of

22   Mr. Wetmore or Mr. Shields, that's fine.

23          THE COURT:  Now, Mr. Wetmore?

24          MR. WETMORE:  Yes.

25          THE COURT:  Do you understand that there is an

1    argument that under the Constitution, you have a right to a

2    probable cause hearing to decide whether there's probable

3    cause to hold you now that your prison sentence has expired,

4    and that your attorney has just waived that?  Do you

5    understand that's what she's done?

6               MR. WETMORE:  I understand that.

7               THE COURT:  Do you want to waive that right?

8               MR. WETMORE:  May I have a moment just to discuss?

9               THE COURT:  Yes.

10              (Discussion off the record between Mr. Wetmore and

11    Ms. Kelley.)

12              MR. WETMORE:  I understand now.

13              THE COURT:  I understand that you want to reserve

14    your facial challenge to the statute, but assuming for a

15    minute that you have a right to a hearing before you're

16    deprived of your liberty, do you want to waive that right,

17    subject to reserving your facial challenge to the statute?

18              MR. WETMORE:  Yes, I reserve it.

19              THE COURT:  Mr. Wetmore, thank you very much.

20              MS. KELLEY:  This is Mr. Shields.

21              THE COURT:  Mr. Shields, do you understand that

22    under the Constitution, you have asserted a right to a

23    hearing before your deprivation of liberty now that your

24    sentence is expired, and do you understand that your

25    attorney has just waived that right?

1            MR. SHIELDS:  Yes, your Honor.

2            THE COURT:  And do you want to waive that right?

3            MR. SHIELDS:  Yes, your Honor.

4            THE COURT:  Okay.  And, Mr. Peavy, do you

5    understand that you've raised a constitutional right to have

6    a hearing before the deprivation of your liberty?

7            MR. PEAVY:  Yes, your Honor.

8            THE COURT:  And do you want to waive that right?

9            MR. PEAVY:  Yes, your Honor.

10            THE COURT:  And do you understand that this will

11    be subject to any facial challenge that you have to the

12    statute?

13            MR. PEAVY:  Yes, your Honor.

14            THE COURT:  All right, thank you very much.  So

15    now we're in Phase B.  We need to set a trial date, and I

16    need to resolve various questions about appointing a

17    psychiatrist or an independent examiner and resolve various

18    discovery issues.  So I just received a motion to appoint an

19    independent examiner on behalf of Mr. Peavy and Mr. Shields,

20    and I didn't get one, I don't think, on Mr. Wetmore.  Is

21    that right?

22            MS. KELLEY:  You did not, and I'm happy to address

23    that, your Honor.  We're asking that Mr. Wetmore's hearing

24    date not be set at this time.

25            THE COURT:  Why?

1        MR. SWOMLEY:  Your Honor, I believe that the

2    decision here has been that he is going to probably need a

3    period of time in treatment before he is ready for that

4    hearing, and one of the issues is whether or not we can do

5    that with or without a court order to do so.

6        THE COURT:  I don't know.  Do you think that --

7    we're all walking --

8        MR. SWOMLEY:  I know, we're all flying blind here

9    a little bit, but the considered opinion of his lawyers is

10   that at this stage he is in need of therapy that the Bureau

11   of Prisons has not yet provided him and wasn't providing

12   him; and in order to be able to go forward in a meaningful

13   way, we think he should already be in therapy, and we're

14   going to fight that fight if we need to fight it first.

15       THE COURT:  Do I need to order that therapy?

16       MR. SWOMLEY:  At this point in time, I think we

17   have an independent therapist who is working with him, and I

18   don't think we're at the point where the Bureau of Prisons

19   has said "no."  Once we're at that point, then I think --

20       THE COURT:  So has he gone in and met with him?

21       MR. SWOMLEY:  Not yet.

22       MS. KELLEY:  We're just having him evaluated,

23   hopefully within the next few weeks, and I think our plan is

24   to present the Court with that expert's opinion about what

25   treatment he needs.  I mean, we may be able to work with the

1    government on it or not.

2             THE COURT:  Well, why don't you confer.  Just give

3    me a timetable so I don't lose track of him.

4             MR. SWOMLEY:  Well, if we keep him as the status

5    when we have a meaningful proceeding on Mr. Peavy or

6    Mr. Shields, then --

7             THE COURT:  I don't want it to go off my radar

8    screen, though, so you need to tell me when you --

9             MR. SWOMLEY:  Six weeks, at least.

10            MS. KELLEY:  Well, we would like to ask for a

11   hearing date for Mr. Shields in early December, and I wonder

12   if we could have a status date for Mr. Wetmore at that time.

13   I think we will have contacted the Court before that time.

14            THE COURT:  Hearing means what, a trial, I mean,

15   essentially?

16            MS. KELLEY:  Yes.

17            MR. SWOMLEY:  Yes.

18            THE COURT:  I know you're claiming it should be

19   jury, and they're claiming it should be bench, but whatever

20   it is, that's the hearing, right?

21            MS. KELLEY:  Correct.

22            MR. SWOMLEY:  Yes.

23            THE COURT:  Right?  Good.

24            MS. KELLEY:  And we've discussed this with

25   Mr. Quinlivan, and the government has said, whenever your

1    Honor wants to set the court date, that's fine with them.

2         THE COURT:  Okay, good.  So is everyone

3    comfortable -- let me look at the government -- with

4    reserving on a status until December?

5         MR. QUINLIVAN:  Yes, your Honor.  I mean, we'd be

6    ready to go forward with the hearing in all three cases, but

7    if they're waiving that at this time --

8         THE COURT:  They appear to be waiving that.

9         MR. QUINLIVAN:  Yes, then we're comfortable, and

10   we also have no objection to the --

11        THE COURT:  What do you view your obligations as

12   far as treatment?  See, here's the rub here, which is, if

13   it's civil, there needs to be treatment, so you've got to be

14   providing him with treatment.  Now, what I don't know

15   whether that means is, does that mean treatment that's

16   sanctioned by the Bureau of Prisons, or does it mean

17   treatment that he wants to pay for somehow on his own?  So

18   what I don't want to be is in December still worrying about

19   that.  I want something to be happening in the intervening

20   period of time.

21        MR. QUINLIVAN:  And we're going to be providing

22   that.  I think we're both filing supplemental memoranda

23   later today, and one of the things we'll be addressing is

24   the treatment issue.  I'm still waiting to get as we speak a

25   finalized version from the Bureau of Prisons as to the issue

7cbb8355-83ac-4624-8d05-997150976cb0

1    of treatment.

2              THE COURT:  Whether or not the Bureau is intending

3    to provide it?

4              MR. QUINLIVAN:  Well, I -- they are providing me

5    with what treatment, if any, is being provided and what

6    they're going to be doing going forward, and that

7    information we'll be getting to you by the end of the day.

8              THE COURT:  So what should I do?  I don't want to

9    wait till December to find out there's a problem.

10             MR. SWOMLEY:  Could I make a suggestion, your

11   Honor?

12             THE COURT:  Yes.

13             MR. SWOMLEY:  And that would be, once we have

14   Mr. Wetmore evaluated and we have our own view of what that

15   treatment should look like, if the Bureau of Prisons says

16   "no," then you'll hear from us very shortly thereafter, and

17   we'll ask to --

18             THE COURT:  So you won't wait until December?

19             MR. SWOMLEY:  No.  No, no.  We would ask to have a

20   hearing right away after that --

21             THE COURT:  December is my backstop.  If worst

22   comes to worst, we're going to see each other once in

23   December to find out what's going on, and if that's a status

24   and everyone's happy, that's fabulous.  But if people aren't

25   happy, I'm not going to wait three months just to find out

7cbb8355-83ac-4624-8d05-997150976cb0

1    people are unhappy, right?

2              MS. KELLEY:  No.

3              THE COURT:  Good, perfect.

4              MR. QUINLIVAN:  And I would just add, I think we

5    are all in uncharted territory, but we do have a very good

6    working relationship, and I think we can resolve most of

7    these issues.

8              THE COURT:  Good.  So speaking of resolving, do

9    you like their independent examiners?

10             MR. QUINLIVAN:  Your Honor, I think that we'd have

11   no objection to their independent examiner.  I think that --

12             THE COURT:  Is it the same one for both?  Should I

13   just sign this on the dotted line?  Are you happy?

14             MR. SWOMLEY:  They're not the same ones, your

15   Honor.

16             THE COURT:  Let me look.  Yes, one's Robert Alan

17   Franky for Charles Peavy, and, yes, Dr. Joe Plaud for

18   Jeffrey Shields.  Do you have a problem?

19             MR. QUINLIVAN:  My experience, for example, in

20   4245 and 4226 cases has been generally that it's usually the

21   respondent who picks the independent expert.  Your Honor, of

22   course, has the discretion to pick her own expert.

23             THE COURT:  I'm about to sign.

24             MR. QUINLIVAN:  We have no objection.

25             THE COURT:  Bottom line, no objection.  "Proposed"

1    gets crossed out.  Now, when it says at government expense,

2    I'm assuming I have to approve it, right?  So we should do

3    what you do typically for an expert?

4              MR. FARQUHAR:  Yes, your Honor.

5              THE COURT:  So what are we going to do here?  So

6    maybe he'll submit a bill at the end?

7              MS. KELLEY:  Well, your Honor, I think the way

8    it's done in the 4246 cases is, there's somebody in the U.S.

9    Attorney's office who handles this.  And Mr. Watkins of our

10   office, Tim Watkins is familiar with this process, and we'll

11   just make sure that you hear from that person, and they'll

12   get the doctor's information so they can bill that person.

13             THE COURT:  You handle it so the court doesn't.

14   It's not like a Criminal Justice Act approval of an expert?

15             MR. FARQUHAR:  No, your Honor, it is not.

16   Actually our office has to receive a requisition from the

17   individual, and we have to first put in for a DCN for those

18   services.  So we have someone internal that will handle

19   that, your Honor.

20             THE COURT:  You know, unfortunately, I just signed

21   it with Dr. Prentky, and I'm sure it's here and I've lost

22   it, but I'm not seeing a similar draft of order with respect

23   to Dr. Plaud.  So why don't I just allow the motion for

24   court order, and someone will give me an order?

25             MS. KELLEY:  Yes.  I'll do that this afternoon,

Page 13

1   your Honor.

2           THE COURT:  All right, so I'm allowing both of

3   these.

4           Now, that doesn't address timing.  So I think what

5   I'm going to ask is Mr. Alba to give a -- we'll set a trial

6   date, and then you all can discuss with the psychiatrists

7   realistically what are we talking about?  And don't forget,

8   this is civil.  It's really different.  So I'm assuming

9   there may be depositions of experts, and it's a whole new

10  world.  I don't know.  You're shaking your head "no" because

11  you're saying it's criminal, but if I don't rule that, then

12  you have a whole panoply of civil rights.

13          MR. FARQUHAR:  That's correct, your Honor.  If

14  you'll allow me to speak on that, we would at least have the

15  opportunity, your Honor, to ask questions based upon

16  whatever report that whatever psychiatrist will come up

17  with.

18          THE COURT:  All right.  But in the meantime, let's

19  just say I'm treating this as a civil matter, and I'm

20  assuming that defendants have the right to take deposition

21  discovery of you, and so there are all sorts of questions

22  that they've asked.

23          MR. FARQUHAR:  That's correct.

24          THE COURT:  And have you had a chance to look at

25  those yet?

1          MR. FARQUHAR:  We have been working with them,

2     your Honor, in terms of questions that they ask.

3          THE COURT:  Are there objections to any of them?

4          MR. FARQUHAR:  There have been some objections.

5          THE COURT:  When can you file defense motion to

6     compel if it's not agreed to?

7          MS. KELLEY:  Well, we did just send out one letter

8     today, and I think --

9          THE COURT:  Can you confer within a week and then

10    file a motion to compel after that?

11         MS. KELLEY:  Yes.

12         THE COURT:  So within a week, a motion to compel?

13         MS. KELLEY:  Yes.

14         THE COURT:  I'm treating this sort of like a

15    scheduling conference, okay?  So let me ask, does defense

16    want to take any depositions?

17         MR. FICK:  I think we would need, your Honor, to

18    reserve on getting the discovery responses back.  Today we

19    filed a discovery letter with regard to individual cases

20    that were sent to the government.  Presumably they will have

21    a response for us relatively quickly.  Among the things

22    we've asked for are to identify certain people who we might

23    wish to depose.

24         THE COURT:  I find this a very difficult case,

25    since we're only starting to join it, and so I reserve the

1    right to change my mind a hundred percent, okay, on anything

2    that I've said.  So where I'm leaning right now, there's a

3    slight inclination that I'm likely to say that it's

4    necessary and proper and not agree with the North Carolina

5    case.  I'm likely to say it should be proof beyond a

6    reasonable doubt, and I don't know what that does to

7    severability, which I know you're all about to address.

8    Okay, so I'm likely to say that it's got to be a much higher

9    standard, and that it's civil, not criminal, but I may

10   impanel an advisory jury.

11           The reason I'm telling you that, which I normally

12   don't tip my hand on until I actually have it in my heart

13   and soul that I believe it, is because I want you all to

14   have this trial by the beginning of December, and I want all

15   the discovery that could flow from a civil case.  And I

16   don't want to be in December or mid-November when my

17   magnum opus comes out, and suddenly we haven't done any

18   discovery, because by far and away the most important thing

19   that needs to happen here is a rapid trial.

20           MR. FICK:  If I could make a suggestion, your

21   Honor --

22           THE COURT:  So I want you to --

23           MR. FICK:  Perhaps we could set a discovery status

24   conference in like a week and a half or two weeks to see

25   where we are.  If there's a disputed issue, we could resolve

1   it at that time.

2           THE COURT:  Well, let me just say, it's easier

3   said than done.  I'm happy to give you a scheduling

4   conference, but I'm not an ATM machine.  So if you have a

5   motion to compel, I'm going to want the motion.  I'm going

6   to want the opposition.  I need you to meet and confer.

7   This is a civil case.  Are any of you civil lawyers?

8           MR. FICK:  Formerly, yes.

9           THE COURT:  In a former life, where were you?

10          MR. FICK:  Foley Hoag.

11          THE COURT:  Fabulous.  So this isn't going to be

12   like one of those mega accounting malpractice cases.

13          MR. FICK:  I hope not, your Honor.

14          THE COURT:  Or like one of those interminable

15   intellectual property cases, so -- but, still, I know

16   Mr. Farquhar -- both of you are civil lawyers, right,

17   primarily?

18          MR. FARQUHAR:  Yes, we are, your Honor.

19          THE COURT:  And this isn't in any way -- the

20   letter is what usually happens on the criminal side.  So we

21   need to have a scheduling conference to move this ahead.

22   There may be motions to compel.  There may be depositions.

23   There may be interrogatories.  There's document productions.

24   There's automatic disclosure rules.  Now, we have the Fifth

25   Amendment privilege that's been asserted here, and part of

1  that, I'm assuming part of that comes up through whether

2  this is civil or criminal; but some of it may be a different

3  kind of issue, which is when people spoke to treatment

4  providers, right, not understanding what the ramifications

5  would be.  And I don't know if that's Fifth Amendment or

6  some sort of more generic due process, but at the very

7  least, I know I'm going to have to address that issue,

8  right?  That's a really big issue.  So maybe what we can do

9  is, I can set up a scheduling conference next week.  I don't

10  want to keep making you all come in.

11          MR. SWOMLEY:  The problem is, I don't think we

12  have the discovery to know whether or not we have the

13  objections to make because we don't know what disclosures --

14          THE COURT:  I understand.  All right, so you have

15  the obligation, you, the government, to provide automatic

16  discovery to them.  How fast can you do that?

17          (Discussion between government counsel.)

18          MR. QUINLIVAN:  We'll do it within a week, your

19  Honor.

20          THE COURT:  Fine.  You should provide automatic

21  discovery.  It's subject to your objection that this is a

22  criminal proceeding and not a civil one.  And if I'm wrong

23  on this, everything would be -- so make it clear what you've

24  produced so that you don't get hit on it if some court

25  decides it's criminal.  It's the one area upon which every

1    court so far has ruled otherwise, so it's probably, at least

2    from a precedential point of view, the weakest point.  But

3    I'm also going to -- there's also cases that say that even

4    if something is a civil proceeding, sometimes the burden

5    needs to go as high as reasonable doubt.  And I'm likely to,

6    I'm thinking about an advisory jury, which you can all talk

7    about whether that makes some sense or not, and impanel

8    twelve people to decide it.  But, at the very least, the

9    factual piece of this, which is, was there a prior instance

10   of sexual violence?

11          MS. KELLEY:  I think Ms. Mizner has addressed this

12   in her memo that will be filed today, but Rule 39(c) of the

13   Rules of Civil Procedure allow you to impanel an advisory

14   jury as you wish, so --

15          THE COURT:  I'm thinking of doing that.  I think

16   that's a really good thing, and I know it's done routinely

17   in the stateside, and I think it's the voice of the

18   community, though I'm not bound by it, but I'm thinking of

19   doing that.  However, here's the problem:  Let's assume that

20   you turn over everything, you've turned over everything, and

21   now we have the question of depositions.  You may not be

22   able to ask them certain questions because regardless of

23   whether this is civil or criminal, I don't know when things

24   happen and whether there's a valid Fifth Amendment right.

25   So I'm going to assume that there may well be.  You've got

1    to come up with names of witnesses.  I mean, this is what's

2    so brand-new about this.  So suppose -- give me an example

3    of one of these gentlemen.  Is there someone who made an

4    allegation that someone raped her?  Is there?  How are you

5    going to prove that they committed a sexual act in the past

6    that's violent?

7                THE COURT:  Well, your Honor, I haven't looked

8    at the particular cases.  I know that in terms of the

9    certifications, they were based on both the interviews and

10   the past criminal history.

11               THE COURT:  So that for these gentleman, there's a

12   conviction?  So you're just going to rely on conviction.

13   Maybe that's right.  I just don't understand the case.

14   Would you just rely on a conviction, or are you going to

15   rely -- as I read this thing, that's what makes it so

16   amazing, is that it doesn't have to be a conviction, right?

17               MR. QUINLIVAN:  Well, that's right.  I mean, the

18   primary evidence from the government will be the interview

19   or psychological evaluation about the likely sexual

20   danger --

21               THE COURT:  But that's going forward, that's

22   prospective.  As I read this, am I wrong, you have to prove

23   that at least once, one of these person who's the subject of

24   the proceeding, right, committed a sexually violent act,

25   right?

7cbb8355-83ac-4624-8d05-997150976cb0

1          MR. QUINLIVAN:  That's right.

2          THE COURT:  And let's say I say beyond a

3    reasonable doubt.  Now, one way I suppose you could do it

4    would be a prior conviction, and maybe that's res judicata,

5    and we'd have to look at what that said.  And if you relied

6    on that, fine.  We'll address the legal ramifications.  But

7    if you're going to rely on individual witness testimony,

8    these guys get the right to depose the person.

9          MR. FARQUHAR:  That's correct, your Honor, and in

10   fact we have the obligation to identify those people, as

11   your Honor knows, in local Rule 26.1.

12         THE COURT:  Yes, potential witnesses.

13         MR. FARQUHAR:  That's right, your Honor, plus what

14   they could potentially say.

15         THE COURT:  So then the issue is, from your point

16   of view, you could potentially want to interview -- I mean,

17   this is all new territory because there is no other statute

18   like this in America that I know of where there doesn't have

19   to be a conviction first, right?

20         MR. FARQUHAR:  No, that's definitely true, your

21   Honor.  And the difficulty with this arena at this point is

22   that typically we're not dealing, as your Honor knows, with

23   an individual that is being held pending civil discovery,

24   because all of this takes time, and we're trying to --

25         THE COURT:  Well, it's going to have to be number

1    one priority because, as I understand it, these folks, at

2    least two defendants want a December trial date.  So that's

3    why we've got to do this fast, and I don't even know what's

4    at stake.  Have you even looked to see whether there are

5    witnesses?

6              MR. FARQUHAR:  Your Honor, no, we would not know

7    that.  We'll know that within the next couple of days, and

8    we will get that out.

9              THE COURT:  You sure will.  So do you want to wait

10   a few days so everybody can scope this out?

11             MR. FICK:  Yes, your Honor.  One of the things

12   we'd asked for, for example, in the letter we sent to the

13   government today -- and while styled as a letter, it really

14   contains what would normally be interrogatories and document

15   requests -- so one of the things we asked, for example, was

16   to identify the specific prior act of sexually violent

17   conduct or child molestation on which they plan to rely, and

18   if it's a conviction, to tell us the date, time, place.

19             THE COURT:  Sure, all fair enough.

20             MR. FICK:  Once that information is out there,

21   we'll have a better idea.  If it's the prior conviction,

22   it's one thing.  If we have to --

23             THE COURT:  You've persuaded me already, Counsel,

24   of one thing, which is, you all don't know enough about this

25   case to even possibly do a scheduling order that makes

1    sense.  So maybe you should come back next week.  I think

2    that's probably the best idea out here.

3              MR. FARQUHAR:  I do think that's a good idea

4    because even from what I'm hearing, typically a letter is

5    not good enough prior to the scheduling conference at least

6    being ordered by the Court for a defendant in a civil matter

7    to be passing on that type of information.

8              THE COURT:  Right, but I am looking for a December

9    trial date because what's it say, 75 days?  We're way past

10   the 75 days.  Now, I understand that's because the probable

11   cause hearing has been waived and this was being briefed.

12   Now, nothing's being waived anymore.  We're going to go

13   right to this trial as soon as I can; I mean, subject to

14   defense counsel wanting more time, which might end

15   happening.

16             So do you want -- I think we should not do these

17   in tandem, two at a time.  I think that would be a bad idea.

18   I think we should do -- so have you figured out -- would you

19   also by then figure out who should go first and who should

20   go second?

21             MR. FICK:  In terms of an actual trial your Honor?

22             THE COURT:  Yes.

23             MR. SWOMLEY:  I think we've actually done that,

24   your Honor.  If I can interject, I've been brought in

25   because I've done this on the stateside a bunch, and they

1    want me to be here.

2         THE COURT:  You're the only one in this room who

3    knows what he's doing.

4         MR. SWOMLEY:  Maybe.  I don't know.  But this

5    statute doesn't look like anything on stateside either, so

6    it's still the Wild West.  But just for my own sense of

7    being able to schedule, there's other trials that I'm

8    already doing.  I have a big window at the end of November,

9    the beginning of December.

10        THE COURT:  Good.

11        MR. SWOMLEY:  And I'd really like to get the first

12   one out of the way, and I think that the first one we were

13   talking about was Mr. Shields.  And if you can pick a date,

14   then make the rest of this come and happen beforehand, I'm

15   ready to go from that.

16        THE COURT:  Robert, when should we do it?  How

17   about right after Thanksgiving?  How long do you think this

18   might be, a week?  I suppose it's hard to say until you know

19   what the incidents that you're trying to prove are.

20        MS. KELLEY:  Well, one of the things that we would

21   be asking your Honor to decide prior to the hearing is how

22   much testimony you're interested in taking on the kind of

23   Daubert issue that we raised in our pretrial motion, so that

24   could take a week.

25        MR. SWOMLEY:  You might decide that in a hearing,

1   or you might defer until you hear cross-examination, for

2   example, of the government's witness.  I don't know how you

3   want to proceed with that.

4          THE COURT:  I don't want to do that on the fly.

5   It's really hard for me to do it that way.  On a bench

6   trial, if you want to waive your right to a jury trial.  But

7   if I did it on an advisory jury level, that's just too hard.

8   So I think what you all need to do, assuming it's the day

9   after Thanksgiving, maybe you can all work out a schedule

10  that makes some sense.

11         You don't even know what the incidence is.  You

12  don't even know whether it's a conviction or whether it's --

13         MR. FARQUHAR:  I think we're trying to wrap a

14  civil matter into a criminal time period, your Honor, and

15  it's going to be --

16         THE COURT:  It's going to happen.  That's the

17  Constitution, and it's the statute, and it's a mess.

18         MR. FARQUHAR:  It's just a mess.  It's just very

19  hard to do.

20         THE COURT:  My big issue is writing something.

21  Let me say this:  You're going to have to do it, and the big

22  issue for me right now, just thinking about it

23  intellectually, is suppose I think there are certain things

24  that need to happen under the Constitution -- i.e., proof

25  beyond a reasonable doubt, i.e., notice and hearing before

1    the expiration of the sentence so that you're not affecting

2    liberty interests, and there may be other things like

3    that -- let's assume I go that route, here's the

4    intellectual dilemma which you're all supposed to be

5    addressing for me:  So then what do I do with that?  Do I

6    just declare I'm going to do it beyond a reasonable doubt

7    and just declare that it's a violation of due process not to

8    do it beforehand, and let some other court figure it out?  I

9    know Ms. Mizner is here.  Or do I declare the whole scheme

10   kaflooey and tell Congress to redo it?  I don't know, and

11   that's what you're all briefing for me, right?

12            MS. MIZNER:  Your Honor, it should have been filed

13   a few moments ago, and the position that we have taken is

14   that, yes, you say "kaflooey" and send it back to Congress.

15            THE COURT:  And what's your position?

16            MR. QUINLIVAN:  That's not our position, your

17   Honor.

18            (Laughter.)

19            THE COURT:  And when's yours going to -- that's a

20   legal term of art.  And you're going to brief it when?

21            MR. QUINLIVAN:  Oh, we're also filing by the end

22   of the day, your Honor.

23            THE COURT:  Oh, fine, I'll let you all go do it

24   then.  But that for me is a hard issue, and I think that

25   we've been looking a lot at Salerno, and it's created

1    problems across the board.  And we know the courts have

2    carved off abortion and First Amendment and have expressed

3    concerns about it, but it's never been completely disavowed,

4    and so I worry about the impact of that.

5            On the other hand, there's certain -- I mean, I'm

6    sure that you have to have a notice and hearing beforehand,

7    and whether that's enough to raise a Salerno facial

8    challenge or just you do it one by one, but it's the one

9    thing that's just bedrock law.  And proof beyond a

10   reasonable doubt is going to be even harder, but I think

11   that that's where I'm going to be.  Now, is that enough so

12   that I just say the whole thing goes out the window under

13   Salerno?  That's going to be your position.  Or do I

14   say I just will do it by proof beyond a reasonable doubt?

15   I'm going to struggle with that one.  I mean, none of the

16   other judges so much needed to do it because Judge Tauro

17   essentially accepted the Salerno case as an across-the-board

18   buffer, shall we say.  He felt that you couldn't challenge

19   any of these things other than case by case.  And the North

20   Carolina court felt it was beyond the necessary and proper

21   clause.  I'm sort of somewhere in between, and I'm not sure

22   what to do.

23           As soon as other cases come down, please let me

24   know.  I mean, I don't know, are any of them up on appeal

25   now as we speak?

1    MS. MIZNER:  I don't believe so, your Honor.  I'm

2  not sure about the North Carolina case, but Judge Tauro's is

3  not.

4    THE COURT:  I'm assuming the North Carolina case

5  will go up.

6    MR. QUINLIVAN:  I believe that he stayed the order

7  on the likelihood that the government -- I don't know if a

8  notice of appeal has been filed, but I anticipate that it

9  will be.

10    THE COURT:  I anticipate that as well.  So on

11  Judge Tauro's, is he working on the same track I am?

12    MS. KELLEY:  We're about to file a status report

13  with him and get that hearing date set.  We actually --

14  Mr. Swomley and Mr. Tennen are on that case as well.  We

15  wanted to see what the time frame was on these cases before

16  jamming them up on that case, so --

17    MR. SWOMLEY:  We basically signed onto all of this

18  first wave.  So, please, from my perspective, if we can work

19  together so that they're not going on at the same time, and

20  at least not the first two or three, I think that it is

21  important for Eric Tennen and myself to be available to do

22  these, the first ones.

23    THE COURT:  Okay, but -- and I could even make a

24  phone call easily to Judge Tauro.  The issue that we're all

25  going to ask, though, is, at some level, it can't be the

1    same prosecutors and the same defense attorneys because

2    there are what, nine here, eleven, something like that?  And

3    my guess is, that's just the beginning of the wave.  And so

4    you can't, especially without any probable cause hearings,

5    and these people are being -- you've got to move them.

6              MR. FICK:  I mean, your Honor, these cases are

7    spread among various people in our office.  I think our hope

8    was just to really carefully do the first two or three of

9    them with Mr. Tennen and Mr. Swomley so we make sure to

10   absorb their expertise on the stateside on the subject

11   matter here.

12             THE COURT:  Who's representing the person in front

13   of Judge Tauro?

14             MS. KELLEY:  I am.

15             THE COURT:  You are.  So Judge Tauro may be happy

16   to defer it.  I mean, we all work together really closely.

17   The question is whether your client will.

18             MS. KELLEY:  I think also he has two other cases

19   with Stellio Sinnis.  But can I just make a suggestion about

20   the scheduling here?

21             THE COURT:  Yes.

22             MS. KELLEY:  Which is, could we perhaps have the

23   government respond to the letter that we sent out today,

24   plus the -- you know, in all fairness to the government,

25   they have been providing us with discovery as this time

1   period has gone by, but not everything that we have

2   requested.  So if we could just have the government finally

3   respond to us within a week, and then perhaps we would have

4   several days to file a motion to compel after that before we

5   appear before the court, and maybe we can wrap up the

6   discovery at that time.

7           THE COURT:  And I may end up having to -- there

8   are periods in there, unfortunately for all of you, where

9   I'm going to be at the First Circuit Judicial Conference,

10  et cetera, so what we need to do is, maybe a magistrate

11  judge can address some of this.  Do you know whether you've

12  been paired with anyone?  Probably not because it's an MBD.

13  So all of these have been drawn as MBDs at this point, is

14  that right?

15          MR. QUINLIVAN:  That's right, your Honor.

16          MS. KELLEY:  Yes.

17          THE COURT:  So I've got to figure that out, but

18  let's have a scheduling conference at the tail end of next

19  week.  How does that sound?  And then we can -- you will

20  have responded to them hopefully by Friday on everything,

21  and then give them everything you've got or tell them what

22  you won't give them or you don't have, and then we'll have a

23  scheduling conference.  You need to exchange some -- when

24  you meet and confer, come up with some dates for

25  depositions, if that's what you want, for experts, for

1    example.  Will you each have your own independent expert?

2              MS. KELLEY:  Again, I think that depends on the

3    report of the court-appointed expert.  If that is

4    satisfactory, I think we would not have an independent.  You

5    know, the statute provides for us to ask for a second

6    expert, but we don't know if that's necessary until we see

7    the results of the first one.

8              THE COURT:  I think it makes sense for you to have

9    one scheduled and ready to go because otherwise we won't

10   make the December date because they're so busy.  I mean,

11   that's something I've found in the other area, which is it

12   takes a while to actually get the report written, for him to

13   meet in enough time with him.  What does the government

14   think?  Do you think you're going to want your own

15   psychiatrist, or are you in the same position?

16             MR. QUINLIVAN:  We're going to be asking to look

17   at that.  I assume we're going to be primarily working --

18             THE COURT:  Well, have someone.

19             MR. QUINLIVAN:  Yes, that's right.

20             THE COURT:  Both people should be finding --

21             MR. QUINLIVAN:  Yes, absolutely.

22             THE COURT:  And then what we're going to have to

23   do is -- you know, ideally speaking, have you talked to

24   these experts that I just appointed to find out if they can

25   get one out fairly quickly?

1       MR. FICK:  Yes, your Honor, we will.  The one sort

2   of other predicate piece we have to resolve, we will try to

3   agree with the government what that expert should see.

4   Hopefully we will agree about that.  If we don't, we'll have

5   to bring that to your Honor next week presumably.

6       THE COURT:  Sure.

7       MS. KELLEY:  But the experts proposed have been

8   contacted, and they're ready to go.

9       THE COURT:  So as soon as they see all the

10  documentation, they can go on an interview?

11      MS. KELLEY:  Yes, and I think Mr. Swomley and

12  Mr. Tennen were explaining, it should not be a lengthy

13  process.  It should not require the 75 days that the statute

14  envisions, so --

15      MR. SWOMLEY:  On the stateside it's 60 days, and

16  really it takes a few hours of interview and then a couple

17  of days to go through all of the documents, and then the

18  length of time to write a report.  So, I mean, it really is

19  generally accomplished within a week.

20      THE COURT:  I should use your expertise.  So what

21  happens on the stateside?  Is there civil discovery?

22      MR. SWOMLEY:  That actually varies from state to

23  state.  In Massachusetts, neither the civil rules nor the

24  criminal rules apply.  And it is still the Wild West where

25  you ask for it, and most judges will not give it to you is

1   the bottom line.

2            THE COURT:  In the Commonwealth of Massachusetts?

3            MR. SWOMLEY:  Yes.

4            THE COURT:  They won't give you discovery?

5            MR. SWOMLEY:  Oh, no, they'll give you discovery,

6   but they will not -- in terms of a deposition, it's just

7   money, and the courts don't want to fund a deposition

8   basically.

9            THE COURT:  Is there a separate set of, for

10  example, local rules that the state courts follow?

11           MR. SWOMLEY:  There are no written rules regarding

12  this.  In Iowa, for example, they do permit depositions.

13  Here I've had interrogatories allowed in a limited fashion,

14  and I've never had a deposition allowed.

15           THE COURT:  Because here in Massachusetts, am I

16  remembering correctly, you had to have been convicted of a

17  sex crime --

18           MR. SWOMLEY:  You did.

19           THE COURT:  -- for this even to have been

20  triggered, so maybe it's a slightly different thing.

21           MR. SWOMLEY:  Right.

22           THE COURT:  So I suppose, as we craft this and

23  work our way together through this, if one of these

24  gentlemen had been convicted of a sex crime and that was

25  what was being relied on, you might have a different result

1    than if it's just the vague "another incident."

2              MR. SWOMLEY:  Oh, I think that if there were no

3    conviction, and I don't know whether we're -- I mean, I

4    think that as they are going forward, they have found people

5    to petition against that have convictions; but there will

6    come a time probably when you don't have the conviction,

7    and, yeah, that will require a whole other layer of

8    discovery, I would think.

9              THE COURT:  Well, do these folks who we'll be

10   going to trial with, do they have convictions?

11             MR. SWOMLEY:  Yes.

12             THE COURT:  Of a touching offense, not a looking?

13             MR. SWOMLEY:  I believe they all have a touching

14   offense, yes.

15             THE COURT:  Okay, so I guess that's it.  So I

16   suppose the issue would be whether you just plan on relying

17   on that or if there are going to be other people you would

18   plan to put on.

19             MS. KELLEY:  Well, I think the question of

20   depositions will largely depend on who the government is

21   calling, and in the letter we sent out today, we asked for a

22   witness list.

23             THE COURT:  That's absolutely fair.

24             MS. KELLEY:  So once we get that, then I think we

25   can evaluate, because your Honor is saying that you want to

1    see the hearings move forward.  So do the clients.  So I

2    know Mr. Shields is very anxious to have his hearing.

3                 THE COURT:  Sure.

4                 MS. KELLEY:  So he may be willing to truncate some

5    of those discovery issues to fit into the time period here.

6    But I think we'll have to see who they intend to call, so --

7                 THE COURT:  Going forward -- I've handled my three

8    cases, and Judge Tauro has his -- I'm just curious about

9    what's happening with the other cases.

10                MR. FICK:  I have a case, your Honor, in front of

11   Judge O'Toole, and he has essentially held everything in

12   abeyance, I think waiting to see what your Honor with the

13   first-filed cases was going to do.  We'll probably file a

14   status report in front of him shortly just to apprise him of

15   where things stand here.

16                THE COURT:  And then who else?  There must be

17   other --

18                MR. FICK:  Judge Wolf I believe has a couple that

19   Tim Watkins represents the clients in those cases, and he

20   also, I believe, intends to file a status report just

21   reporting on what's going in the various other courtrooms in

22   the building.

23                THE COURT:  So before I report to the court, why

24   don't I at least hear from you all next week after you've

25   had a chance to confer.  I'll tell them what I'm doing so

7cbb8355-83ac-4624-8d05-997150976cb0

1    that they can all make judgments in their own case.  And,

2    ironically, we're going to have to make a decision about

3    what to do with the MBD status of these cases.  Typically --

4    well, I don't know, we don't have a typically in this

5    situation.  I don't know whether they should be drawn

6    randomly or whether I just keep these as a pilot case.  And

7    I'll make certain recommendations to the court, but at least

8    I'm going to wait till after I've heard from all of you as

9    to where it's going and how fast and that sort of thing, and

10   then if worst comes to worst -- because I need to be issuing

11   a written opinion in any event, but I don't want this all to

12   wait for that because you can bring it all up at the same

13   time.  Okay?

14              So when can we do that next week?  Four o'clock on

15   the 9th, okay?  Is that too soon?

16              MS. MIZNER:  Isn't the 9th Columbus Day?

17              MR. FICK:  It's the day after Columbus Day, your

18   Honor.  I'm just afraid we may not have a chance to react to

19   what the government provides and says at the end of this

20   week.

21              THE COURT:  Maybe 2:30 on the 11th?

22              MS. KELLEY:  That's fine.

23              MR. FICK:  That's fine.

24              MR. QUINLIVAN:  That's fine with us, your Honor.

25              MS. KELLEY:  Your Honor, the clients are asking

1   that they not be brought in.  I think it's pretty arduous.

2         THE COURT:  Actually, I was going to say the exact

3   thing because I think we're just going to be talking --

4   first of all, it's likely to be considered a civil

5   proceeding, so given that there's no right to be there at

6   every single scheduling conference, and to boot, it's just

7   going to be not dispositive kinds of things, more technical

8   in how we go forward.

9         So, anyway, thank you very much.  I'll see you

10  next week.  And let me be quite clear:  I don't need to see

11  you if you don't need to see me.  So if you have a proposed

12  order going forward, I think the two things that need to be

13  built in are the very difficult issue of what to do about

14  Daubert, so we need to build in an afternoon for that

15  probably sometime in November, at least.  And I don't have a

16  whole trial on Daubert, although I did for Joan Griffin and

17  her challenge to the forensics, the bullets, and I did once

18  for DNA evidence.  I think it was a long time ago we had the

19  first DNA case here in the district.  But for the most part,

20  this is just psychiatrist testimony, right?  And so you can

21  put in a lot through affidavits, and then have maybe an

22  expert a side come and tell me about it.  But you can put in

23  a lot of it through a big binder, and so we can probably do

24  it in an afternoon.  So I want to do Daubert.  And then what

25  will the challenge be on the statements, if there are

1    statements, once you find out if the government is planning

2    on using statements?  I know there will be a Fifth Amendment

3    type challenge, right, or a due process type challenge?

4            MR. FICK:  Fifth Amendment, due process, perhaps

5    something in the nature of a contractual privacy/medical

6    records type thing also.  We have to figure out how to

7    formulate that based on what releases may have been signed

8    and what the doctor --

9            THE COURT:  Yes, you're going to get them all of

10   that.  Were there releases signed and notices and warnings

11   given?

12           MS. KELLEY:  I don't know.  For people who were in

13   the sex offender treatment program, which Mr. Shields was

14   not, I think they did sign a release releasing their

15   treatment records to the Bureau of Prisons, but without

16   foreseeing the SDP law warning.  So I think the question for

17   your Honor will be if that's really a waiver when nobody

18   envisioned the treatment records were going to be used to

19   imprison somebody for life.

20           THE COURT:  It may not arise on Mr. Shields if

21   he's going to be the first one, right?

22           MS. KELLEY:  That's correct, though Mr. Shields

23   did receive counseling while in the Bureau of Prisons, and

24   we just don't know if the government intends to use that or

25   not.

1          THE COURT:  You say there was no release that he

2     signed?

3          MS. KELLEY:  I think there was a release.  I don't

4     actually have the release.

5          THE COURT:  We'll have to see the language of

6     that.

7          MS. KELLEY:  Right.

8          THE COURT:  Have you seen the releases?

9          MR. QUINLIVAN:  I have not, your Honor.  That's

10    one of the things we're going to be looking at.

11         THE COURT:  So if you could build that into your

12    schedule, I'll need a hearing on that.  And of course

13    there's generally a psychiatrist privilege that's been

14    recognized by the Supreme Court.  On the other hand, it can

15    be waived.  So I think that might be one of the issues.

16         MR. SWOMLEY:  There will be probably a question as

17    to the voluntariness as well because oftentimes privileges

18    are conditioned on waivers, and so whether or not it was

19    free and voluntary may be an issue as well.

20         THE COURT:  Sure.

21         MS. KELLEY:  There's also a question, if the

22    government is going to put in information that was relied on

23    by the evaluator when these men were first brought to Fort

24    Devens, if we can just see the body of information that they

25    intend to admit.  There were interviews conducted when they

1   got to Fort Devens.  There's some issue about people

2   requesting counsel and not being given counsel, and then --

3            THE COURT:  So what are you asking for?  I don't

4   understand.  You've already asked for that, right?

5            MS. KELLEY:  Yes, we have asked for that.

6            THE COURT:  Okay, so we'll see what's -- do you

7   know yet whether you're planning on relying on statements

8   that these men made?

9            MR. QUINLIVAN:  We don't know that, and we just

10  got this letter literally a few hours ago, so although --

11           THE COURT:  Do you have a contact within the

12  Bureau?

13           MR. QUINLIVAN:  Yes, we do.

14           THE COURT:  Somebody who's sort of up to speed and

15  is going to help you on this so we can move this quickly?

16           MR. QUINLIVAN:  Yes.

17           THE COURT:  I've got some -- you didn't see the

18  expressions behind you that seemed dubious, but, in any

19  event, you're going to need someone from the Bureau of

20  Prisons because the two of you at this point know nothing,

21  and you're going to need to know a lot within two months.

22           MR. FARQUHAR:  You give us too much credit.

23           THE COURT:  Okay, see you then.

24           MR. SWOMLEY:  Judge, and I understand you're not

25  setting any trial dates now?

1          THE COURT:  We did, the day after Thanksgiving.

2    What's that, December what?  Oh, yeah, I'm going to catch

3    you in your window.

4          MR. SWOMLEY:  All right.  All right, I just didn't

5    hear that we actually started --

6          MR. FICK:  Well, since two are ready to go

7    forward, can we set one for Mr. Peavy as well, if that was

8    for Mr. Shields?

9          MR. SWOMLEY:  A week later.

10         MR. FICK:  A week later.

11         THE COURT:  If you're telling me it's a week, I'm

12    the happiest woman around.

13         MR. SWOMLEY:  I expect, whenever I tell you a

14    week, it's longer than that.  I know that I'm a bad judge of

15    time.

16         THE COURT:  We'll plan on having the other one

17    follow, and you all may need a break too, and we'll bump it

18    till January, but at least we'll start with that

19    anticipation because I will not be here the week of

20    Christmas.

21         MR. SWOMLEY:  I'd like to not be here.

22         THE COURT:  And I don't know what everybody's

23    schedule looks like, but we'll plan on, in any event, two

24    back-to-back trials.  But if everybody agrees there's a need

25    for a breathing room, it may go into early January.

1          MR. SWOMLEY:  Okay, your Honor, thank you.

2          THE CLERK:  Court is in recess.

3          (Adjourned, 3:50 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7            I, Lee A. Marzilli, Official Court Reporter, do

8    hereby certify that the foregoing transcript, Pages 1

9    through 41 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in MC No. 06-10427, United States

11   of America V. Jeffrey Shields, and thereafter by me reduced

12   to typewriting and is a true and accurate record of the

13   proceedings.

14            In witness whereof I have hereunto set my hand

15   this 13th day of May, 2009.

16

17

18

19

20
                   /s/ Lee A. Marzilli
21            _____
              LEE A. MARZILLI, RPR, CRR
22            OFFICIAL COURT REPORTER

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25