Page 1

```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
                 Petitioner      )
                                 ) MC No. 06-10427
        -VS-                     ) MC No. 06-10449
                                 ) MC No. 06-10439
JEFFREY SHIELDS, CHARLES PEAVY,  ) Pages 1 - 39
JOEL WETMORE,                    )
                                 )
                 Respondents     )
```

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts 02210
October 18, 2007, 9:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA 02210
(617)345-6787

1    A P P E A R A N C E S:

2         MARK T. QUINLIVAN, ESQ. and RAY FARQUHAR, ESQ.,
     Assistant United States Attorneys, Office of the United
3    States Attorney, 1 Courthouse Way, Boston, Massachusetts,
     02210, for the Petitioner.

4
          PAGE KELLEY, ESQ. and WILLIAM FICK, ESQ.,
5    Federal Defender Office, 408 Atlantic Avenue, Boston,
     Massachusetts, 02210, for the Respondents.

6
          ERIC TENNEN, ESQ., Swomley & Associates,
7    227 Lewis Wharf, Boston, Massachusetts, 02110-3927,
     for the Respondents.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  The case of the United States V.

3   Jeffrey Shields, Miscellaneous Case No. 06-10427, United

4   States V. Charles Peavy, Miscellaneous Action No. 06-10449,

5   and United States J. Joel Wetmore, Miscellaneous

6   No. 06-10439, will now be heard before this Court.  Will

7   counsel please identify themselves for the record.

8          MR. QUINLIVAN:  Good morning, your Honor.  Mark

9   Quinlivan for the United States.

10         MR. FARQUHAR:  Good morning, your Honor.  Ray

11  Farquhar for the United States.

12         MS. KELLEY:  Good morning.  Page Kelley.  I

13  represent Mr. Shields.

14         MR. FICK:  Good morning, your Honor.  William Fick

15  for Mr. Peavy.

16         MR. TENNEN:  Good morning, your Honor.  Eric

17  Tennen for all three defendants, I guess.  I'm not sure what

18  we're calling them.

19         THE COURT:  All right, so at this point you've

20  turned over all your documents?

21         MR. QUINLIVAN:  Yes.  We've turned over all the

22  documents with respect to Mr. Shields and Mr. Peavy, and

23  today we're going to be turning over all of the documents

24  for the other seven, including Mr. Wetmore.

25         THE COURT:  For the other?

1          MR. QUINLIVAN:  In the other seven cases, we're

2     going to be getting them the materials in all of the other

3     seven case, including Mr. Wetmore.  We focused initially on

4     getting the materials for Mr. Peavy and Mr. Shields.

5          THE COURT:  But they're going to trial?

6          MR. QUINLIVAN:  Yes.

7          THE COURT:  And what are the grounds for holding

8     them?  Is it based on prior convictions, or is it based on

9     just prior charges, allegations?

10          MR. FICK:  Those two individuals, Mr. Peavy and

11     Mr. Wetmore, have prior convictions, and so the fact of a

12     predicate is not in dispute.  There may be a dispute about

13     to what extent certain evidence like police reports come in

14     as to conduct, but --

15          THE COURT:  This is exactly my question, so what

16     was the prior conviction for Shields?

17          MR. QUINLIVAN:  Your Honor, in our view, he has

18     two that would qualify as the pretext.  In 1990 he was

19     convicted of two counts of unlawful sexual contact in Maine.

20     On October 30, 1998, he was convicted of unlawful sexual

21     contact, also in Maine.

22          THE COURT:  So what does that mean, "contact"?

23          MR. QUINLIVAN:  In both cases, it was a touching

24     of a young boy.

25          THE COURT:  And what does that mean?  Like, in

1    other words, I'm just trying to -- when we talk about --

2    like in that priest case where somebody touched the butt, or

3    are we talking about a rape?

4            MR. QUINLIVAN:  They were not -- well --

5            MS. KELLEY:  I think the statute in Maine that he

6    was convicted under is equivalent to an indecent A and B in

7    Massachusetts.

8            THE COURT:  So would you just be resting on that

9    for the part one step?

10           MR. QUINLIVAN:  Yes.  We are obtaining certified

11   copies of those --

12           THE COURT:  So would the trial only look like a --

13   basically what the psychiatrists think that means?

14           MR. QUINLIVAN:  Yes.  That's from our perspective.

15   With respect to these two, you know, we don't anticipate and

16   aren't intending factual testimony.  We're intending to just

17   offer those convictions.

18           THE COURT:  Are there any statements from

19   Mr. Shields to psychiatrists or anything like that?

20           MR. QUINLIVAN:  There is with Mr. Peavy, not with

21   Mr. Shields.

22           THE COURT:  Shields is the first one, is that

23   right?

24           MR. QUINLIVAN:  Yes.

25           THE COURT:  So I'm trying to figure out, so for

1    the very first trial, I will not have the issue of

2    statements, right?  I will not have the -- is that right, I

3    will not have the issue of statements of psychiatrists?

4            MS. KELLEY:  We have just received quite a stack

5    of his counseling records from the BOP.  I'm not certain

6    until I go through them carefully, because some of them I

7    have not seen before, whether we would even want to exclude

8    those or not.  And one of the things we would like to ask

9    your Honor this morning, the defendants, is to give us a

10   chance to review exactly what we've received from the

11   government.  I have a stack about like this that we got the

12   day before yesterday, so I've started to go through it.  A

13   lot of it is handwritten notes, and it's a little bit tricky

14   to decipher.  But if we could just review what we've been

15   given, have a couple days to talk to the government about

16   whether we want additional materials and which of those

17   materials we would want to keep, number one, experts who are

18   going to be testifying from reviewing, because we may argue

19   that some of that should not be seen by the experts, and/or

20   just keep it out at trial.

21           THE COURT:  Was there a signed waiver?

22           MS. KELLEY:  Well, that's a whole question whether

23   there was a waiver and what the waiver was for.

24           THE COURT:  Was there a signed waiver?

25           MR. QUINLIVAN:  There was a signed waiver in both

1    cases, yes.

2         MR. FICK:  Well, I think the question is a signed

3    waiver for what?  There was a statement -- when the whole

4    Adam Walsh commitment process began, the defendants signed a

5    statement saying, "I understand I am being evaluated."  We

6    would argue that that's a long way from informed consent.

7    There may also be old records of interviews or counseling

8    with these people where we don't know yet whether there's

9    consent or not because we haven't gone through the records.

10        THE COURT:  Well, I guess I'm just trying to

11   figure out.  I had anticipated an advisory jury trial if

12   there were a question about the facts of the prior

13   conviction -- not the conviction -- the prior sexual

14   offense.  It sounds as if I don't need to do that.

15        MR. FICK:  Well, whether there is a conviction as

16   a predicate I think in these cases, it is clear you don't

17   have to do that.  But where it becomes tricky is

18   potentially, though, to the extent the experts placed

19   importance on the actual nature of the conduct underlying

20   the conviction, then we may get into disputes about, well,

21   do you admit the police report?  Do you need live witnesses?

22   If there were a federal sentencing, of course, Shepard would

23   preclude the Court from looking at those things other than

24   the fact of conviction.  Here, though, the experts may well

25   think, "Well, we really need to know what happened."  So

1   until we dig down a little bit deeper to that level --

2          THE COURT:  It's not a sentencing, so I don't know

3   which way that cuts.  When it's a hearing, I don't know if

4   the Rules of Evidence apply even.  What happens in state

5   court?  The Rules of Evidence apply, right?

6          MR. TENNEN:  It essentially all comes out through

7   case law, and they've created case law rules about what

8   comes in and what doesn't come in.  A lot more does come in

9   in state court than in a regular case, but --

10         THE COURT:  And a lot comes in through an expert

11   who can rely on what an expert will rely on.

12         MR. TENNEN:  It does.

13         THE COURT:  So it sounds as if, if it's just about

14   whether or not they're likely to be dangerous in the future,

15   the prospective piece of it, if you will, I don't know if

16   I'll have an advisory jury trial.  What I was hoping, to

17   have an advisory jury trial if there was no prior

18   conviction.  I have to think about that.

19         MR. TENNEN:  Can I also just add, in state court,

20   at least the statute is a lot clearer about what records

21   they do allow in, and that's normally what the courts play

22   off of.  So they say the statute has a list of, you know,

23   "shall be admissible," whatever it is, police reports,

24   treatment records, et cetera; and that's where they obviate

25   the need for witness testimony because the statute is very

1    explicit in what records can come in in lieu of testimony,

2    and that's the fault we have here.

3                    THE COURT:  Does it say in the statute whether the

4    Rules of Evidence apply?

5                    MR. QUINLIVAN:  I don't believe it says that in

6    the statute.

7                    THE COURT:  One way or another?

8                    MR. QUINLIVAN:  I don't believe it does, that's

9    right.

10                   THE COURT:  Do you know whether any court has

11   addressed that issue in the context of any of these state

12   statutes if it's not in the statute itself?

13                   MR. TENNEN:  I'm sorry?  If it's not -- well, in

14   the Rules of Civil Procedure, actually in state and federal,

15   I don't know which one it is, but towards the end, 81 or

16   something along those lines, there's a list of, "In the

17   following cases, the Rules of Civil Procedure do not apply,"

18   and there's a laundry list.

19                   THE COURT:  Evidence?  The Rules of Evidence?

20                   MR. TENNEN:  Oh, evidence.  I'm sorry.  Well, no,

21   again, in state court they just -- it's all based on what

22   the statute explicitly says, and the courts will fill in the

23   blanks.

24                   THE COURT:  It's an interesting area.  Do you know

25   whether --

1          MR. FARQUHAR:  No, your Honor, but I will --

2          THE COURT:  -- I should treat this in the

3    commitment hearings under 4246, is that it?  Do you know

4    whether --

5          MR. QUINLIVAN:  In the hearings that at least I've

6    done, that issue has not come up.  I mean, it's usually just

7    been -- the court has heard testimony from a court-appointed

8    expert, but I don't recall that specific issue yet coming

9    up.

10         MR. FARQUHAR:  And if I might add too, your Honor,

11   particularly in those cases, the court-appointed expert can

12   also instruct the court on what items that expert relied

13   upon.  And I think where we're getting a bit muddled up here

14   is, if the expert relies upon information that goes back to

15   the conviction, then certainly this Court can hear

16   testimony, it would be our opinion, on what that expert

17   relied upon.

18              Now, my brothers and sisters here are basically

19   stating that, well, if they relied upon, let's say, a police

20   report or something from the underlying conviction, that's

21   something that we actually have to prove here first before

22   that can be shown that it's something that can be relied

23   upon.  We would say "no."  If you're asking for what will

24   this person potentially do in the future, what did you look

25   at in the person's past and over the time period the person

1  was incarcerated with the BOP that would lead you to believe

2  that?

3          THE COURT:  Well, it sounds like you're right,

4  experts do that.  On the other hand, they can impeach the

5  credibility of the expert if in fact they prove it didn't

6  actually happen.

7          MR. FARQUHAR:  That's correct, that's correct.

8          THE COURT:  For example, take your touching case.

9  Let's suppose it said he did all sorts of disgusting

10 touching, but in fact it turns out all he pled was to a

11 touching on the butt.  I mean, let me just -- I have no

12 idea, you know.  If the expert is relying on the grosser --

13 I'm sure I'm not using terms of arts -- the more disgusting

14 kinds of touching and saying dangerous in the future, and it

15 turns out that factually all he did was touch a butt, which

16 is still a crime, that may undercut the credibility of the

17 expert's opinion.  I'm thinking out loud, but the facts may

18 be relevant.

19          MS. KELLEY:  Well, for example, in Mr. Shields's

20 case, which you're going to hear shortly, I think, if we

21 keep this date, which I hope we do --

22          THE COURT:  Well, we will.

23          MS. KELLEY:  In Mr. Shields case, one of his

24 convictions was for touching an underage boy -- I believe he

25 was a teenager, but he was underage -- in a bathroom.  And

1   one of the documents we have states that he touched the boy

2   under his clothes, and Mr. Shields's contention is it was

3   over the clothes.  Now, whether that would have a big impact

4   on the expert's opinion of his future dangerousness or not,

5   I don't know.

6           THE COURT:  That's a better example than mine

7   because it's right from the facts.  I don't know either.

8           MS. KELLEY:  Right.

9           THE COURT:  And they're both crimes.

10           MR. FARQUHAR:  Correct.  I mean, depending upon

11   where the touching might be, quite frankly, and you would

12   have to then, of course, find out from the expert, what did

13   the person in their time at the BOP exhibit as to why you

14   thought this person would be a continuing threat?

15           THE COURT:  What do you all think about the use --

16   I was quite sure I was going to use an advisory jury, quite

17   sure, if there were no prior convictions as to the

18   underlying fact of the crime.  I wasn't sure that I was

19   required to do it or I would do it as a matter of

20   discretion, but now I'm looking on the second piece which is

21   prospective.  Do either of you want a jury?

22           MR. FICK:  On a case-by-case basis, I think we

23   would like to leave the possibility open.  I mean, in the

24   state system, the jury, as I understand it, is there

25   precisely for the purpose of assessing the testimony about

1  future dangerousness, and so I don't know that you'd want

2  the --

3           THE COURT:  Do you want one?  You both need to

4  think about that.

5           MR. FICK:  Well, and part of that is, we've got to

6  review these records and see what they say and think about

7  whether we want a jury in the individual case, but I think

8  the possibility is something that we would like to keep in

9  place.

10          THE COURT:  The irony is, a lot of times it's the

11 one area where defense counsel waive the right to jury, at

12 least on the criminal side, in the state courts.  So I don't

13 know what you would want, and that would help guide me, if

14 you both wanted an advisory jury.

15          MR. FICK:  Certainly, your Honor, before the

16 hearing, I expect we would file something with the Court

17 expressing our preference explicitly and saying why, is what

18 I would suspect.

19          THE COURT:  So we need at this point a full

20 pretrial order.  I'm going to treat it -- it says

21 "hearing" -- like a trial, right?

22          MR. FICK:  It is essentially a trial, I agree.

23          THE COURT:  It's essentially a trial, right?

24          MS. KELLEY:  Yes.

25          THE COURT:  I don't know if the Rules of Evidence

1   apply.  We should probably take a look at that.

2           MR. TENNEN:  Just to add on that point, there are

3   certainly constitutional limitations to certain types of

4   evidence coming in that would be at play, just general due

5   process considerations that come into play on all levels of

6   trials and hearings less than, you know, a probation

7   hearing, for example, or something along those lines.  I

8   mean, there's certainly some limitations that have to apply,

9   just constitutionally, whatever other rules we put in place

10  to limit it.

11          THE COURT:  Well, hearsay is typically

12  allowed without due process violations but only if it's

13  reliable.

14          MR. TENNEN:  Exactly.  I mean, there's certain

15  types of hearsay.

16          THE COURT:  I'd have to think long and hard, for

17  example, before I let you subpoena that little boy in, you

18  know.  I don't know how far to go on that stuff.  I don't

19  know.  But what about the charging police officer who

20  interviewed the boy, and then the question is, on the fresh

21  complaint, would we allow the police officer to testify

22  about the fresh complaint?  And I don't know whether this

23  looks like retrying that or not.

24          MS. KELLEY:  I don't foresee that kind of detail

25  or bringing in those kinds of witnesses, your Honor.  In

1    Mr. Shields's case, we have two guilty pleas.  He didn't

2    have jury trials.  So even under Shepard, I think it would

3    be -- you know, one reliable document would be a transcript

4    of the guilty plea, if you're interested in the underlying

5    facts and what precisely did he plead guilty to.  So --

6            THE COURT:  All right, so why don't we do this.

7    At this point we know more than we did last time but not a

8    lot more, so I'm open to an advisory jury.  Before, as I

9    said, if it was going to be a factual predicate, I was going

10   to insist on it.  I'm nowhere near as firm right now.  So

11   when do you think -- let's just go through -- this is

12   essentially like an expedited civil case.  Did we set all

13   sorts of deadlines last time?  I don't think we did.  Is

14   anyone anticipating any kind of civil discovery other this

15   document exchange?

16           MS. KELLEY:  We are.  The government is making a

17   proposal, I believe today, that the Court appoint another

18   expert.  We have just received the credentials of that

19   person.  They're a BOP employee, and we're going to --

20           THE COURT:  So I appointed someone that you both

21   agreed on, right?

22           MS. KELLEY:  Yes.

23           THE COURT:  Everyone agreed on?

24           MR. QUINLIVAN:  Yes, and I was going to raise this

25   issue.  The expert who the government is going to be relying

1   on, we're going to be asking the Court to allow him to

2   conduct a psychological examination of the respondents.  The

3   statute allows more than one expert to be appointed.  He is

4   a BOP employee, but I can tell the Court that we're going

5   to, you know --

6            THE COURT:  Can't he decline, this guy Shields, I

7   guess, at this point decline?

8            MR. QUINLIVAN:  That's an issue that we've talked

9   about.  I mean, I think from our perspective, you know, I'm

10  not sure they could selectively invoke their Fifth Amendment

11  rights, you know, with respect to one examiner and not with

12  respect to the Court-appointed.

13           THE COURT:  So let me just take one step.  So it's

14  not a slam dunk that I'm going to do this if the follow on

15  from that is -- I don't want to be putting them in jail for

16  refusing to talk to your person.  This is new to me.  I've

17  already appointed an independent examiner that both people

18  agreed on.  You agreed on, right?

19           MR. QUINLIVAN:  We didn't oppose, that's right,

20  but, I mean, we think that the statute allows for more than

21  one psychological examination.

22           THE COURT:  Maybe it does and maybe it doesn't,

23  but I'm not here to waive his Fifth Amendment rights.  I

24  don't know.  It's just pulling something that's new to me.

25           MR. QUINLIVAN:  No, I understand, and I would say,

1    in the civil context, I mean, in the civil context, at most,

2    my understanding with Fifth Amendment is, you know, an

3    adverse inference is taken.  I don't think there would be

4    any issue about, you know, incarcerating him.  But, you

5    know, this is something we've preliminarily talked about.

6    We do intend to file a request with your Honor.  At bottom,

7    you know, we think, you know, your Honor should have as much

8    information as possible in making this determination.

9              THE COURT:  Well, is this the BOP person who

10   initially was the basis of the certification?

11             MR. QUINLIVAN:  No, it's not.  It's a --

12             THE COURT:  Can't that person -- I assume you had

13   a psychiatrist make that determination.

14             MR. QUINLIVAN:  No, we did, but --

15             THE COURT:  So let him testify in the government's

16   corner.  He's already examined him, right?

17             MR. QUINLIVAN:  No, we absolutely could, your

18   Honor.  And to a certain extent we're taking the risk

19   because this person has not yet examined the respondents and

20   might not come to the same conclusion.  So we're willing to

21   take --

22             THE COURT:  Where does this end with you?  Let's

23   suppose I appoint them -- maybe you're right that you can

24   appoint two -- and he declines to be interviewed?  Then

25   what?

1          MR. QUINLIVAN:  Well, I think, from our

2     perspective, I mean, he could decline to be interviewed, but

3     I think he would -- I'm not sure he could decline to be

4     interviewed by one but be interviewed by others.

5          THE COURT:  So then you would come to me with an

6     order, right?

7          MR. QUINLIVAN:  Yes, presumably.

8          THE COURT:  And I end up putting him in jail for

9     contempt?  It just ends up being an ugly scene.

10         MR. QUINLIVAN:  I understand, your Honor, and I

11    don't think we would be asking your Honor -- in the civil

12    context, when Fifth Amendment rights are invoked,

13    ordinarily, you know, unless there's some kind of user, you

14    know, order, ordinarily all the government does is say that

15    an adverse inference can be taken.  It doesn't -- we're

16    certainly not asking that they be incarcerated.  In any

17    event, I mean, they --

18         THE COURT:  They may well have a Fifth Amendment

19    privilege if it's material beyond which the independent, the

20    neutral, the independent person, right?

21         MR. FICK:  I guess, your Honor, several issues.

22    The first is, I'm not sure there's really any basis, quite

23    apart from the Fifth Amendment, to require any of the

24    respondents to participate in an evaluation process; and

25    certainly an evaluation can be done based on the records,

1    which is really the basis of a lot of these actuarial

2    instruments that are used, in any event, for determinations

3    of dangerousness.

4              THE COURT:  What happens in the state courts when

5    an independent person is appointed?

6              MR. TENNEN:  Well, again, the statutes are very

7    clear what happens there, and in the petitions for a

8    commitment, these initial petitions, essentially the person

9    has the choice whether to talk or not, and there's no

10   penalty one way or the other.  It's just uniform amongst all

11   the doctors.  And in the petitions coming out, once you're

12   being committed and you're trying to be released, the

13   statute itself is very clear that you have to talk, you

14   know, unless there's good cause not to.  So it's governed by

15   the statutes, and it's pretty much uniform among all the

16   persons who are doing the evaluation.

17             THE COURT:  Let me ask you because the flip side

18   hurts you too.  Suppose this neutral guy says, "Yeah, he's

19   dangerous"?

20             MR. TENNEN:  Well, and that's also, I mean --

21             THE COURT:  So if you get to put on an expert --

22             MR. TENNEN:  I mean, I am sure at that point we'd

23   be seeking and even now at this point are talking about

24   seeking our own independent person that we can talk to

25   outside of the court context.  I mean, the assumption is --

1          THE COURT:  The government could do that too.  I

2    mean, you can't say one thing and then --

3          MR. TENNEN:  I think it's all or none, to be

4    perfectly honest, either --

5          MR. FICK:  Well, the government, your Honor, could

6    certainly do it, but the question is, you know, does the

7    respondent have to talk to the government's person?  And I

8    think the statute here is clear that the Court certainly can

9    appoint more than one person, but it's all framed in terms

10   of the Court can appoint an evaluator for the Court.  The

11   defense can request another one.  There's certainly no

12   provision for the government to ask the Court to appoint an

13   employee of the government, of the very institution that's

14   seeking certification, as another expert.  Certainly the

15   government can have their expert look at the records, look

16   at what the other evaluators say the respondents said, but

17   I'm not sure our clients have to talk to the government's

18   expert.

19          THE COURT:  Suppose they wanted another expert

20   outside the Bureau of Prisons, would you have the objection?

21          MS. KELLEY:  I would still object at this stage.

22   I mean, first of all, I know it's through no fault of their

23   own, but the government gave us this discovery late.  We're

24   bumping up against all kinds of deadlines now.

25          THE COURT:  That's why I'm doing this now.  Let me

1   do this --

2          MS. KELLEY:  We would need to depose the person.

3   I'm just really concerned about the time frame here.

4          MR. TENNEN:  Can I add one more thing about the

5   state scheme?

6          THE COURT:  I don't know what I'm going to do, let

7   me just say this, but I do know one thing, which is, I'm not

8   getting into this whole thing.  If he declines to testify on

9   the grounds of the Fifth, the best you get is an adverse

10  inference.  I'm not going to hold a contempt proceeding and

11  order him to.  If he takes the Fifth, and then you're going

12  to say, well, he waived it with one rather than the other, I

13  think that's a really unseemly place for this to be right

14  now.  I think you can have your own expert, and you can have

15  your own expert, but I don't know why I should appoint more

16  than one, period.  I don't know why at this point.  Maybe in

17  another case I will.  This is a fairly simple one, two prior

18  convictions, right?  It doesn't sound -- I don't know enough

19  about him.  Did he say something to the psychiatrist that "I

20  can't stop touching"?

21         MS. KELLEY:  No.  In fact, quite the opposite.  He

22  went through counseling at Butner.  He had a very successful

23  treatment there.  We may well call the woman who treated him

24  at Butner for counseling.  He did not enter sex offender

25  treatment, but he was in individual therapy, very intense

1   therapy with a therapist there at Butner for years.  You

2   know, one of his convictions obviously is seventeen years

3   old.

4             THE COURT:  What was he found guilty of?

5             MS. KELLEY:  He was in jail for child pornography,

6   not a touching, so --

7             THE COURT:  Isn't there some study that shows

8   connections?

9             MR. TENNEN:  No.

10            MS. KELLEY:  That study is so flawed, it was not

11   able to be published.

12            MR. FICK:  The BOP actually withdrew the study.  I

13   mean, it was sort of floated out there, talked about, and

14   then the BOP formally withdrew it.  We may actually be

15   seeking some discovery about that to the extent it may come

16   up.

17            THE COURT:  Actually, it was vetted in some

18   majority judge's conference.  It's interesting.  I don't

19   know much about it other than I knew it was controversial.

20            Let me say this:  I don't know if I'm going to.

21   At this point this seems pretty straight -- there are lots

22   of things I don't know, but let's set deadlines.  You're

23   going to file your motion today.  You'll file an opposition

24   within a week, right?

25            MS. KELLEY:  Yes.

1          THE COURT:  Okay.  When is our trial date,

2     November what?  Let's work backwards.

3          MS. KELLEY:  It's the week after Thanksgiving.

4          THE COURT:  I don't want to be doing motions

5     in limine over Thanksgiving weekend, so, ideally speaking,

6     we will have resolved them by then.  So if in fact the 26th

7     is the day of trial, what if we —— and I know we're coming

8     up against it, but what if we said that all motions

9     in limine would be filed with respect to all these issues on

10    November 5?  And then the opposition on the 12th, then we

11    hold a hearing on the week of the 12th, and ideally I'll

12    rule before you walk into trial.

13         MR. FICK:  As a practical matter, we might need to

14    really do this even earlier because part of the issue is

15    going to be, if something we believe needs to be excluded,

16    we're not going to want the expert to he see it, and so it's

17    going to have to be a quick turnaround, I think, where we

18    either agree ——

19         THE COURT:  I'm not preventing you from doing it

20    earlier, this is just the drop—dead date kind of thing,

21    because right now it's October 18.  As you point out, it's

22    not a whole lot of time here.  So my theory is —— when is

23    the expert going to meet with him?

24         MR. TENNEN:  That's part of the problem he's going

25    to face.  Normally they like to look at the records before

1   going out and talk to the person.  He needs to get a sense

2   of the background.

3             THE COURT:  He should be able to look at

4   everything that the Bureau of Prisons looked at.

5             MR. TENNEN:  This is the conflict.  There are some

6   things that we believe --

7             THE COURT:  Like what?

8             MR. FICK:  Well, to the extent there was an

9   evaluation of these guys for the Adam Walsh Act where they

10  were presented with this piece of paper saying, "You're

11  going to be evaluated, sign this," and then they talked, we

12  may well take the position that that was not voluntary

13  consent.

14            THE COURT:  Can I just say something?  You're the

15  one pushing this early trial date, and I understand why.  I

16  mean, it took forever to brief this thing.  The briefing was

17  fabulous, but it took six months, whatever it took, and, you

18  know, we're working on it as we speak.  But you can't have

19  it both ways.  At some point I'm not going to be an ATM

20  machine.  This is all brand-new turf.  You need to be able

21  to get it in in a way that there's at least a week's

22  opposition period, and then at least a week for me to rule,

23  and then enough time for the experts.  I mean, we're there,

24  we're right up against it right now.  Somebody asked for

25  another deferring on the hearing.  I can't do that.  Really,

1  we've got a month.  That's huge if you want this November

2  date.

3           MS. KELLEY:  Well, can I make a suggestion, which

4  is that may we see the Court next Friday, the 26th?  And

5  that way, if we don't need to see the Court, we can notify

6  Mr. Alba, but --

7           THE COURT:  But seeing me isn't going to help

8  because it's just like some of these issues, I'm spewing off

9  the top of my head:  Do we need Rules of Evidence?  What

10  about an advisory jury?  What about waiver?  I won't give

11  you an answer.  It won't be thoughtful.  I need something in

12  writing, a point/counterpoint, just the way we always do

13  things.  And you're all just so excellent.  The briefing, as

14  I said, was fabulous, and it helps me.  I won't give you a

15  good answer.  I'll be sitting here just sort of talking off

16  the top of my head:  Oh, I can't remember if the Rules of

17  Evidence apply to a civil commitment proceeding, right?

18           So you tell me when you can get a motion.  What

19  I'm saying is on the drop-dead date, any motions in limine

20  should be filed on November 5, any opposition by the 12th.

21  When can we have a hearing in the afternoon of that week

22  following the 12th, Robert?

23           THE CLERK:  That would be the 16th at 4:00.

24           THE COURT:  No.

25           (Discussion off the record.)

1            THE COURT:  How about 3:00 o'clock on the 16th?

2            MR. FARQUHAR:  That's fine, your Honor.

3            THE COURT:  So we'll have a hearing on at least

4    any motions in limine that are filed.  But here's the thing.

5    Now, any position that you have on advisory jury trial I'm

6    going to need to let the jury commissioner know.  I'm torn.

7    I think in the state court system, it adds a certain degree

8    of legitimacy, both for the defendant and the public,

9    whatever happens.  If the person is let go, a jury has said

10   it; if the person is held, a jury has said it.  It adds a

11   certain degree of legitimacy.  On the other hand, I don't

12   think it's constitutionally required, and sometimes defense

13   don't want it and sometimes they do, and sometimes

14   prosecutors want it.  It just depends, I suppose.

15           MS. KELLEY:  Well, your Honor, if we could just

16   have a few days to look at the discovery.  My impression is,

17   for Mr. Shields, we would be asking the Court for an

18   advisory jury, and I'll file something relatively soon on

19   that point.  I just think it's totally up to the Court's

20   discretion.  Under Rules of Civil Procedure, you can do it

21   if you want to, and it's just a question, do you want --

22           THE COURT:  Well, I knew I was going to do it if

23   there wasn't a prior conviction, and now I've got to think

24   about it.  But I must say, for the reasons I just said,

25   especially for the first trial out of the box here, it

1  wouldn't be such a terrible thing to have a jury speak its

2  mind; and then of course, because it's ultimately my say, I

3  would have to decide what weight to give to that.  But,

4  anyway, I'd be willing to do it for sure if you both agreed.

5  If you disagreed, I'll think about it.  I just think that it

6  is a culture of Massachusetts that we have juries do this,

7  and that means something; you know, why should you get a

8  jury on the stateside and not the federal side?  I'm

9  thinking out loud, but I'm inclined to do it if you all want

10  it; and if there's a disagreement, let's just vet it by that

11  timetable.

12          Now, on the waiver point, that's got to move a lot

13  faster.

14          MR. FICK:  I think, your Honor, if we have a

15  disagreement with the government about that, we would try to

16  file something next week, in the first part of next week to

17  put that issue in play.  The government can oppose it, and

18  then you can either set a hearing or decide on the papers.

19          THE COURT:  Have you looked at it?

20          MR. QUINLIVAN:  Yes.  There was sort of a standard

21  form that both Mr. Shields and Mr. Peavy signed.

22          THE COURT:  And what does it say?

23          MR. QUINLIVAN:  Paraphrasing, it basically says

24  that "For purposes of the interview, one of the things that

25  could result is a determination that you're a sexually

1    dangerous person under the --" I don't know if it says the

2    Adam Walsh Act.

3              THE COURT:  And does it say "and you could be

4    held"?

5              MR. FICK:  It does, your Honor, but the problem

6    with it is, it just says, "We are going to do this.  Sign

7    this to say you understand we are going to do this."  It

8    doesn't give the defendant any choice about, you know, "You

9    don't have to talk to us.  You can ask for a lawyer."  It

10   says nothing -- it doesn't require any kind of consent.  It

11   just says, "I understand you're going to do this."  And from

12   our point of view, that's problematic.

13             THE COURT:  It doesn't say "waiver"?

14             MR. FICK:  No.

15             THE COURT:  Is that right?

16             MR. FICK:  It's a notice of psychological

17   evaluation or something like that is the way it's styled.

18             THE COURT:  So it's not clear they had a choice.

19             MS. KELLEY:  Well, I think on Mr. Shields's behalf

20   too, I need to look more closely at what the body of records

21   is and what we're wishing to keep out, if anything, and then

22   I think we will all file something next week, because

23   especially if we don't want the evaluator to see certain

24   records, which happens in state court quite frequently, the

25   evaluator is given certain materials and not given other

1   inadmissible things, so --

2           THE COURT:  What happens in state court with

3   respect to the waiver?  Is it not an issue?

4           MR. TENNEN:  Well, again, it's a little different,

5   and it's all governed by statute.  It depends if you're

6   going in or coming out.  In terms of whether you have to

7   talk to the experts, is that your question?

8           MS. KELLEY:  The records.

9           MR. TENNEN:  Oh, the records?  Both of those

10  issues, whether you have to talk or not and what records are

11  admissible, all in the statute.  So if you're --

12          THE COURT:  What does the statute say?  Do you

13  have to talk?

14          MR. TENNEN:  Again, if the Commonwealth is trying

15  to petition for your civil commitment, you do not.  It's up

16  to you essentially.  If you are petitioning for release, you

17  do unless there's good cause, so --

18          THE COURT:  It shifts.

19          MR. TENNEN:  It does.  Essentially they can't

20  force you to talk when they're trying to put you in, but

21  when you're coming out, I guess they think they can.  In

22  terms of the records, it's the same thing.  The records that

23  come in --

24          THE COURT:  Suppose I say there wasn't a valid

25  waiver because it doesn't give them a choice, what then

1  happens?

2          MR. FICK:  Well, I think we would seek then to

3  redact any information going to the independent expert that

4  reflects statements made by the respondents in these Adam

5  Walsh evaluations.

6          MR. QUINLIVAN:  I think that -- I mean, obviously

7  we're going to be opposing, but I think that's probably

8  right.  I don't think it would call into question the

9  certifications themselves.  I think the question then would

10  be what information would have to be redacted.

11          THE COURT:  So this is called a notice, not a

12  waiver?

13          MR. QUINLIVAN:  Just off the top of my head, I

14  don't remember the title of it.  I don't know if the word

15  "waiver" is in there.  It's almost a page-long document.

16          THE COURT:  Does it say like a Miranda right, "You

17  have the right not to --"

18          MR. QUINLIVAN:  No, it does not say that, but it's

19  more in the terms --

20          THE COURT:  Do you think you have a right not to?

21          MR. QUINLIVAN:  To?  I'm sorry?

22          THE COURT:  Do you think you have a right not to

23  talk to the psychiatrist?

24          MR. QUINLIVAN:  I think anyone, certainly, I mean,

25  I think that they have the right not to.  I think the only

1  question becomes whether they have the right to selectively

2  invoke the Fifth Amendment privilege with respect to one

3  examiner versus another.

4  Again, to the extent one or both respondents do

5  that, all we would -- at most, what we would be saying is an

6  adverse inference would be taken.  But, you know, I guess

7  that's -- you know, I haven't looked at this closely, but my

8  sense is that, you know, everyone has the right to invoke

9  their Fifth Amendment rights in an appropriate context.  The

10  only question becomes whether or not you can do it

11  selectively.

12  MR. FICK:  I think your Honor in some ways is

13  beginning to mix two questions because the question of

14  whether statements made while still inside the BOP prior to

15  certification were proper versus whether they have to talk

16  to one, two, or three experts now, I think those are

17  distinguishable questions.

18  MS. KELLEY:  I had one other matter I wanted to

19  raise with the Court.

20  THE COURT:  And you think I'm going to resolve all

21  this by the November 26 date?  That's daunting.

22  MS. KELLEY:  I plan to file today or tomorrow a

23  motion to dismiss Mr. Shields's case entirely because as I

24  was just looking at the BOP computation sheets, it seems to

25  me that the government filed his certification one day after

1    I think he should have been released from custody.  You

2    know, the statute says "A person in the custody of the BOP

3    may be certified."  So one of the issues for all of us is,

4    was our client's sentences calculated properly?  And I

5    think --

6              THE COURT:  There's no way I'm going to resolve

7    that all by November 26.  It's not going to happen.  It may

8    be a valid post-hearing decision.  It's just not going to

9    happen.  My big issue immediately is to have this expert

10   interview him.

11             MS. KELLEY:  Okay.

12             THE COURT:  And if you take the most extreme

13   position, you're saying that they're not allowed to look at

14   anything post the Adam Walsh Act?

15             MR. FICK:  No.  I think, your Honor, the question

16   is, can they look at purported statements of the respondent

17   made to BOP personnel in the process of being evaluated?  So

18   if we decide we have to disagree about that issue, we will

19   file something with the Court; and if the Court were to rule

20   that it needs to be excluded, it would be a relatively

21   simple process, I think, of redaction.

22             THE COURT:  Why wouldn't everything come in?

23   Wouldn't everything after the notice -- if you say it was an

24   invalid waiver, everything he said after that -- I mean, I

25   wouldn't pick and choose.

1          MR. TENNEN:  Perhaps the confusion is, there

2     aren't that many documents generated other than the

3     interview that he had with the BOP personnel in preparation

4     for the certification.

5          THE COURT:  I see, but there's a whole range of

6     discussions prior?  Is that right?

7          MR. FICK:  Potentially, yes.  Certain of the

8     clients were in counseling, perhaps for even years before.

9     There may be a separate issue about that.

10          THE COURT:  I see, so this is just like the tail

11     end of it?

12          MR. TENNEN:  It's a relatively small part of the

13     records.  I think largely we agree on most of the records.

14          THE COURT:  Thank you.  That's very helpful.  I

15     had this image -- because at some point do they sign a

16     general waiver when they talk to the psychiatrist at Butner

17     for all these years?

18          MS. KELLEY:  Well, let's take Mr. Wetmore whose

19     case you will see eventually.

20          THE COURT:  That's your tough nut case.

21          MS. KELLEY:  Yes, ma'am, he is.  He was in the sex

22     offender treatment program down in Butner, and he signed a

23     waiver that said, "I understand that the things I divulge in

24     this treatment may be released to the BOP."  So ostensibly

25     you could say, okay, anything he says in treatment at Butner

1    we can use to certify him as a sexually dangerous person.

2    But when he signed that waiver, the Adam Walsh Act wasn't

3    even in existence.

4            THE COURT:  That's a harder case for you than when

5    you know about it and you don't say that you don't have the

6    right to talk.  I mean, that comes up in all sorts of

7    different contexts, that kind of an issue, but --

8            MS. KELLEY:  Well, also --

9            THE COURT:  Well, all the Guidelines and the

10   enhancements and the this and the that.  But, anyway, I

11   think I hear the issue come up.  I think we've got a time

12   line.  The key thing is, can you both think and take a

13   position within a week on the jury issue?

14           MR. QUINLIVAN:  Yes, absolutely.

15           THE COURT:  What I would hope to do is maybe call

16   up -- I'm told Ralph Gants, Diane Kottmyer, there are a

17   bunch of judges in the state court that do a lot of this

18   stuff, and get some jury instructions and adapt them for the

19   federal side.

20           MR. TENNEN:  We can certainly supply you with

21   suggested jury instructions.

22           (Laughter.)

23           MS. KELLEY:  But, your Honor, I am going to file

24   this motion to dismiss which might negate the necessity for

25   the whole proceeding.

1          THE COURT:  Yes, maybe.  It's just I'll need an

2    opposition period, and then I'll need to think about it, and

3    just assume it's not right now.

4          MS. KELLEY:  Okay.  Well --

5          THE COURT:  But maybe it's something that happens

6    post, you know, like, I just worry about afterwards.

7          MS. KELLEY:  Okay.

8          THE COURT:  But even if I did, it just moves right

9    into -- I'm going to just do Shields and then right into

10   Peavy.  So what's Peavy's background?

11         MR. FICK:  Well, he has a long history of various

12   psychological problems and he's had a stroke, and so there's

13   years and years and years of records with the guy.  You

14   know, but I think it's still, relatively speaking, a

15   straightforward case.  We'll have the doctor look at him,

16   look at the records --

17         THE COURT:  What's his prior conviction?  What's

18   he in on?

19         MR. FICK:  Well, he was in for a touching of a

20   nurse at VA facility for six months was the offense for

21   which he was in federal custody.  He has, though, dating

22   back to the '70s a couple of very serious sexual assault

23   convictions.

24         MS. KELLEY:  On adults.

25         MR. FICK:  On adults.

1        MR. QUINLIVAN:  Including he actually has a rape

2   conviction as well, Mr. Peavy.

3        THE COURT:  How many rape convictions?

4        MR. QUINLIVAN:  He has a rape conviction from

5   1978, and then sexual assault and/or contact convictions as

6   well.

7        THE COURT:  All right, so I think, although I'm

8   not setting absolute deadlines now -- there are two lawyers

9   for the government and three for you -- we should be putting

10  Peavy on a similar track.

11       MR. FICK:  Yes, your Honor.  I mean, our hope was

12  to really, whether Shields goes forward or not, was to do

13  Peavy as soon as possible thereafter, and so, you know, if

14  he can get bumped up --

15       THE COURT:  Suppose they missed it by a few days

16  on Shields, what would your position be?  I mean, what if

17  it's clear, it's not one of these bean-counting things to

18  figure out, what if they miss it by a day or two?

19       MS. KELLEY:  It's pretty straightforward actually.

20  What happened was, they didn't credit him with the time from

21  the date of his arrest for some reason, and we've finally

22  been able to get the Penobscot County jail to verify.  He

23  wasn't arrested on the 20th of September, 2002; he was

24  arrested on the 18th and was in custody for those two days.

25  They certified him on their own records the day before he

1  was to be released, so they missed him by a day.  He should

2  have been released --

3            THE COURT:  See, but this is the kind of thing

4  that is not so simple because I don't know if he was

5  arrested on a state warrant for a separate charge.  I don't

6  know.  Just, you know, I've had this come up in my own

7  sentencings, you know, do you get state time credit for

8  these things?  Well, it depends, he was picked up on a state

9  charge; and then it's up to the judge often to figure out

10  whether the state time gets credited to the federal.  You

11  need to go look this stuff up.  You may end up being right.

12            MS. KELLEY:  Well, he was given -- he was picked

13  up on a state warrant, and he was given all the credit on

14  state time for 375 days of credit, but it should have been

15  377.  That's our contention, so --

16            THE COURT:  It doesn't sound simple, but you may

17  be right.

18            MS. KELLEY:  Okay.

19            MR. QUINLIVAN:  I mean, I haven't seen the

20  pleadings yet.  I mean, Ms. Kelley has informed me about

21  this, but we'll take a look and we'll respond.  I haven't

22  seen any of the particulars.

23            THE COURT:  If it's clear-cut, like, let's say it

24  was a true that they just made a mistake --

25            MR. QUINLIVAN:  Well, I think your Honor is

1   exactly right, it's not -- I don't think it would even then

2   be fair --

3           THE COURT:  It does strike me as jurisdictional,

4   right?

5           MR. QUINLIVAN:  I don't know if it's

6   jurisdictional.  I don't know, you know, whether this is a

7   collateral challenge to the BOP's determination.  I don't

8   know if it would be jurisdictional, and that's one of the

9   things we'd respond in writing.  I have to see their

10  argument before --

11          THE COURT:  But I don't know if it's

12  jurisdictional if by accident they're still holding him, and

13  they shouldn't have been holding him, as opposed to if he

14  was released a day in supervised release, and then they said

15  "whoops."  I think then it's too late for you.

16          MR. QUINLIVAN:  I think that might be the case.

17  There is no question here he was absolutely in BOP custody

18  when the certification was made, so the question -- so I

19  don't think it's as simple as saying --

20          THE COURT:  I don't think it's as simple either,

21  okay, but I do think -- I mean, I was thinking about it

22  because one of the guys when I was reading the North

23  Carolina case, really interesting, he was on probation, and

24  he got revoked for something, you know, like all the things

25  that you get revoked for, and it was during the revocation

1   period that he got certified.  So it's really interesting.

2   He was on nine months, I think, probation.  I read some of

3   the factual background.  Anyway, I look forward to this.

4          Are we the first case in the nation that's

5   actually going to go to trial?

6          MS. KELLEY:  Yes.

7          THE COURT:  So I can't call anyone else?  Is there

8   anybody else scheduled that I could --

9          MR. TENNEN:  I think you're trailblazing, your

10  Honor.

11         MS. KELLEY:  No, there's no one else scheduled.

12  It's just you.  You're way out there.

13         THE COURT:  That North Carolina judge is on

14  appeal, right?

15         MR. FICK:  Yes.

16         THE COURT:  And what about Judge Tauro?  He's

17  usually faster than I am.

18         MS. KELLEY:  No.

19         THE COURT:  No, all right.

20         THE CLERK:  Court is in recess.

21         (Adjourned, 9:55 a.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Court Reporter, do

8  hereby certify that the foregoing transcript, Pages 1

9  through 39 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in MC No. 06-10427, United States

11 of America V. Jeffrey Shields, and thereafter by me reduced

12 to typewriting and is a true and accurate record of the

13 proceedings.

14           In witness whereof I have hereunto set my hand

15 this 15th day of May, 2009.

16

17

18

19

20

                /s/ Lee A. Marzilli
21          _____

            LEE A. MARZILLI, RPR, CRR
22          OFFICIAL COURT REPORTER

23

24

25